**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

RENEE GALLOWAY, DIANNE TURNER,
DOMINIQUE DE LA BAY, LORI
FITZGERALD, ANDREA SCARBOROUGH,
EARL BROWNE, ROSE MARIE BUCHERT,
REGINA NOLTE, KEVIN MINOR, TERESA
TITUS, BURRY POUGH, LISA MARTINEZ,
SONJI GRANDY, ANASTASIA SHERMAN,
JERRY AVENT, LUCINDA GRAY,
ANTHONY GREEN, LINDA MADISON,
DEREK GETER, KEISHA HAMM, FAITH
THOMAS, SHARON PAAVO, and
LATANYA TARLETON, *as individuals and
as representatives of the classes*,

                Plaintiffs,

    v.

JAMES WILLIAMS, JR., TRIBAL CHAIRMAN
OF THE LAC VIEUX DESERT BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS TRIBAL
COUNCIL, *in his individual and official capacities*;
MICHELLE HAZEN, *in her individual capacity*;
HENRY SMITH, VICE CHAIRMAN OF THE
LAC VIEUX DESERT BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS TRIBAL
COUNCIL, *in his official capacity*; ALICE
BRUNK, SECRETARY OF THE LAC VIEUX
DESERT BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS TRIBAL COUNCIL, *in her
official capacity*; ANDREA RUSSELL,
TREASURER OF THE LAC VIEUX DESERT
BAND OF LAKE SUPERIOR CHIPPEWA
INDIANS TRIBAL COUNCIL, *in her official
capacity*; TINA CARON, COUNCIL MEMBER
OF THE LAC VIEUX DESERT BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS TRIBAL
COUNCIL, *in her official capacity*; MITCHELL
MCGESHICK, COUNCIL MEMBER OF THE
LAC VIEUX DESERT BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS TRIBAL
COUNCIL, *in his official capacity*; JEFFERY
MCGESHICK, COUNCIL MEMBER OF THE

Case No. **3:19-cv-470**

**JURY TRIAL
DEMANDED**

LAC VIEUX DESERT BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS TRIBAL
COUNCIL, *in his official capacity*; ROBERTA
IVEY, COUNCIL MEMBER OF THE LAC
VIEUX DESERT BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS TRIBAL COUNCIL, *in her
official capacity*; and JUNE SAAD, COUNCIL
MEMBER OF THE LAC VIEUX DESERT BAND
OF LAKE SUPERIOR CHIPPEWA INDIANS
TRIBAL COUNCIL, *in her official capacity*.

Defendants.

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Renee Galloway, Dianne Turner, Dominique de la Bay, Lori Fitzgerald, Andrea Scarborough, Earl Browne, Rose Marie Buchert, Regina Nolte, Teresa Titus, Kevin Minor, Burry Pough, Lisa Martinez, Sonji Grandy, Anastasia Sherman, Jerry Avent, Lucinda Gray, Anthony Green, Linda Madison, Derek Geter, Keisha Hamm, Faith Thomas, Sharon Paavo, and Latanya Tarleton, *on behalf of themselves and all individuals similarly situated* ("Plaintiffs"), by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## GENERAL ALLEGATIONS

1.      This is a case about a scheme to make online usurious short-term loans (commonly called "payday loans"). These loans carry triple-digit interest rates, often exceeding 400%, and are illegal.

2.      Payday loans target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.      In recent years, payday lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws.

4.      In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

5.      Federal banking regulators shut down these "rent-a-bank" schemes. Michael A. Stegman, *Payday Lending*, 21 JOURNAL OF ECONOMIC PERSPECTIVES 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

6.      Some payday lenders have since developed a new method to attempt to avoid state usury laws—the "rent-a-tribe" scheme.

7.      In a rent-a-tribe scheme, the payday lender—which does most of its lending over the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and state law by purporting to piggy-back on the tribe's sovereign legal status and its general immunity from suit under federal and state laws. Using this doctrine, lenders argue that, because their businesses are located on a Native American reservation or are affiliated with a Native American tribe, they are bound by the laws of that reservation or tribe only, not applicable federal and state law. *See* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 759 (2012).

8.      Like its predecessor, this scheme is doomed to fail for at least two fundamental flaws in the structure of the scheme.

9.      First, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. By extension, the business does not occur on tribal lands but instead occurs in the state where the consumer is located.

10.     Second, even a cursory examination of the underlying relationship between the payday lender and the tribe demonstrates that the relationship is insufficient to permit the lender to avail itself of the tribe's immunity.

11.     Rent-a-tribe schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state and federal law, with the vast majority of the revenues going to non-tribal entities.

12.     In recent years, these rent-a-tribe schemes have come under increasing scrutiny from courts and regulators. Two prominent perpetrators were recently convicted and sentenced to prison for their roles.[1]

13.     This case is about one such rent-a-tribe scheme. This case involves a rent-a-tribe enterprise created and operated by Matt Martorello ("Matt Martorello")—a Chicago entrepreneur with no lineage to the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD"). Beginning in 2011, the enterprise made high-interest loans across the country to consumers in the name of Duck Creek Financial, LLC ("Duck Creek") and Red Rock Tribal Lending, LLC ("Red Rock")—two entities formed under the laws of the LVD for the dual purpose of avoiding state and

---

[1] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

federal laws and concealing the role of Matt Martorello's companies. Although Duck Creek and Red Rock were held out as the actual lender of the internet loans, the LVD and Red Rock had minimal involvement in the operations and received a mere 2% of the net profits from the loans. On the other hand, Martorello's companies, namely SourcePoint VI, Bellicose VI, and their parent companies, reaped nearly all the profits; provided the infrastructure to market, fund, and collect the loans; and controlled the day-to-day operations of the lending enterprise.

14.    Two years into its operation, regulators caught on to Red Rock's illegal loan products, starting with the New York Department of Financial Services issuing a cease and desist to Red Rock warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013). In response, Red Rock and Martorello did not shut down the enterprise. Rather, Red Rock filed a lawsuit in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Id*.

15.    The lawsuit completely backfired—the district court not only denied Red Rock's motion for a preliminary injunction, its decision jeopardized the entire business model. Most notably, in an opinion published on September 30, 2013, the district court found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." *Id*. at 361.

16.    In an attempt to continue the illegal enterprise, the entire lending operation was restructured, including the formation of two tribal entities: Big Picture Loans, LLC ("Big Picture")

and Ascension Technologies, LLC ("Ascension"). As part of the restructure, Red Rock was rebranded as Big Picture, and Bellicose became Ascension, a new entity created by the LVD.[2]

17.     This case seeks prospective injunctive and declaratory relief for the LVD Tribal Council's continuous and ongoing violations of state and federal law. This case also seeks to hold Defendant Williams and Defendant Hazen personally liable for their violations of state and federal law in their individual capacities.

## JURISDICTION AND VENUE

18.     The Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1965 and 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

19.     The Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs are citizens of Virginia, California, Florida, Illinois, Indiana, Maryland, New Jersey, North Carolina, Texas, Ohio, and Washington, at least one Defendant is not a citizen of any of those states, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

20.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in a district court for "any district" where a person "resides, is found, has an agent, or transacts his affairs."  18 U.S.C. § 1965(a). Defendants have transacted their affairs in this District through the nationwide scheme,

---

[2] Ten days after the district court's decision, Martorello formed Bellicose Capital, LLC ("Bellicose Capital"), to add an additional layer of protection to his companies involved in the scheme. Bellicose Capital became the holding company for Bellicose VI and SourcePoint VI to reduce their risk of liability. Each of these companies was wrapped up in the restructure described below.

which collected millions of dollars from Virginia consumers. As part of their scheme, Defendants solicited Virginia consumers with direct mail, debited Virginia consumers' bank accounts, and serviced the illegal loans of thousands of Virginia consumers.

## PARTIES

21.     Plaintiff Renee Galloway is a natural person who resides in this District and Division.

22.     Plaintiff Dominque de la Bay is a natural person who previously resided in Alexandria, Virginia.

23.     Plaintiff Lori Fitzgerald is a natural person who resides in Charlottesville, Virginia.

24.     Plaintiff Andrea Scarborough is a natural person who resides in Portsmouth, Virginia.

25.     Plaintiff Dianne Turner is a natural person who resides in Rocky Mountain, Virginia.

26.     Plaintiff Earl Browne is a natural person who resides in Burbank, California.

27.     Plaintiff Rose Marie Buchert is a natural person who resides in Rockford, Illinois.

28.     Plaintiff Regina Nolte is a natural person who resides in Indianapolis, Indiana.

29.     Plaintiff Kevin Minor is a natural person who resides in Toledo, Ohio.

30.     Plaintiff Teresa Titus is a natural person who resides in Ridgefield, Washington.

31.     Plaintiff Burry Pough is a natural person who resides in Texas.

32.     Plaintiff Lisa Martinez is a natural person who resides in Texas.

33.     Plaintiff Sonji Grandy is a natural person who resides in New Jersey.

34.     Plaintiff Anastasia Sherman is a natural person who resides in Florida.

35.     Plaintiff Jerry Avent is a natural person who resides in North Carolina.

36.     Plaintiff Lucinda Gray is a natural person who resides in North Carolina.

37.     Plaintiff Anthony Green is a natural person who resides in Illinois.

38.     Plaintiff Linda Madison is a natural person who resides in Maryland.

39.     Plaintiff Derek Geter is a natural person who resides in Virginia.

40.     Plaintiff George Hengle is a natural person who resides in Virginia.

41.     Plaintiff Keisha Hamm is a natural person who resides in Georgia.

42.     Plaintiff Faith Thomas is a natural person who resides in Georgia.

43.     Plaintiff Sharon Paavo is a natural person who resides in Michigan.

44.     Plaintiff Latanya Tarleton is a natural person who resides in Michigan.

45.     Defendant James Williams, Jr. is the tribal chairman of the LVD Tribal Council. Plaintiffs seek relief from Defendant Williams in his individual and official capacities.

46.     Defendant Michelle Hazen was formerly on the LVD Tribal Council from 1994 through 2018. She was a manager of Red Rock and currently serves as the Chief Executive Officer of Big Picture, a manager of Ascension, and a manager of Tribal Economic Development Holdings, LLC. Plaintiffs seek relief from Defendant Hazen in her individual capacity for her role in the enterprise.

47.     Defendant Henry Smith is the vice chairman of the LVD Tribal Council. Plaintiffs seek relief from Defendant Smith in his official capacity only.

48.     Defendant Alice Brunk is the secretary of the LVD Tribal Council. Plaintiffs seek relief from Defendant Brunk in her official capacity only.

49.     Defendant Andrea Russell is the treasurer of the LVD Tribal Council. Plaintiffs seek relief from Defendant Russell in her official capacity only.

50.     Defendant Tina Caron is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Caron in her official capacity only.

51.     Defendant Mitchell McGeshick is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Mitchell McGeshick in his official capacity only.

52.     Defendant Jeffery McGeshick is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Jeffery McGeshick in his official capacity only.

53.     Defendant Roberta Ivey is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Ivey in her official capacity only.

54.     Defendant June Saad is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Saad in her official capacity only.

## SERVICE ON THE ATTORNEY GENERAL

55.     Counsel for Plaintiffs are causing a copy of this pleading to be served contemporaneously with this filing on the Attorney General of Washington in accordance with RCW 19.86.095, and on the Attorney General of Illinois in accordance with 815 ILCS 505/10a(d).

## STATE USURY AND CONSUMER PROTECTION LAWS

### A.  Virginia

56.     Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).[3] The Supreme Court of Virginia has repeatedly

---

[3] Usury laws are not unique to the United States of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic

acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

57.     In accordance with this longstanding public policy, Virginia's Consumer Finance Act prohibits a person from charging an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A). The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders.

58.     Neither Big Picture nor Red Rock were licensed to make loans in Virginia.

59.     The Virginia General Assembly has expressly declared that any attempt to circumvent usury laws is "against public policy and void." Va. Code. § 6.2-306(A) ("Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void."). This includes attempts to evade the application "by any device, subterfuge, or pretense whatsoever," including "procurement of a loan through any use or activity of a third person, whether real or fictitious." Va. Code. § 6.2-1541(C).

60.     Any loan made in violation of Virginia's usury laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made." Va. Code § 6.2-1541(A)-(B).

---

foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

### B. California

61.     Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872. Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

62.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

63.     Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

64.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.*

65.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

66.     Thus, California law allows borrowers to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

11

67.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

**C. Illinois**

68.     Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less. 205 ILCS 670/15.

69.     Small consumer loan lenders are required to be licensed to make loans. 205 ILCS 670/1. A licensed lender may charge interest rates up to 99%. *See* 205 ILCS 670/17.2(a)(1), (b)(3).

70.     Neither Big Picture nor Red Rock were licensed to make loans in Illinois.

71.     If a lender is unlicensed, annual interest is capped at 9%: "[I]n all written contracts it shall be lawful for the parties to stipulate or agree [to] 9% per annum, or any less sum of interest." *See* 815 ILCS 205/4(1).

72.     If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan." 205 ILCS 670/20(d).

73.     Through a civil action, a borrower can sue a lender for violating the Illinois Consumer Installment Loan Act "prior to the expiration of 2 years after the date of his last scheduled payment" to reduce the balance by the amount that the lender is entitled to recover, and to recover attorneys' fees and costs. 205 ILCS 670/20(b); 205 ILCS 670/20.7.

74.     The Illinois Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce. 815 ILCS 505/2; 815 ILCS 550/10a.

### D. Indiana

75.     In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans in Indiana. Ind. Code § 24-4.5-3-502. A separate license is required for making small loans of less than $550. *Id.* If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

76.     Neither Big Picture nor Red Rock were licensed to make loans in Indiana.

77.     Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150. Ind. Code § 24-4.5-7-201. For all other loans, even licensed lenders may not charge interest that exceeds the equivalent of the greater of:

> (a) the total of:
>
>> (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is two thousand dollars ($2,000) or less;
>> (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
>> (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal which is more than four thousand dollars ($4,000); or
>
> (b) twenty-five percent (25%) per year on the unpaid balances of the principal.

Ind. Code § 24-4.5-3-508.

78.     "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt."  Ind. Code § 24-4.5-5-202.

79.     In addition to these penalties, debtors on small loans are also entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees."  Ind. Code § 24-4.5-7-409.

**E.  Ohio**

80.     "The [legislature's] right to regulate the rate of interest by law is as old as government itself."  *Wessell v. Timberlake*, 116 N.E. 43, 46 (Ohio 1916).

81.     Ohio law generally caps interest rates at 8% per annum. Ohio Rev. Code § 1343.01(A).

82.     Lenders licensed under the Small Loans Law may charge interest rates exceeding 8% APR for loans of $5,000 or less. Ohio Rev. Code § 1321.02. For loans between $1,000 and $5,000, licensees may charge interest rates no greater than 28% APR on the first $1,000 and 22% on amounts of the principal exceeding $1,000. Ohio Rev. Code § 1321.13(A). Neither Big Picture nor Red Rock were licensed to make loans in Ohio.

83.     Any lender who charges interest rates in excess of those provided by law "shall forfeit to the borrower twice the amount of interest contracted for."  Ohio Rev. Code § 1321.14(D).

84.     Lenders licensed under Ohio's Short-Term Loans Law may charge interest rates no greater than 28% APR on loans of $500 or less. Ohio Rev. Code § 1321.35–40. Licensees must be located in Ohio. Ohio Rev. Code § 1321.36.

85.     Any interest charged in excess of 28% APR on loans of $500 or less is deemed an unfair or deceptive business practice in violation of Ohio's Consumer Sales Practices Act. Ohio Rev. Code §1321.44(A). A short-term borrower injured by excessive interest rates "shall have a cause of action and be entitled to the same relief available to a consumer under [the CSPA]."  Ohio Rev. Code §1321.44(A).

86.     Ohio's Consumer Sales Practices Act allows injured borrowers to "recover [their] actual economic damages plus an amount not exceeding five thousand dollars in noneconomic damages."  Ohio Rev. Code § 1345.09(A).

**F.  Washington**

87.     Washington's usury laws were "enacted in order to protect the residents of this state from debts bearing burdensome interest rates" and "in recognition of the duty to protect our citizens from oppression."  RCW 19.52.005.

88.     In Washington, the maximum allowable interest rate is twelve percent per annum. RCW 19.52.020(1); *see also* RCW 19.52.025; State Maximum Interest Rate, *available at* http://leg.wa.gov/CodeReviser/Documents/rates.htm. "No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action."  RCW 19.52.020(1).

89.     If interest greater than the statutory maximum of twelve percent is directly or indirectly contracted for, received, or reserved, the contract is usurious. RCW 19.52.030.

90.     If a usurious interest rate is charged, the creditor shall be entitled to collect only the principal amount of the loan, less the amount of interest accruing thereon, and if any interest was actually paid, the creditor shall be entitled to collect only the principal amount less twice the amount of the interest paid and less the amount of all accrued by unpaid interest. RCW 19.52.030. A plaintiff may seek application of these statutory penalties by bringing an action under RCW 19.52.032.

91.     RCW Chapter 19.52 applies to loans made to any person residing in Washington at the time the loan was made, regardless of the location where the loan was made. RCW 19.52.034.

92.    In addition to a statutory usury claim entitling a plaintiff to recover the penalties provided in RCW 19.52.030, entering into or transacting a usurious contract constitutes a per se unfair act or practice in the conduct of commerce for purposes of establishing a claim under the Washington Consumer Protection Act. RCW 19.52.036.

**G. Texas**

93.    Subject to limited exceptions, the maximum rate of interest allowed in Texas is 10%. Tex. Fin. Code § 302.001.

94.    Texas law requires persons issuing consumer loans to obtain a license. Tex. Fin. Code § 342.051. Licensees may exceed the 10% maximum interest rate for consumer loans not secured by real property, depending on the type of loan and subject to calculations made by the Consumer Credit Commissioner. *Id.* § 342.201.

95.    Creditors who charge more than 10% in interest in violation of Texas's Finance Code are liable for the greater of (1) three times the amount of interest charged in excess of 10%, or (2) the lesser of $2,000 or 20 percent of the principal. Tex. Fin. Code § 305.001.

96.    Additionally, if the interest charged and received is more than twice the permissible amount, the creditor will be held liable for the principal amount, the interest, and any other charges or fees. Tex. Fin. Code § 305.002.

97.    Neither Big Picture nor Red Rock were licensed to make loans in Texas.

**H. Florida**

98.    In Florida, the maximum allowable rate of interest on loans of $500,000 or less is eighteen percent (18%). Fla. Stat. § 687.03.

99.    Florida makes it either a misdemeanor or felony—depending on the interest rate—to charge usurious interest in excess of twenty-five percent (25%). Fla. Stat. § 687.071. Loan

contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

100.    Lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2).

101.    Under Florida law, consumers can recover twice the amount of usurious interest paid on illegal loans. Fla. Stat. § 687.04.

102.    Neither Big Picture nor Red Rock were licensed to make loans in Florida.

**I.  New Jersey**

103.    The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a). Charging consumers a rate of interest greater than 30% is a criminal act under New Jersey law. N.J. Stat. § 2C:21-19.

104.    The New Jersey Consumer Finance Licensing Act ("CFLA") governs the provision of installment loans to consumers in New Jersey and allows *licensed* lenders to charge interest higher than 16% for installment loans under $50,000. N.J. Stat. §§ 17:11C-1 to 17:11C-49.

105.    The CFLA provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree."  N.J. Stat. § 17:11C-33(b). The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error…." *Id.*

106.    Neither Big Picture nor Red Rock were licensed to make loans in New Jersey.

107. The New Jersey Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce. N.J. Stat. § 56:8-2.

**J. North Carolina**

108. In North Carolina, the legal interest rate chargeable to consumers is 8%. N.C. Gen. Stat. § 24-1.

109. Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

110. Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest. N.C. Gen. Stat. § 24-2. If the interest has been paid, the borrower may recover twice the amount of interest paid. *Id.*

111. North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. §§ 53-166(a), 53-168.

112. Unlicensed lenders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor. N.C. Gen. Stat. § 53-166(c). Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

113. Neither Big Picture nor Red Rock were licensed to make loans in North Carolina.

### K. Maryland

114.    Maryland law, Md. Code, Com. Law § 12-306, prohibits lenders from making consumer loans to Maryland residents in excess of 24% or 33% depending on the size of the loan.

115.    Moreover, no person may make a loan under Maryland's Consumer Loan Law without being licensed by the Maryland Commissioner of Financial Regulation. Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204. Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection."  Neither Big Picture nor Red Rock were licensed to make loans in Maryland.

116.    Because the loans were made in violation of Maryland's licensing and interest rate requirements, it was unlawful for any person to collect or receive any interest, fees, or charges on the loans. Md. Code, Com. Law § 12-314.

117.    For willful violations, like those committed here, Maryland law allows consumers to recover principal, interest, or other compensation paid with respect to all loans. Md. Code, Com. Law § 12-313.

### L. Georgia

118.    Short term loans of $3,000 or less fall within the scope of the Georgia Industrial Loan Act. Ga. Code § 7-3-1, *et seq.*

119.    The purpose of the Industrial Loan Act is to "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (2012) (citation omitted).

120.    Unless expressly exempted by the terms of the Industrial Loan Act, a lender must obtain a license by the Industrial Loan Commissioner to make loans of $3,000 or less at an interest rate exceeding eight percent (8%). Ga. Code §§ 7-3-5, 7-3-6, 7-3-8.

121.     Pursuant to Ga. Code § 7-3-29(a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Industrial Loan Act] by such person shall be null and void."

122.     Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less at an interest rate that exceeds eight percent (8%). Ga. Code § 16-17-1, *et seq*.

123.     A lender who violates of the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both." Ga. Code § 16-17-2(d).

124.     Ga. Code § 16-17-3 bars a lender from collecting any indebtedness created by the illegal loan and declares the loan "void ab initio."

**M. Michigan**

125.     Under Michigan law, the legal rate of interest is 5%. MCL 438.31. In cases where the parties stipulate in writing for the payment of interest, the legal rate of interest shall not exceed 7%. *Id.*

126.     Pursuant to MCL 438.32, lenders that charge interest at a rate that exceeds 7% are barred from recovering any "interest, any official fees, delinquency or collection charge, attorney fees or court costs" and the borrower is entitled to recover attorney fees and court costs from the lender.

127.     In Michigan, criminal usury results when a person, not being authorized or permitted by law to do so, knowingly charges interest at a rate that exceeds 25%. MCL 438.41.

128.     The penalty for any person guilty of criminal usury is imprisonment for a term not to exceed 5 years or a fine of not more than $10,000, or both. MCL 438.41.

129.     The possession of usurious loan records is also prohibited by Michigan law. MCL 438.42. A person commits the offense of possession of usurious loan records "when, with knowledge of the contents thereof, he possesses any writing, paper, instrument or article used to record criminally usurious transactions" that are prohibited by law. *Id.* The penalty is imprisonment up to one year or a fine of not more than $1,000, or both. *Id.*

130.     In Michigan, the Deferred Presentment Service Transactions Act (DPSTA) regulates lenders that provide short-term loans to consumers up to $600. MCL 487.2121 *et seq.*

131.     Entities that are engaged in such lending must apply and receive a license to issue short-term loans. MCL 487.2131.

132.     Any person who violates the DPSTA is subject to "a civil fine of not less than $1,000.00 or more than $10,000.00 for each violation." MCL 487.2168. A person who knew or reasonably should have known of the violation is subject to "a civil fine of not less than $5,000.00 or more than $50,000.00 for each violation." *Id.*

## THE INITIAL STRUCTURE OF THE SCHEME

133.     Martorello and  others established and operated a rent-a-tribe scheme that charges more than 400% annual interest on short term loans.

134.     Beginning in 2011, the enterprise made high-interest loans to consumers in the name of Red Rock—an entity formed under the laws of the LVD for the dual purpose of avoiding state and federal laws and concealing the role of Martorello's companies.

135.     Consistent with the rent-a-tribe model, Red Rock received 2% of the net revenue from the loans in return for the use of its name. Ex. 1 at § 2.25.[4]

---

[4] In reality, Red Rock actually received 1% of the net revenue of the loans because it paid 50% "broker fee" to Tribal Loan Management, LLC—a company owned by Robert Rosette, *i.e.*, the managing partner of the Rosette law firm.

136.    By contrast, SourcePoint received the "revenue remaining" and reimbursement for all advances and expenses. Ex. 1 at § 3.5.1; § 2.2.2.

137.    Further, under the servicing agreement, SourcePoint was contractually entitled to exercise almost exclusive control over Red Rock's operations.

138.    For example, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. Ex. 1 at § 3.1.

139.    The servicing agreement further outlined the extensive duties SourcePoint performed and Red Rock's nominal role, including: (1) selecting and negotiating with service providers and lenders; (2) "[d]evelopment and promotion of sound and positive business relationships," including "the enforcement and termination of agreements with such service providers and lenders;" (3) preparation of regulatory, compliance, training, education, and accounting standards, as well as standards for "screening and review of" "website contents, marketing and consumer relations practices;" (4) providing "pre-qualified leads" and the "credit-modeling data and risk assessment strategies;" (5) oversight of Red Rock's call center in the Philippines; and (6) sales to third-party debt collectors. Ex. 1 at § 4.2.1.

140.    SourcePoint also had the authority to "collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock.]" Ex. 1 at § 4.9.

141.    SourcePoint also had the contractual right to "sweep [Red Rock's] bank account into [SourcePoint's] bank account" to receive its share of the proceeds. Ex. 1 at § 3.5.

142.    SourcePoint had "*sole signatory and transfer authority* over such bank accounts." Ex. 1 at § 3.5; § 4.4.

143.    Consistent with the terms of the Servicing Agreement, tribal members provided minimal assistance in the day-to-day operations of Red Rock, and nearly all the activities associated with it occurred off the Lac Vieux Reservation, such as the call centers, payment processing, and servicing of the loans.

144.    Nearly all activities performed on behalf of Red Rock were performed by officers and employees of Mattorello's companies located in the Virgin Islands, Puerto Rico, and the Philippines.

145.    For example, Bellicose Capital procured consumer reports from Trans Union in an attempt to identify consumers who may be susceptible to, or in need of, a loan.

146.    If a consumer's report showed that he or she may be susceptible to a high-interest loan, then Bellicose Capital sent direct mailings to the home of the consumer stating that he or she was pre-approved, that the loan was "a smarter way to borrow," and that funds can be deposited "as early as tomorrow."

147.    If a consumer called the number on the letter, he or she would reach a call center in the Philippines, who took direction and instructions from Bellicose Capital and not the Tribe.

## EVENTS LEADING TO THE RESTRUCTURE

148.    In August 2013, the New York Department of Financial Services issued a cease and desist notice to Red Rock warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

149.    The New York Department of Financial Services also issued warnings to third parties, such as banks and payment processors, to cease providing electronic banking services to

Red Rock, and these third parties "cut back or cut off entirely their financial dealings with the Tribes." *Id.*

150.    In response, Red Rock filed a lawsuit in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Id.*

151.    The district court denied Red Rock's request for a preliminary injunction on September 30, 2013, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, Red Rock was "subject to the State's non-discriminatory anti-usury laws." *Id.* at 361.

152.    The court reasoned, "There is simply no basis . . . that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id.*

153.    Ten days after the district court's decision, Martorello formed Bellicose Capital, LLC ("Bellicose Capital"), to add an additional layer of protection to his companies involved in the scheme. Ex. 2.

154.    Bellicose Capital became the holding company for Bellicose VI and SourcePoint VI to reduce their risk of liability.

155.    Through multiple shell entities, Matt Martorello owned 85.1% of Bellicose Capital, which wholly owned SourcePoint and Bellicose VI. *See, e.g.*, Ex. 3. Matt Martorello's brother, Justin Martorello, owned 9.9% of Bellicose; and the remaining 5% was owned by three investors: Brian McFadden, Simon Liang, and James Dowd. *Id.*

156.    Despite the additional layer of liability, Martorello and the other investors remained worried. In addition to the loss in *Otoe-Missouria*, a growing number of lawsuits and

government enforcement actions against the scheme's competitors brought increased scrutiny to the tribal lending business model, including an affirmative action filed by the New York Attorney General against CashCall in August 2013. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV1507522JFWRAOX, 2018 WL 485963, at *10 (C.D. Cal. Jan. 19, 2018) (findings of fact and conclusions of law detailing CashCall's tribal lending involvement).

157.   Martorello was paying close attention to the litigation involving CashCall, including the case filed by the CFPB in December 2013. *Consumer Fin. Protection Bureau v. CashCall, Inc.,* No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013).

158.   In that case, the CFPB took the same position as the district court in *Otoe-Missouria*, *i.e.*, that state usury laws applied to tribal lenders. Ex. 4, Jan. 2014 e-mail chain at LVD-DEF00018128.

159.   On January 3, 2014, Martorello characterized the CFPB's position as "without question a major attack on legit tribal lending operations." *Id*. If an "attack" on the Red Rock operation happened, he warned, "the stakes are very literally everything." Ex. 4 at LVD18129.

160.   The threat of an attack grew on October 1, 2014, when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014).

161.   In doing so, the Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Id*.

162.   A month after the Second Circuit's decision, Red Rock's attorney, Karrie Wichtman, wrote an e-mail to Martorello, explaining that the best option was to "go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 5 at Rosette1130 (emphasis added).

25

## OVERVIEW OF THE RESTRUCTURE

163.    Long before the restructure, Martorello had created the concept for Big Picture to be used as another rent-a-tribe enterprise associated with a tribe on the Fort Belknap Indian Reservation.

164.    Martorello worked with a marketing company to develop a logo, website, and other marketing materials, which are identical to those used by Big Picture today.

165.    In September 2013, Bellicose VI was getting ready to launch Big Picture Loans for the tribe on the Fort Belknap Indian Reservation, but the "launch date" was delayed because of the lack of an ACH provider to process the payments. *Id*.

166.    Because of the loss in *Otoe-Missouria*, Matt and Justin Martorello never officially launched Big Picture Loans with the tribe located on the Fort Belknap Indian Reservation.

167.    Instead, as evidenced by an e-mail from Justin Martorello dated October 22, 2013, undertakings associated with this venture were placed on "FULL STOP" and because of "the massive attacks on the industry we do not plan use these sites."

168.    Because of these massive attacks, the ongoing enterprise with Red Rock was also at risk. As Matt Martorello further explained: "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." Ex. 6 at Martorello_009775.

169.    One of those was an action filed by the Pennsylvania Attorney General, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for sure." *Id*.

170.    Martorello further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id*.

171.     In addition to state attorney general threats, Martorello further explained that the NYDFS has "issues too" with tribal lending "and they could go after SPVI as well." *Id*.

172.     In "order to build an even stronger case for future litigation," Ex. 5, and protect the illegal amounts obtained from consumers, Martorello wrapped up the lending operation in newly-created tribal entities through a "sale" of Bellicose Capital and its wholly owned subsidiaries.

173.     Through a series of interrelated agreements, Red Rock was rebranded as Big Picture (using the materials and website previously created for the other tribe), and Bellicose became Ascension, a newly created LVD entity.

174.     On paper, the LVD now appeared to have created and to own the lending business, ostensibly: (1) shielding Bellicose (and the substantial revenue paid to it) from any pre-merger claims; and (2) enhancing the appearance of tribal ownership and control over operations.

175.     To facilitate the restructure, the LVD's entities agreed to a $300,000,000.00 promissory note to Eventide—a new company with the same ownership structure as Bellicose, *i.e.*, 85.1% being held by Matt Martorello; 9.9% being held by Justin Martorello; and the remaining 5% was owned by McFadden, Liang, and Dowd.

176.     But other than changing the form of the transaction, the substance remained the same—the Promissory Note requires the tribal entities to pay 1.8% interest *and* the "Net Cash Available" at the end of each month. Ex. 7, Promissory Note.

177.     The "Net Cash Available" is defined as the tribal entities' gross revenues minus: (1) a "monthly distribution to the Tribe equal to two percent (2%) of the Gross Revenues;" (2) a "one-time reinvestment amount equal to $1.3 million dollars ($1,300,000), and a monthly reinvestment amount thereafter of two percent (2%);" and (3) interest, expenses, and reserves. *Id*. at § 1.2(a)-(b)(1)-(6).

178.    In other words, Martorello and a few other investors continue to be the primary beneficiaries of the scheme.

179.    And, other than changing the name and the jurisdiction of formation, Ascension continues to be operated in the same manner and by primarily the same individuals who ran Bellicose—none of whom are members of the LVD or work on the reservation.

180.    The LVD not only lacks involvement in Ascension's day-to-day operations, it contractually relinquished any right to control Ascension through a Delegation of Authority Policy. Ex. 8, Delegation of Authority Policy.

181.    Under this policy, Ascension delegated Brian McFadden with the authority to: (1) handle Ascension's "strategic direction, goals and targets," (2) perform "all matters necessary for the day to day management of Ascension," (3) execute documents on behalf of Ascension, (3) open and maintain bank accounts, and (5) adopt employee benefit plans and programs. *Id*. at § 1.4(a)-(e).

182.    Brian McFadden also possesses the exclusive authority to handle "verbal communications with media, regulatory bodies, or other entities" and must approve any written communications with the media, regulatory bodies, and other entities. *Id*. at § 3.1-3.2.

183.    By contrast, the only matters designated to the tribal co-managers, Defendants Hazen and Williams, are: (1) approval of contracts in excess of $100,000 in a calendar year, (2) appointment of the president, and (3) approval of any "new major employee benefit plans." *Id*. at § 1.2(a)-(c).

184.    And, while the authority to appoint the president seems to provide some control, a Loan and Security Agreement takes this control away.

185.    To appoint a new president of Ascension, the tribal entities must receive the approval of Eventide, *i.e.*, a company owned by Matt Martorello and Brian McFadden.

186.    Because of Martorello/McFadden/Eventide's *de facto* control of Ascension, Defendants delegated to Ascension the vast majority of responsibilities associated with Big Picture's operations—no different than the relationship between SourcePoint and Red Rock.

187.    In particular, Ascension and Big Picture entered into an "Intratribal Servicing Agreement," which is virtually identical to the prior servicing agreement between SourcePoint and Red Rock. *Compare* Ex. 9; *with* Ex. 1.

188.    This agreement grants Ascension "all the necessary power and authority to act in order to fulfill its responsibilities," which includes the enumerated responsibilities previously designated to SourcePoint.

189.    And, just like the Delegation of Authority Policy, the tribal entities cannot amend, modify, or terminate the Intratribal Servicing Agreement until satisfaction of the $300 million-dollar promissory note.

190.    In short, other than the change in titles, things have largely stayed the same because the restructuring agreements "confer on Eventide, and hence Martorello, significant control mechanisms over significant aspects of Ascension's operations." *Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 279 (E.D. Va. 2018).

## DEFENDANTS' ROLE IN THE ENTERPRISE

191.    The LVD Tribal Council serves as the LVD's governing body and has the power to make laws and ordinances pursuant to the LVD Constitution.

192.    Pursuant to Article IV of the LVD Constitution, the Tribal Council is vested with all powers of its inherent sovereignty and "shall exercise such powers to the fullest extent permitted

by Federal law." These powers expressly include the power to "manage the economic affairs, enterprises, property, both real and personal, and other interests of the Band."

193.    Although Plaintiffs maintain that Defendants are not involved in the day-to-day management and operations of Big Picture Loans, the LVD Tribal Council's quiescence in and facilitation of the illegal lending enterprise is a key component. And, Defendants' withdrawal from the conspiracy and direction that Big Picture Loans cease unlawful collections in Plaintiffs' home states would provide Plaintiffs with relief from future harm.

194.    Accordingly, it is within Defendants' power, as members comprising the Tribal Council, toshutdown the operations of Big Picture Loans and Ascension, including to stop the unlawful collection of interest by Big Picture in Plaintiffs' home states.

195.    In July 2011, the LVD Tribal Council created Red Rock by tribal ordinance, which purported that Red Rock was a wholly-owned tribal business entity.

196.    Defendant Hazen, who was on the Tribal Council at the time Red Rock was formed, was manager of Red Rock from 2011 through its dissolution in 2016.

197.    Defendant Hazen has *claimed* that her and Defendant Williams were ultimately responsible for all final decisions about operations at Red Rock.

198.    In 2014, the LVD Tribal Council created Big Picture Loans by passing a tribal resolution. The LVD holds out Big Picture Loans as owned and operated by the LVD.

199.    Defendants Hazen and Williams were designated as co-managers of Big Picture. And since, December 2015, Defendant Hazen has been designated as the Chief Executive Officer of Big Picture.

200.    Big Picture's operating agreement grants Defendants Williams and Hazen with broad authority over the business; however, they are ultimately appointed and may be removed by the Tribal Council.

201.    In early 2015, the LVD Tribal Council created Tribal Economic Development Holdings, LLC, which purports to be a wholly-owned and operated economic arm and instrumentality of LVD.

202.    The LVD was the sole member of Tribal Economic Development Holdings, and Defendants Hazen and Williams were designated as its co-managers.

203.    The Tribal Council also created Ascension as a subsidiary of Tribal Economic Development Holdings.

204.    Ascension was created "as a wholly owned and operated instrumentality of the Tribe," with Tribal Economic Development Holdings as its sole member, and Defendants Hazen and Williams were designated as its co-mangers.

205.    Defendant Hazen has purported to be responsible for the day to day operations and management of Tribal Economic Development Holdings, Ascension, and Big Picture.

206.    As CEO of Big Picture, Defendant Hazen has purported to have control over the bank account used by Big Picture to fund consumer loans, receive consumer payments, and pay vendors.

207.    Defendant Williams has described Defendant Hazen as "handl[ing] more onsite operational functions, such as overseeing employees, marketing, customer and applicant matters, budgeting, website operation, office materials, etc."

208.    Defendant Williams, who is the LVD Tribal Council Chairman, is a manager of Tribal Economic Development Holdings, Ascension, and Big Picture.

209.   Defendant Williams has purported to be responsible for oversight of Tribal Economic Development Holdings, Ascension, and Big Picture.

210.   Specifically, Defendant Williams has represented that he is "responsible for outreach, recruiting investors, and soliciting vendors, mentoring industry best practices; managing relationships with banks, other tribal officials, and other tribal consumer financial service providers."

211.   Defendant Williams has represented that the LVD has invested over $7,000,000 into the illegal lending enterprise, and he suggested that these were profits from the illegal lending enterprise that the LVD reinvested back into the illegal lending enterprise.

212.   Each month, Big Picture reinvests a portion of the profits from the illegal loans back into the lending enterprise.

213.   Defendant Williams has represented that Tribal Economic Development Holdings has the power to make all important business decisions with respect to Big Picture Loans and has complete discretion to expand the business as it chooses.

## PLAINTIFFS' EXPERIENCES

### A.  Plaintiff Renee Galloway (Virginia)

214.   On or around April 21, 2017, Plaintiff Galloway obtained a loan for $600 with Big Picture that had an interest rate of 636.75%.

215.   Plaintiff Galloway paid $930 on her loan with Big Picture, almost all of which was credited to interest and fees.

216.   As part of her application, Plaintiff Galloway entered in her Virginia residential address.

**B.  Plaintiff Dominque de la Bay (Virginia)**

217.   On or around July 4, 2017, Plaintiff de la Bay obtained a loan for $1,025.00 with Big Picture that had an interest rate of 482.12%.

218.   Plaintiff de la Bay paid more than $500 on her loan with Big Picture, almost all of which was credited to interest and fees.

219.   As part of her application, Plaintiff de la Bay entered in her Virginia residential address, located in Alexandria, Virginia.

**C.  Plaintiff Aaron Fitzgerald (Virginia)**

220.   On or around July 24, 2017, Plaintiff Fitzgerald obtained a loan for $500.00 with Big Picture that had an interest rate of 643.87%.

221.   Plaintiff Fitzgerald paid approximately $836 on his loan with Big Picture, almost all of which was credited to interest and fees.

222.   As part of his application, Plaintiff Fitzgerald entered in his Virginia residential address.

**D.  Plaintiff Andrea Scarborough (Virginia)**

223.   On or around May 10, 2018, Plaintiff Scarborough obtained a loan for $750.00 with Big Picture that had an interest rate of 492.18%.

224.   Plaintiff Scarborough also obtained a loan with Big Picture in early 2017 that had a similar interest rate.

225.   Plaintiff Scarborough paid approximately $200 on her 2017 loan with Big Picture.

226.   Plaintiff Scarborough paid more than $200 on her 2018 loan with Big Picture, almost all of which was credited to interest and fees.

227.    As part of her application, Plaintiff Scarborough entered in her Virginia residential address.

### E.  Plaintiff Dianne Turner (Virginia)

228.    On October 12, 2015, Plaintiff Turner obtained a $400 loan with Red Rock that had an interest rate of 615%.

229.    Plaintiff Turner paid no less than $560 on her loan with Red Rock, almost all of which was credited to interest and fees.

230.    As part of her application, Plaintiff Turner entered in her Virginia residential address.

### F.  Plaintiff Derek Geter (Virginia)

231.    Since January 2016, Plaintiff Geter has obtained multiple high-interest loans with Big Picture, including a loan dated October 18, 2018, that had an interest rate of 348.4%.

232.    Plaintiff Geter has paid no less than $7,838 on the loans with Big Picture, much of which was credited to interest and fees.

233.    As part of his application, Plaintiff Geter entered in his Virginia residential address.

### G.  Plaintiff Earl Browne (California)

234.    On February 2, 2017, Plaintiff Browne obtained a loan with Big Picture that had an interest rate of 697%.

235.    Plaintiff Browne paid no less than $1,124.09 on his loan with Big Picture within the past year, most of which was credited to interest and fees.

236.    As part of his application, Plaintiff Browne entered in his California residential address.

### H.  Plaintiff Rose Marie Buchert (Illinois)

237.    On October 9, 2015, Plaintiff Buchert applied for a $250 loan from Red Rock. The loan had an interest rate of 755%, requiring monthly payments with a final payment due on August 3, 2016. The finance charge was $1,000.

238.    In October 2016, Plaintiff Buchert took out a second loan that was identical in amount, interest rate, and payment plan to her first loan.

239.    As part of her applications, Plaintiff Buchert entered in her Illinois residential address.

240.    Plaintiff Buchert paid off both loans, including $2,000 in finance charges.

### I.  Plaintiff Anthony Green (Illinois)

241.    On or around January 9th, 2018, while living in Illinois, Plaintiff Green took out a loan from Big Picture.

242.    The principal amount on the loan was $400.00 and the interest rate was 683.36%. This loan required 13 bi-weekly payments of $116.67.

243.    Plaintiff Green made approximately seven payments and paid at least $800.00 to Big Picture for repayment on the loan.

244.    As part of his application, Plaintiff Green entered in his Illinois residential address.

### J.  Plaintiff Regina Nolte (Indiana)

245.    Plaintiff Nolte took out a $450 loan from Big Picture that was deposited into her account on December 20, 2016. The interest rate on the loan was at least 200%.

246.    As part of her application, Plaintiff Nolte entered her Indiana residential address.

247.    Plaintiff Nolte paid Big Picture in excess of the principal amount on her loan.

35

### K.  Plaintiff Kevin Minor (Ohio)

248.    On or about May 5, 2016, Plaintiff Minor received a $900 loan from Big Picture. The loan had an annual interest rate that exceeded 44%.

249.    On or about August 4, 2016, Plaintiff Minor received a $1,000 loan from Big Picture. The loan had an annual interest rate that exceeded 56%.

250.    Plaintiff Minor made multiple payments on his loans, and paid off at least one of his loans with Big Picture in full.

251.    As part of his loan applications, Plaintiff Minor entered his Ohio address.

### L.  Plaintiff Teresa Titus (Washington)

252.    On or about July 14, 2015, Plaintiff Titus applied for a loan at www.castlepayday.com. Plaintiff Titus was approved for a loan for $400.00. The loan had an annual interest rate over 400%.

253.    On July 14, 2015, $400 was deposited into her bank account by "Castle Payday.com."

254.    By June 2016, Plaintiff Titus had paid a total of $2,281.25 on her July 2015 loan. But when she could no longer afford her payments on the loan, she had to take out another loan to cover her payments on the first loan. Over the course of the next year, Plaintiff Titus suffered from this debt treadmill whereby she had to take out new loans in order to pay back old loans.

255.    In addition to her original loan, Plaintiff Titus took out loans from Defendants in June 2016 ($500) and July 2017 ($400). These loans both had annual interest rates in excess of 400%. These loans were deposited into Plaintiff Titus's bank account by "VBS Big Picture Loans" and "Big Picture Loans," respectively.

256.    Since August 2015, Plaintiff Titus has paid $4,994.11 to Defendants toward her $1,300 principal in Castle Payday/Big Picture loans. Plaintiff Titus has also paid $175 in overdraft fees and returned item charges associated with automatic bank account debits for her Castle Payday/Big Picture payments.

257.    As part of her application for these loans, Plaintiff Titus entered in her Washington residential address.

258.    As of the filing of the initial complaint in the matter, Defendants are still attempting to collect additional payments from Plaintiff Titus.

**M. Plaintiff Burry Pough (Texas)**

259.    On or around November 28, 2017, while living in Texas, Plaintiff Pough took out a loan from Big Picture.

260.    The principal amount on the loan was $800.00 and the interest rate was 598.3569%. The loan required 20 bi-weekly payments of about $179.58. Plaintiff paid at least $2,873.28 to Big Picture for repayment on the loan.

261.    As part of the loan application, Plaintiff Pough provided his Texas address.

262.    Defendants are still attempting to collect on the loan.

**N. Plaintiff Lisa Martinez (Texas)**

263.    On or around October 19, 2017, while living in Texas, Plaintiff Lisa Martinez took out a loan from Big Picture.

264.    The principal amount on the loan was $800.00 and the interest rate was at least 320%. The loan required 13 bi-weekly payments of about $211.16.

265.    Plaintiff Martinez paid off the loan in full prior to the loan maturity date, and paid at least $2,598.28 to Big Picture for repayment on the loan.

266.    As part of the loan application, Plaintiff Martinez provided her Texas address.

**O. Plaintiff Anastasia Sherman (Florida)**

267.    On or around April 21, 2016, while living in Florida, Plaintiff Sherman took out her first loan from Big Picture.

268.    The principal amount on the loan was $400.00 and the interest rate was 569.2071%. Plaintiff Sherman paid off well above the principal balance of the loan.

269.    On or around October 20, 2017, still while living in Florida, Plaintiff Sherman took out her second loan from Big Picture.

270.    The principal amount on the loan was $425.00 and the interest rate was 497.6327%. The loan required 13 bi-weekly payments of about $85.45. Plaintiff Sherman paid at least $1,110.66 to Big Picture for repayment on the second loan.

271.    As part of the loan applications, Plaintiff Sherman provided her Florida address.

**P. Plaintiff Sonji Grandy (New Jersey)**

272.    On or around January 19, 2017, while living in New Jersey, Plaintiff Grandy took out a loan from Big Picture.

273.    The principal amount on the loan was $600.00 and the interest rate was 720.03%. This loan required 28 bi-weekly payments varying from $62.50-$150.00.

274.    Plaintiff Grandy paid at least $3,000 to Big Picture for repayment on the loan.

275.    As part of the loan application, Plaintiff Grandy provided her New Jersey address.

**Q. Plaintiff Jerry Avent (North Carolina)**

276.    In or around December 2017, while living in North Carolina, Plaintiff Avent took out a loan from Big Picture.

277.    The principal amount on the loan was $200.00 and the interest rate was between 564.392%.

278.    Plaintiff Avent has paid around $700 on the loan, including $653.69 that has been credited to interest.

279.    As part of the loan application, Plaintiff Avent provided his North Carolina address.

### R.  Plaintiff Lucinda Gray (North Carolina)

280.    On or around December 10, 2017, while living in North Carolina, Plaintiff Gray took out a loan from Big Picture.

281.    The principal amount on the loan was $600.00 and the interest rate was 598.7874%. The loan required 12 monthly payments of about $264.27.

282.    Plaintiff Gray paid at least $2,114.16 to Big Picture for repayment on the loan.

283.    As part of the loan application process, Plaintiff Gray entered in her North Carolina address.

### S.  Linda Madison (Maryland)

284.    On or around March 6, 2018, Plaintiff Madison obtained an $800 loan with Big Picture that had an interest rate of 665%.

285.    Plaintiff Madison obtained the loan over the internet when she was in Maryland, and her loan application originated in Maryland.

286.    Plaintiff Madison paid no less than $880.92 on her loan with Big Picture—most of which was credited to interest and fees.

### T.  Plaintiff Keisha Hamm (Georgia)

287.    In or around July 2015, while living in Georgia, Plaintiff Hamm took out a Castle Payday loan for $1,000 with an interest rate of over 500%. She paid back at least $6,931.50 on that loan.

288.    In or around April 2017, while living in Georgia, Plaintiff Hamm took out a Big Picture loan for $1,500 with an interest rate of over 4500%. She paid back at least $6,779.96 on that loan.

289.    As part of her loan applications, Plaintiff Hamm entered in her Georgia address.

### U.  Plaintiff Faith Thomas (Georgia)

290.    In 2017, Plaintiff Thomas took out loans for $1,300 and $825 from Big Picture with interest more than twice what is allowed under Georgia law. She paid off both the loans, paying back thousands of dollars to Big Picture.

291.    In July 2018, Plaintiff took out another usurious loan with Big Picture for $1,200. She paid back no less $1,358 on that loan.

292.    As part of her loan applications, Plaintiff Hamm entered in her Georgia address.

### V.  Plaintiff Sharon Paavo (Michigan)

293.    On or around January 29, 2018, Plaintiff Paavo applied for a loan with Big Picture for $350. Plaintiff Paavo made six monthly payments to Big Picture in 2018. Paavo paid back at least $1,056.86 on this loan, with most of the payments going towards an excessive interest rate of over 300%.

294.    As part of her loan application, Plaintiff Paavo entered in her Michigan residential address.

### W. Plaintiff Latanya Tarleton (Michigan)

295.     Between February 2016 and March 2018, Plaintiff Tarleton applied for at least 6 loans with Big Picture. The amounts of the loans range between $300 to $1,000. Plaintiff Tarleton has paid far in excess of the principal balance of these loans to Big Picture for repayment on the loans.

296.     On or around March 10, 2018, Plaintiff Tarleton applied for a loan with Big Picture for $600. The loan required 13 monthly payments of about $102.90, with a total repayment of $1,337.59. Plaintiff Tarleton has paid far in excess of $600 to Big Picture for repayment on the loan. Most of the payments were going towards an excessive interest rate of over 398.906%.

297.     As part of her application, Plaintiff Tarleton entered in her Michigan residential address.

## CLASS ACTION ALLEGATIONS

298.     Plaintiffs also assert claims on behalf of the proposed RICO Class defined as follows:

> *All individuals located in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, Georgia, Michigan or states with similar laws who entered into a loan agreement with Big Picture or Red Rock.*

299.     Plaintiffs also assert claims on behalf of the proposed Declaratory Judgment Class defined as follows:

> *All individuals located in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, Georgia, Michigan or states with similar laws who entered into a loan agreement with Big Picture or Red Rock and who have outstanding balances on the loans.*

300.     Plaintiffs also assert claims on behalf of the proposed Injunctive Relief Class defined as follows:

> All individuals located in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, Georgia, Michigan or states with similar laws who entered into a loan agreement with Big Picture or Red Rock and who have outstanding balances on the loans.

**Numerosity**

301. At this time, Plaintiffs do not know the exact number of members of the Classes; however, given the volume of Big Picture loans, there are likely tens of thousands of members of each Class. Thus, the Classes are so numerous that joinder of all members is impracticable.

**Commonality**

302. There are numerous common questions of law and fact common to Plaintiffs and members of the Classes. These questions include but are not limited to the following:

    a.    Whether Matt Martorello, the other investors, Bellicose Capital, SourcePoint, the Tribal officials, and others unknown to Plaintiffs, constitute an "enterprise" under RICO;

    b.    Whether Defendants conducted the affairs or participated in the enterprise's affairs;

    c.    Whether Defendants violated RICO by collecting on the loans;

    d.    Whether the loans were unlawful debts as defined by RICO; and

    e.    Whether injunctive and declaratory relief is appropriate.

**Typicality**

303. Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Each Plaintiff, like members of the Classes, took out a usurious Big Picture or Red Rock loans. Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices of conduct by Defendants and are based on the same legal and remedial theories.

**Adequacy**

304.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience in litigating rent-a-tribe cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that conflict with the Classes.

**Injunctive Relief**

305.    The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for defendants.

**Predominance and Superiority**

306.    The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

        a.      Absent a class action, class members as a practical matter will be unable to
                obtain redress; Defendants' violations will continue without remedy; and

additional consumers will be harmed.

b.      It would be a substantial hardship for most individual members of the

Classes if they were forced to prosecute individual actions.

c.      A class action will permit an orderly and expeditious administration of

class claims and foster economies of time, effort, and expense.

d.      The lawsuit presents no difficulties that would impede its management by

the Court as a class action.

e.      Defendants have acted on grounds generally applicable to class members,

making class-wide relief appropriate.

## <u>CAUSES OF ACTION</u>

### <u>FIRST CAUSE OF ACTION</u>
**Violation of RICO, 18 U.S.C. §§ 1962(a)-(d)**
**(On behalf of all Plaintiffs and the RICO Class)**
**(Class Claims against Defendants Williams *in his official capacity* as Chairman of the LVD Tribal Council; Defendant Smith *in his official capacity* as Vice Chairman of the LVD Tribal Council; Defendant Brunk *in her official capacity* as Secretary of the LVD Tribal Council; Defendant Russell *in her official capacity* as Treasurer of the LVD Tribal Council; and Defendants Caron, Mitchell McGeshick, Jeffrey McGeshick, Ivey, and Saad *in their official capacities* as Members of the LVD Tribal Council)**

307.    Plaintiffs reallege and incorporate by reference each and every allegation set forth

in the preceding paragraphs.

308.    Defendants Williams, Smith, Brunk, Russell, Caron, Mitchell McGeshick, Jeffrey

McGeshick, Ivey, and Saad are each being sued in their official capacities as members of the LVD

Tribal Council and will be referred to collectively as the "Tribal Council Defendants."

309.    Each of the Tribal Council Defendants is a "person" as that term is defined in 18

U.S.C. § 1964(3).

44

310.    The Enterprise, consisting of the LVD Tribal Council, Matt Martorello, Brian McFadden, and the unnamed officers, executives, and other employees of Big Picture and Ascension, together with Bellicose Capital and Source Point, are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Castle Payday, later known as Big Picture.

311.    The Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.

312.    The LVD Tribal Council violated and continue to violate 18 U.S.C. § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

313.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

314.    All of the loans made to RICO Class members and collected by the Tribal Council Defendants, Big Picture Loans, and others included interest rates far in excess of twice the enforceable rate in their states.

315.    Plaintiffs and RICO Class members were injured as a direct result of the Tribal Council Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

316.    This conduct began sometime in 2011, continues to date, and will be repeated again and again in the future to the detriment of consumers in Virginia, California, Illinois, Indiana,

Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, Georgia, Michigan and other states with similar usury laws.

317.    The Tribal Council Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each of the Tribal Council Defendants knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

318.    Plaintiffs and RICO Class members were injured as a direct result of the Tribal Council Defendants' violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

319.    This conduct began sometime in 2011, continues to date, and will be repeated again and again in the future to the detriment of consumers in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, Georgia, Michigan and other states with similar usury laws.

320.    Additionally, the Tribal Council Defendants also violated and continue to violate RICO, 18 U.S.C. § 1962(a) through the receipt of income derived, directly and indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

321.    The Tribal Council Defendants participated and continue to participate in the collection of the unlawful debt by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

322.    Plaintiffs and the class members were injured as a result of the violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for their investment and participation in the enterprise.

323. Plaintiffs and RICO Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(a) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

324. The Tribal Council Defendants also violated RICO 18 U.S.C. § 1962(b) by acquiring and maintaining interests in and control of the Enterprise involved in the unlawful collection of debt.

325. The Tribal Council Defendants participated in the collection of the unlawful debt as principals by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

326. Plaintiffs and the class members were injured as a result of the violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for the Tribal Council Defendants' investment and participation in the enterprise.

327. Plaintiffs and RICO Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(b) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

328. Plaintiffs seek prospective injunctive and declaratory relief for the Tribal Council Defendants' conduct taking place in Plaintiffs' home states including an order that the Tribal Council Defendants divest themselves of any interest, direct or indirect, in the Enterprise; imposing reasonable restrictions on the future activities or investments of the Tribal Council Defendants, including, but not limited to, prohibiting them from engaging in the collection of unlawful debt in Plaintiffs' home state; and ordering dissolution or reorganization of Big Picture Loans and Ascension.

<u>SECOND CAUSE OF ACTION</u>
**Violation of RICO, 18 U.S.C. §§ 1962(c)-(d)**
**(On behalf of all Plaintiffs and the RICO Class)**
**(Class Claims against Defendants Williams *in his individual capacity***
**and Defendant Hazen *in her individual capacity*)**

329.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

330.   Defendants Williams and Hazen are each being sued in their individual capacities for their own conduct violating RICO, 18 U.S.C. § 1962(c) and (d).

331.   Defendants Williams and Hazen are each a "person" as that term is defined in 18 U.S.C. § 1964(3).

332.   Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

333.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

334.   All of the loans made to RICO Class members and collected by Defendants included interest rates far in excess of twice the enforceable rate in their states.

335.   Defendant Hazen has represented that she was personally involved in the collection of unlawful debt, including as a signatory for the bank account used to debit the money from Plaintiffs' bank accounts and as a manager and executive of Red Rock, Big Picture, and Ascension.

336.   Defendant Williams has represented that he was responsible for "recruiting investors, soliciting vendors, mentoring industry best practices; managing relationships with banks, other tribal officials, and other tribal consumer financial providers." This conduct was in order to solicit the payment of unlawful debt.

48

337.    Defendants Williams and Hazen also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Defendants Williams and Hazen each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

338.    Plaintiffs and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

339.    Defendants Williams' and Hazen's unlawful conduct began sometime in 2011, continues to date, and will be repeated again and again in the future to the detriment of consumers in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, Georgia, Michigan and other states with similar usury laws.

340.    Accordingly, Defendants Williams and Hazen are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### THIRD CAUSE OF ACTION
### DECLARATORY JUDGMENT
**(On behalf of all Plaintiffs and the Declaratory Judgment Class)**
**(Class Claims against Defendants Williams *in his official capacity* as Chairman of the LVD Tribal Council; Defendant Smith *in his official capacity* as Vice Chairman of the LVD Tribal Council; Defendant Brunk *in her official capacity* as Secretary of the LVD Tribal Council; Defendant Russell *in her official capacity* as Treasurer of the LVD Tribal Council; and Defendants Caron, Mitchell McGeshick, Jeffrey McGeshick, Ivey, and Saad *in their official capacities* as Members of the LVD Tribal Council)**

341.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

342.    Virginia and many other states require all who engage in the business of making personal loans to be licensed.

343. Neither Big Picture nor Red Rock were licensed to make loans in Virginia or any other state in the United States.

344. Because the loans were made without the required license and charged excessive interest rates, the loans are null and void in Virginia, as well as many other states.

345. In addition to licensing violations, Defendants' loan violated the general usury laws of many states including Virginia's. *See* Va. Code § 6.2-305(A). Thus, the loans violated the general usury statutes of many states and are void pursuant to state usury laws.

346. As alleged herein, Defendants' loan agreements were violative of fundamental state public policy in Virginia and other states with similar usury, licensing, and criminal laws.

347. Further, the lending agreements used for Plaintiffs contained unconscionable choice of law and forum-selection provisions that are void and unenforceable for public policy concerns.

348. Plaintiffs still have outstanding amounts owed for their Red Rock and Big Picture accounts.

349. Because of the triple digit interest rates charged on the loans, the debts are increasing in value substantially.

350. Accordingly, Plaintiffs seek a determination as to their obligation to pay their outstanding Red Rock and Big Picture debts.

351. The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law and forum-selection provisions.

352.     Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

353.     Accordingly, Plaintiffs seek a declaratory judgment that they are not obligated to pay any principal or interest outstanding on the illegal loans.

### FOURTH CAUSE OF ACTION
**INJUNCTIVE RELIEF**
**(On behalf of all Plaintiffs and the Injunctive Relief Class)**
**(Class Claims against Defendants Williams in his official capacity as Chairman of the LVD Tribal Council; Defendant Smith in his official capacity as Vice Chairman of the LVD Tribal Council; Defendant Brunk in her official capacity as Secretary of the LVD Tribal Council; Defendant Russell in her official capacity as Treasurer of the LVD Tribal Council; and Defendants Caron, Mitchell McGeshick, Jeffrey McGeshick, Ivey, and Saad in their official capacities as Members of the LVD Tribal Council)**

354.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

355.     As alleged herein, Plaintiffs have taken out Red Rock and Big Picture loans, which they maintain were void ab initio because they violated their state's licensing and usury requirements in addition to violating the public policy of their states and using unconscionable terms.

356.     Plaintiffs have outstanding balances on their Red Rock and Big Picture loans.

357.     Because of the triple digit interest rates used by Red Rock and Big Picture loans, each Plaintiff is subject to significant liability as the interest accrues on their unpaid debts.

358.     Such debt has the potential to financially ruin and bankrupt each of Plaintiffs if relief is not obtained.

359.    Big Picture is owned by the LVD, which claims that Big Picture is an arm of the tribe and subject to its sovereign immunity. Even if not true, the LVD is entitled to sovereign immunity, and Plaintiffs are unable to recover against the LVD.

360.    Accordingly, Plaintiffs face irreparable harm if the Court does not grant injunctive relief.

361.    Further, Plaintiffs face ongoing harm absent relief because collection efforts are ongoing and will continue in the absence of relief.

362.    Accordingly, Plaintiffs seek injunctive relief prohibiting the Tribal Council Defendants from continuing to collect on the unlawful loans in Plaintiffs' home state, requiring the Tribal Council Defendants to forgive the loans and/or prevent Big Picture Loans from selling the unlawful loans to third-party debt collectors, and prohibiting the Tribal Council Defendants from continuing to engage in unlicensed and unlawful lending in Plaintiffs' home states.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.    An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.    An Order declaring that Defendants committed the violations of law alleged herein;

C.    An Order providing for any and all injunctive relief the Court deems appropriate;

D.    An Order awarding monetary damages against Defendants Williams and Hazens in their individual capacities, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

E.     An Order awarding treble damages against Defendants Williams and Hazens in their individual capacities in accordance with proof and in an amount consistent with applicable precedent;

F.     An Order awarding interest at the maximum allowable legal rate against Defendants Williams and Hazens in their individual capacities on the foregoing sums;

G.     An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees against Defendants Williams and Hazen in their individual capacities; and

H.     Such further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

RESPECTFULLY SUBMITTED AND DATED this 26th day of June, 2019.

CONSUMER LITIGATION ASSOCIATES, P.C.

By: /s/ Leonard A. Bennett, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    Elizabeth W. Hanes, VSB #75574
    Email: elizabeth@clalegal.com
    Craig C. Marchiando, VSB #89736
    Email: craig@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

Kristi C. Kelly, VSB #72791
Email: kkelly@kellyguzzo.com
Andrew J. Guzzo, VSB #82170
Email: aguzzo@kellyguzzo.com
Casey S. Nash, VSB #84261
Email: casey@kellyguzzo.com
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167

E. Michelle Drake (*pro hac vice* forthcoming)
Email: emdrake@bm.net
John G. Albanese (*pro hac vice* forthcoming)
Email: jalbanese@bm.net
BERGER & MONTAGUE, P.C.
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470

Beth E. Terrell (*pro hac vice* forthcoming)
Email: bterrell@terrellmarshall.com
Jennifer Murray (*pro hac vice* forthcoming)
Email:  jmurray@terrellmarshall.com
Elizabeth A. Adams (*pro hac vice* forthcoming)
Email: eadams@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Matthew Wessler (*pro hac vice* forthcoming)
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

*Attorneys for Plaintiffs and Proposed Classes*