**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| RENEE GALLOWAY, LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY, MARCELLA SINGH, as administrator of the ESTATE OF FELIX GILLISON, JR., DIANNE TURNER, EARL BROWNE, ROSE MARIE BUCHERT, REGINA NOLTE, KEVIN MINOR, TERESA TITUS, LISA MARTINEZ, ANTHONY GREEN, SONJI GRANDY, ANASTASIA SHERMAN, BURRY POUGH, LINDA MADISON, DOMINQUE de la BAY, LUCINDA GRAY, ANDREA SCARBOROUGH, JERRY AVENT, LORI FITZGERALD, DEREK GETER, KEISHA HAMM, FAITH THOMAS, SHARON PAAVO, LATANYA TARLETON, CHRISTINA CUMMING, LAMESHA KONDO, ANDREA MENDEZ, TAMMY WANGELINE, KIMBERLY POOL, TASHA PETTIFORD, RICHARD L. SMITH, JR., VICTORIA RENEE McKOY, DESIREE WRIGHT LOVINS, SANDRA MONSALVE, CARRIE SAMANTHA SMITH, CHRIS KOBIN, DANA DUGGAN, AND JOHN ACTIS II, on behalf of themselves and all individuals similarly situated, | Case No. 3:19-cv-00470-REP **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| JAMES WILLIAMS, JR., TRIBAL CHAIRMAN OF THE LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS TRIBAL COUNCIL, *in his individual and official capacities*; MICHELLE HAZEN, *in her individual capacity*; HENRY SMITH, VICE CHAIRMAN OF THE LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS TRIBAL COUNCIL, *in his official capacity*; ALICE BRUNK, SECRETARY OF THE LAC VIEUX | |

DESERT BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS TRIBAL COUNCIL,
*in her official capacity,* ANDREA
RUSSELL, TREASURER OF THE LAC
VIEUX DESERT BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS
TRIBAL COUNCIL, *in her official capacity;*
TINA CARON, COUNCIL MEMBER OF
THE LAC VIEUX DESERT BAND OF
LAKE SUPERIOR CHIPPEWA INDIANS
TRIBAL COUNCIL, *in her official capacity;*
MITCHELL MCGESHICK, COUNCIL
MEMBER OF THE LAC VIEUX DESERT
BAND OF LAKE SUPERIOR CHIPPEWA
INDIANS TRIBAL COUNCIL, *in his
official capacity*; GERTRUDE
MCGESHICK, COUNCIL MEMBER OF
THE LAC VIEUX DESERT BAND OF
LAKE SUPERIOR CHIPPEWA INDIANS
TRIBAL COUNCIL, *in her official capacity*;
SUSAN MCGESHICK, COUNCIL
MEMBER OF THE LAC VIEUX DESERT
BAND OF LAKE SUPERIOR CHIPPEWA
INDIANS TRIBAL COUNCIL, *in her
official capacity*; GIIWEGIIZHIGOOKWAY
MARTIN, COUNCIL MEMBER OF THE
LAC VIEUX DESERT BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS
TRIBAL COUNCIL, *in her official capacity*;
JEFFERY MCGESHICK, COUNCIL
MEMBER OF THE LAC VIEUX DESERT
BAND OF LAKE SUPERIOR CHIPPEWA
INDIANS TRIBAL COUNCIL, *in his
official capacity*; ROBERTA IVEY,
COUNCIL MEMBER OF THE LAC
VIEUX DESERT BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS
TRIBAL COUNCIL, *in her official capacity*;
and JUNE SAAD, COUNCIL MEMBER OF
THE LAC VIEUX DESERT BAND OF
LAKE SUPERIOR CHIPPEWA INDIANS
TRIBAL COUNCIL, *in her official capacity;*
BIG PICTURE LOANS, LLC; ASCENSION
TECHNOLOGIES, LLC; COLUMBIA PIPE
& SUPPLY CO.; TIMOTHY ARENBERG;
TERRANCE ARENBERG; DEBORAH M.

ARENBERG LIVING TRUST; DTA
TRINITY WEALTH TRANSFER TRUST;
AMLAUR RESOURCES, LLC; BRIAN
JEDWAB; JAMES DOWD; SIMON
LIANG; and BRIAN McFADDEN,

               Defendants.

## FIRST AMENDED
## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy, Marcella Singh as administrator of the Estate of Felix Gillison, Jr., Renee Galloway, Dianne Turner, Earl Browne, Rose Marie Buchert, Regina Nolte, Kevin Minor, Teresa Titus, Lisa Martinez, Anthony Green, Sonji Grandy, Anastasia Sherman, Burry Pough, Linda Madison, Dominque de la Bay, Lucinda Gray, Andrea Scarborough, Jerry Avent, Lori Fitzgerald, Derek Geter, Keisha Hamm, Faith Thomas, Sharon Paavo, Latanya Tarleton, Christina Cumming, Lamesha Kondo, Andrea Mendez, Tammy Wangeline, Kimberly Pool, Tasha Pettiford, Richard L. Smith, Jr., Victoria Renee McKoy, Desiree Wright Lovins, Sandra Monsalve, Carrie Samantha Smith, Chris Kobin, Dana Duggan, and John Actis II, on behalf of themselves and all individuals similarly situated ("Plaintiffs"), by counsel, and for their First Amended Class Action Complaint against Defendants Big Picture Loans, LLC, Ascension Technologies, LLC, James Williams, Jr. Michelle Hazen, Henry Smith, Alice Brunk, Andrea Russell, Tina Caron, Mitchell McGeshick, Gertrude McGeshick, Susan McGeshick, Giiwegiizhigookway Martin, Jeffrey McGeshick, Roberta Ivey, June Saad, Columbia Pipe & Supply Co., Timothy Arenberg, Terrance Arenberg, Deborah M. Arenberg Living Trust, DTA Trinity Wealth Transfer Trust, Amlaur Resources, LLC, Brian Jedwab, James Dowd, Simon Liang, and Brian McFadden, allege as follows:

## GENERAL ALLEGATIONS

1.      This is a case about a scheme to make online usurious short-term loans (commonly called "payday loans"). These loans carry triple-digit interest rates, often exceeding 400%, and are illegal.

2.      Payday loans target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.      In recent years, payday lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws.

4.      In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

5.      Federal banking regulators shut down these "rent-a-bank" schemes. Michael A. Stegman, *Payday Lending*, 21 JOURNAL OF ECONOMIC PERSPECTIVES 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

6.      Some payday lenders have since developed a new method to attempt to avoid state usury laws—the "rent-a-tribe" scheme.

7.      In a rent-a-tribe scheme, the payday lender—which does most of its lending over the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and state law by purporting to piggy-back on the tribe's sovereign legal status and its general immunity from suit under federal and state laws. Using this doctrine, lenders argue that, because their businesses are located on a Native American reservation or are affiliated with a Native

- 4 -

American tribe, they are bound by the laws of that reservation or tribe only, not applicable federal and state law. *See* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 759 (2012).

8.      Like its predecessor, this scheme is doomed to fail for at least two fundamental flaws in the structure of the scheme.

9.      First, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. By extension, the business does not occur on tribal lands but instead occurs in the state where the consumer is located.

10.      Second, even a cursory examination of the underlying relationship between the payday lender and the tribe demonstrates that the relationship is insufficient to permit the lender to avail itself of the tribe's immunity.

11.      Rent-a-tribe schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state and federal law, with the vast majority of the revenues going to non-tribal entities.

12.      In recent years, these rent-a-tribe schemes have come under increasing scrutiny from courts and regulators. Two prominent perpetrators were recently convicted and sentenced to prison for their roles.[1]

---

[1] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

13.     This case is about one such rent-a-tribe scheme. This case involves a rent-a-tribe enterprise created and operated by Matt Martorello ("Matt Martorello")—a Chicago entrepreneur with no lineage to the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD"). Beginning in 2011, the enterprise made high-interest loans across the country to consumers in the name of Duck Creek Financial, LLC ("Duck Creek") and Red Rock Tribal Lending, LLC ("Red Rock")—two entities formed under the laws of the LVD for the dual purpose of avoiding state and federal laws and concealing the role of Matt Martorello's companies. Although Duck Creek and Red Rock were held out as the actual lender of the internet loans, the LVD and Red Rock had minimal involvement in the operations and received a mere 2% of the net profits from the loans. On the other hand, Martorello's companies, namely SourcePoint VI, Bellicose VI, and their parent companies, reaped nearly all the profits; provided the infrastructure to market, fund, and collect the loans; and controlled the day-to-day operations of the lending enterprise.

14.     Two years into its operation, regulators caught on to Red Rock's illegal loan products, starting with the New York Department of Financial Services issuing a cease and desist to Red Rock warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013). In response, Red Rock and Martorello did not shut down the enterprise. Rather, Red Rock filed a lawsuit in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Id*.

15.     The lawsuit completely backfired—the district court not only denied Red Rock's motion for a preliminary injunction, its decision jeopardized the entire business model. Most notably, in an opinion published on September 30, 2013, the district court found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts

- 6 -

demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." *Id*. at 361.

16.     In an attempt to continue the illegal enterprise, the entire lending operation was restructured, including the formation of two tribal entities: Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension"). As part of the restructure, Red Rock was rebranded as Big Picture, and Bellicose became Ascension, a new entity created by the LVD.[2]

17.     Although Martorello was the architect and primary beneficiary of the scheme, Defendants Brian McFadden, James Dowd, and Simon Liang were the other officers and shareholders of Bellicose. And as part of the restructure, each of these individuals became an officer of Ascension and a shareholder of Defendant Eventide Credit Acquisitions, LLC—another company created to facilitate the scheme. Each of these individuals played an integral role in the operation and management of the enterprise; agreed to undertake the conspiracy to collect high-interest loans from consumers in violation of their respective state laws; and received a percentage of the profits earned by the scheme.

18.     This case also seeks damages from Defendants Brian Jedwab, Amlaur Resources, LLC, Columbia Pipe & Supply Co., Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and Deborah M. Arenberg Living Trust. Although they did not participate in the day-to-day operations of the enterprise, these individuals knowingly provided the capital used to

---

[2] Ten days after the district court's decision, Martorello formed Bellicose Capital, LLC ("Bellicose Capital"), to add an additional layer of protection to his companies involved in the scheme. Bellicose Capital became the holding company for Bellicose VI and SourcePoint VI to reduce their risk of liability. Each of these companies was wrapped up in the restructure described below.

make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from their investment in the scheme.

19.     This case seeks prospective injunctive and declaratory relief for the LVD Tribal Council's continuous and ongoing violations of state and federal law. This case also seeks to hold Defendant Williams and Defendant Hazen personally liable for their violations of state and federal law in their individual capacities.

## JURISDICTION AND VENUE

20.     The Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1965 and 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

21.     The Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs are citizens of Virginia, California, Florida, Georgia, Illinois, Indiana, Maryland, Massachusetts, Michigan, Mississippi, New Jersey, North Carolina, Ohio, Oregon, Texas, Washington, and at least one Defendant is not a citizen of any of those states, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

22.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in a district court for "any district" where a person "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Defendants have transacted their affairs in this District through the nationwide scheme, which collected millions of dollars from Virginia consumers. As part of their scheme, Defendants solicited Virginia consumers with direct mail, debited Virginia consumers' bank accounts, and serviced the illegal loans of thousands of Virginia consumers.

## PARTIES

23.     Plaintiff Renee Galloway is a natural person who resides in this District and Division.

24.     Plaintiff Lula Williams is a natural person who resides in this District and Division.

25.     Plaintiff Gloria Turnage is a natural person who resides in this District and Division.

26.     Plaintiff Dowin Coffy is a natural person who resides in this District and Division.

27.     Plaintiff Marcella Singh as administrator of the Estate of Felix Gillison, Jr. is a natural person who resides in this District and Division.

28.     Plaintiff Christina Cumming is a natural person who resides in California.

29.     Plaintiff Lamesha Kondo is a natural person who resides in Ohio.

30.     Plaintiff Andrea Mendez is a natural person who resides in Texas.

31.     Plaintiff Tammy Wangeline is a natural person who resides in Wisconsin.

32.     Plaintiff Kimberly Pool is a natural person who resides in Illinois.

33.     Plaintiff Tasha Pettiford is a natural person who resides in Michigan.

34.     Plaintiff Richard L. Smith, Jr. is a natural person who resides in Oregon.

35.     Plaintiff Victoria Renee McKoy is a natural person who resides in Georgia.

36.     Plaintiff Desiree Wright Lovins is a natural person who resides in Georgia.

37.     Plaintiff Sandra Monsalve is a natural person who resides in Georgia.

38.     Plaintiff Carrie Samantha Smith is a natural person who resides in Georgia.

39.     Plaintiff Chris Kobin is a natural person who resides in California.

40.     Plaintiff Dana Duggan is a natural person who resides in Massachusetts.

41.     Plaintiff John Actis II is a natural person who resides in Mississippi.

42.     Plaintiff Dominque de la Bay is a natural person who previously resided in Virginia.

43.     Plaintiff Lori Fitzgerald is a natural person who resides in Virginia.

44.     Plaintiff Andrea Scarborough is a natural person who resides in Virginia.

45.     Plaintiff Dianne Turner is a natural person who resides in Virginia.

46.     Plaintiff Earl Browne is a natural person who resides in California.

47.     Plaintiff Rose Marie Buchert is a natural person who resides in Illinois.

48.     Plaintiff Regina Nolte is a natural person who resides in Indiana.

49.     Plaintiff Kevin Minor is a natural person who resides in Ohio.

50.     Plaintiff Teresa Titus is a natural person who resides in Washington.

51.     Plaintiff Burry Pough is a natural person who resides in Texas.

52.     Plaintiff Lisa Martinez is a natural person who resides in Texas.

53.     Plaintiff Sonji Grandy is a natural person who resides in New Jersey.

54.     Plaintiff Anastasia Sherman is a natural person who resides in Florida.

55.     Plaintiff Jerry Avent is a natural person who resides in North Carolina.

56.     Plaintiff Lucinda Gray is a natural person who resides in North Carolina.

57.     Plaintiff Anthony Green is a natural person who resides in Illinois.

58.     Plaintiff Linda Madison is a natural person who resides in Maryland.

59.     Plaintiff Derek Geter is a natural person who resides in Virginia.

60.     Plaintiff George Hengle is a natural person who resides in Virginia.

61.     Plaintiff Keisha Hamm is a natural person who resides in Georgia.

62.     Plaintiff Faith Thomas is a natural person who resides in Georgia.

63.     Plaintiff Sharon Paavo is a natural person who resides in Michigan.

64.     Plaintiff Latanya Tarleton is a natural person who resides in Michigan.

65.     Defendant Big Picture Loans, LLC is a limited liability company doing business as an internet lending website under the domain name www.bigpictureloans.com. In return for a small fraction of the revenue, the Tribe allowed the lending scheme to use its name and falsely claim that it is operated by the Tribe. At all times relevant to this matter, the Tribe did not participate in the day-to-day operations of Big Picture Loans and did not fund the loans or handle the servicing or collection of the loans. Big Picture Loans was formerly known as Red Rock Tribal Lending, LLC, who did business under the domain name www.castlepayday.com. Big Picture Loans is the successor in interest of Red Rock.

66.     Defendant Ascension Technologies, LLC was a limited liability company previously organized under the laws of the U.S. Virgin Islands and then Puerto Rico. Bellicose Capital was formed by Martorello in 2011 to make the usurious loans to Virginia consumers. Although it was held out as a "managing consulting company," Bellicose Capital was the actual entity that procured the investment capital, serviced the loans, and received the vast majority of the revenue from the loans, which was then funneled to Martorello. Due to various lawsuits against Martorello's competitors and anticipated regulation from the Consumer Financial Protection Bureau ("CFPB"), Martorello transferred Bellicose to the Tribe in April 2016 in an attempt to shield Bellicose Capital's illegal business practices, the Tribe rebranded Bellicose as Ascension Technologies, which continues to operate with minimal tribal involvement or benefit to the Tribe.

67.     Defendant James Williams, Jr. is the tribal chairman of the LVD Tribal Council. Plaintiffs seek relief from Defendant Williams in his individual and official capacities.

68.     Defendant Michelle Hazen was formerly on the LVD Tribal Council from 1994 through 2018. She was a manager of Red Rock and currently serves as the Chief Executive Officer of Big Picture, a manager of Ascension, and a manager of Tribal Economic Development Holdings, LLC. Plaintiffs seek relief from Defendant Hazen in her individual capacity for her role in the enterprise.

69.     Defendant Henry Smith is the vice chairman of the LVD Tribal Council. Plaintiffs seek relief from Defendant Smith in his official capacity only.

70.     Defendant Alice Brunk is the secretary of the LVD Tribal Council. Plaintiffs seek relief from Defendant Brunk in her official capacity only.

71.     Defendant Andrea Russell is the treasurer of the LVD Tribal Council. Plaintiffs seek relief from Defendant Russell in her official capacity only.

72.     Defendant Tina Caron is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Caron in her official capacity only.

73.     Defendant Mitchell McGeshick is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Mitchell McGeshick in his official capacity only.

74.     Defendant Gertrude McGeshick is the secretary of the Lac Vieux Desert Band of Lake Superior Chippewa Indians. Plaintiffs seek relief from Defendant Gertrude McGeshick in her official capacity only.

75.     Defendant Susan McGeshick is treasurer of the Lac Vieux Desert Band of Lake Superior Chippewa Indians. Plaintiffs seek relief from Defendant Susan McGeshick in her official capacity only.

76.     Defendant Giiwegiizhigookway Martin is the tribal chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians. Plaintiffs seek relief from Defendant Giiwegiizhigookway Martin in her official capacity only.

77.     Defendant Jeffery McGeshick is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Jeffery McGeshick in his official capacity only.

78.     Defendant Roberta Ivey is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Ivey in her official capacity only.

79.     Defendant June Saad is a council member of the LVD Tribal Council. Plaintiffs seek relief from Defendant Saad in her official capacity only.

80.     Defendant Columbia Pipe & Supply Co. ("Columbia Pipe") is a limited liability company organized under the laws of Illinois. Through a series of agreements with Big Picture and others, Columbia Pipe knowingly provided millions of dollars to be used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme.

81.     Defendant Timothy Arenberg is a natural person and resident of Illinois. Timothy Arenberg is the President of Columbia Pipe. As the President of Columbia Pipe, Timothy Arenberg personally participated in its decision to provide the capital to the enterprise, had knowledge that the capital would be used to make high-interest loans to consumers, and signed the key documents related to Columbia Pipe's investment in the enterprise. In addition, Timothy Arenberg personally contributed his own money to the enterprise.

82.     Defendant Terrance Arenberg is a natural person and resident of Illinois. Terrance Arenberg is the vice president of Columbia Pipe. As the vice president of Columbia Pipe, Terrance Arenberg personally participated in its decision to provide the capital to the enterprise,

and had knowledge that the capital would be used to make high-interest loans to consumers. In addition, Terrance Arenberg personally contributed his own money to the enterprise.

83.     Defendant DTA Trinity Wealth Transfer Trust is a trust created under the laws of the state of Illinois. Through a series of agreements between Big Picture and others, the DTA Trinity Wealth Transfer Trust provided a significant amount of the capital used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme.

84.     Defendant Deborah M. Arenberg Living Trust is a trust created under the laws of the is a trust created under the laws of the state of Illinois. Through a series of agreements between Big Picture and others, the Deborah M. Arenberg Living Trust provided a significant amount of the capital used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme.

85.     Defendant Amlaur Resources, LLC is a limited liability company organized under the laws of Delaware. Through a series of agreements with Big Picture and others, Amlaur Resources knowingly provided millions of dollars to be used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme.

86.     Defendant Brian Jedwab is a hedge fund manager and resident of New York. At all times relevant to this matter, Jedwab was the president of Amlaur Resources, one of the companies who provided the capital used to make the high-interest loans to consumers through the rent-a-tribe enterprise and, in return, generated large profits from its investment in the scheme. As the president of Amlaur Resources, Jedwab personally participated in its decision to provide the capital to the enterprise, had knowledge that the capital would be used to make high-

interest loans to consumers, and signed the key documents related to Amlaur Resources' investment in the enterprise.

87. Defendant James Dowd is a natural person and resident of Illinois. Dowd was an officer of Bellicose Capital and owned 1.5% of its shares. As an officer of Bellicose, Dowd participated in the operation and management of the enterprise designed to collect high-interest loans from consumers. And after the sale of Bellicose to the LVD, Dowd continued to participate in the enterprise as the vice president of Ascension Technologies and as a shareholder of Eventide.

88. Defendant Simon Liang is a natural person and resident of South Carolina. Liang was an officer of Bellicose Capital and owned 1.5% of its shares. As an officer of Bellicose, Liang participated in the operation and management of the enterprise designed to collect high-interest loans from consumers. And after the sale of Bellicose to the LVD, Liang continued to participate in the enterprise as the vice president of Ascension Technologies and as a shareholder of Eventide.

89. Defendant Brian McFadden is natural person and resident of Michigan. McFadden, a childhood friend of Matt Martorello, was an officer of Bellicose Capital. As an officer of Bellicose, McFadden participated in the operation and management of the enterprise designed to collect high-interest loans from consumers. And after the sale of Bellicose to the LVD, McFadden continued to participate in the enterprise as the vice president of Ascension Technologies and as a shareholder of Eventide.

## STATE USURY AND CONSUMER PROTECTION LAWS

A. **Virginia**

90. Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty.*

- 15 -

*Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).[3] The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

91.     In accordance with this longstanding public policy, Virginia's Consumer Finance Act prohibits a person from charging an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A). The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders.

92.     Neither Big Picture nor Red Rock were licensed to make loans in Virginia.

93.     The Virginia General Assembly has expressly declared that any attempt to circumvent usury laws is "against public policy and void."  Va. Code. § 6.2-306(A) ("Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void."). This includes attempts to evade the application "by any device, subterfuge, or pretense whatsoever," including "procurement of a loan through any use or activity of a third person, whether real or fictitious."  Va. Code. § 6.2-1541(C).

---

[3] Usury laws are not unique to the United States of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin."  Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country."  Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

94.     Any loan made in violation of Virginia's usury laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made."  Va. Code § 6.2-1541(A)-(B).

**B.     California**

95.     Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872. Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

96.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money."  *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

97.     Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan."  *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

98.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest."  *Id.*

99.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'"  *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

100.     Thus, California law allows borrowers to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year

preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

101.    Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

**C.    Illinois**

102.    Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less. 205 ILCS 670/15.

103.    Small consumer loan lenders are required to be licensed to make loans. 205 ILCS 670/1. A licensed lender may charge interest rates up to 99%. *See* 205 ILCS 670/17.2(a)(1), (b)(3).

104.    Neither Big Picture nor Red Rock were licensed to make loans in Illinois.

105.    If a lender is unlicensed, annual interest is capped at 9%: "[I]n all written contracts it shall be lawful for the parties to stipulate or agree [to] 9% per annum, or any less sum of interest."  *See* 815 ILCS 205/4(1).

106.    If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."  205 ILCS 670/20(d).

107.    Through a civil action, a borrower can sue a lender for violating the Illinois Consumer Installment Loan Act "prior to the expiration of 2 years after the date of his last scheduled payment" to reduce the balance by the amount that the lender is entitled to recover, and to recover attorneys' fees and costs. 205 ILCS 670/20(b); 205 ILCS 670/20.7.

108.   The Illinois Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce. 815 ILCS 505/2; 815 ILCS 550/10a.

**D.   Indiana**

109.   In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans in Indiana. Ind. Code § 24-4.5-3-502. A separate license is required for making small loans of less than $550. *Id.* If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

110.   Neither Big Picture nor Red Rock were licensed to make loans in Indiana.

111.   Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150. Ind. Code § 24-4.5-7-201. For all other loans, even licensed lenders may not charge interest that exceeds the equivalent of the greater of:

(a) the total of:

(i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is two thousand dollars ($2,000) or less;
(ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
(iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal.

Ind. Code § 24-4.5-3-508.

112.   "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an

assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt."  Ind. Code § 24-4.5-5-202.

113.     In addition to these penalties, debtors on small loans are also entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees."  Ind. Code § 24-4.5-7-409.

**E.     Ohio**

114.     "The [legislature's] right to regulate the rate of interest by law is as old as government itself."  *Wessell v. Timberlake*, 116 N.E. 43, 46 (Ohio 1916).

115.     Ohio law generally caps interest rates at 8% per annum. Ohio Rev. Code § 1343.01(A).

116.     Lenders licensed under the Small Loans Law may charge interest rates exceeding 8% APR for loans of $5,000 or less. Ohio Rev. Code § 1321.02. For loans between $1,000 and $5,000, licensees may charge interest rates no greater than 28% APR on the first $1,000 and 22% on amounts of the principal exceeding $1,000. Ohio Rev. Code § 1321.13(A). Neither Big Picture nor Red Rock were licensed to make loans in Ohio.

117.     Any lender who charges interest rates in excess of those provided by law "shall forfeit to the borrower twice the amount of interest contracted for."  Ohio Rev. Code § 1321.14(D).

118.     Lenders licensed under Ohio's Short-Term Loans Law may charge interest rates no greater than 28% APR on loans of $500 or less. Ohio Rev. Code § 1321.35–40. Licensees must be located in Ohio. Ohio Rev. Code § 1321.36.

119.     Any interest charged in excess of 28% APR on loans of $500 or less is deemed an unfair or deceptive business practice in violation of Ohio's Consumer Sales Practices Act. Ohio Rev. Code §1321.44(A). A short-term borrower injured by excessive interest rates "shall have a

cause of action and be entitled to the same relief available to a consumer under [the CSPA]."
Ohio Rev. Code §1321.44(A).

120.    Ohio's Consumer Sales Practices Act allows injured borrowers to "recover [their]
actual economic damages plus an amount not exceeding five thousand dollars in noneconomic
damages." Ohio Rev. Code § 1345.09(A).

**F.    Washington**

121.    Washington's usury laws were "enacted in order to protect the residents of this
state from debts bearing burdensome interest rates" and "in recognition of the duty to protect our
citizens from oppression."  RCW 19.52.005.

122.    In Washington, the maximum allowable interest rate is twelve percent per annum.
RCW 19.52.020(1); *see also* RCW 19.52.025; State Maximum Interest Rate, *available at*
http://leg.wa.gov/CodeReviser/Documents/rates.htm. "No person shall directly or indirectly take
or receive in money, goods, or things in action, or in any other way, any greater interest for the
loan or forbearance of any money, goods, or things in action."  RCW 19.52.020(1).

123.    If interest greater than the statutory maximum of twelve percent is directly or
indirectly contracted for, received, or reserved, the contract is usurious. RCW 19.52.030.

124.    If a usurious interest rate is charged, the creditor shall be entitled to collect only
the principal amount of the loan, less the amount of interest accruing thereon, and if any interest
was actually paid, the creditor shall be entitled to collect only the principal amount less twice the
amount of the interest paid and less the amount of all accrued by unpaid interest. RCW
19.52.030. A plaintiff may seek application of these statutory penalties by bringing an action
under RCW 19.52.032.

125.     RCW Chapter 19.52 applies to loans made to any person residing in Washington at the time the loan was made, regardless of the location where the loan was made. RCW 19.52.034.

126.     In addition to a statutory usury claim entitling a plaintiff to recover the penalties provided in RCW 19.52.030, entering into or transacting a usurious contract constitutes a per se unfair act or practice in the conduct of commerce for purposes of establishing a claim under the Washington Consumer Protection Act. RCW 19.52.036.

## G.     Texas

127.     Subject to limited exceptions, the maximum rate of interest allowed in Texas is 10%. Tex. Fin. Code § 302.001.

128.     Texas law requires persons issuing consumer loans to obtain a license. Tex. Fin. Code § 342.051. Licensees may exceed the 10% maximum interest rate for consumer loans not secured by real property, depending on the type of loan and subject to calculations made by the Consumer Credit Commissioner. *Id.* § 342.201.

129.     Creditors who charge more than 10% in interest in violation of Texas's Finance Code are liable for the greater of (1) three times the amount of interest charged in excess of 10%, or (2) the lesser of $2,000 or 20 percent of the principal. Tex. Fin. Code § 305.001.

130.     Additionally, if the interest charged and received is more than twice the permissible amount, the creditor will be held liable for the principal amount, the interest, and any other charges or fees. Tex. Fin. Code § 305.002.

131.     Neither Big Picture nor Red Rock were licensed to make loans in Texas.

## H.     Florida

132.     In Florida, the maximum allowable rate of interest on loans of $500,000 or less is eighteen percent (18%). Fla. Stat. § 687.03.

133.   Florida makes it either a misdemeanor or felony—depending on the interest rate—to charge usurious interest in excess of twenty-five percent (25%). Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

134.   Lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2).

135.   Under Florida law, consumers can recover twice the amount of usurious interest paid on illegal loans. Fla. Stat. § 687.04.

136.   Neither Big Picture nor Red Rock were licensed to make loans in Florida.

**I.     New Jersey**

137.   The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a). Charging consumers a rate of interest greater than 30% is a criminal act under New Jersey law. N.J. Stat. § 2C:21-19.

138.   The New Jersey Consumer Finance Licensing Act ("CFLA") governs the provision of installment loans to consumers in New Jersey and allows ***licensed*** lenders to charge interest higher than 16% for installment loans under $50,000. N.J. Stat. §§ 17:11C-1 to 17:11C-49.

139.   The CFLA provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree."  N.J. Stat. § 17:11C-33(b). The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error…." *Id.*

140.     Neither Big Picture nor Red Rock were licensed to make loans in New Jersey.

141.     The New Jersey Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce. N.J. Stat. § 56:8-2.

**J.    North Carolina**

142.     In North Carolina, the legal interest rate chargeable to consumers is 8%. N.C. Gen. Stat. § 24-1.

143.     Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

144.     Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest. N.C. Gen. Stat. § 24-2. If the interest has been paid, the borrower may recover twice the amount of interest paid. *Id.*

145.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. §§ 53-166(a), 53-168.

146.     Unlicensed lenders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor. N.C. Gen. Stat. § 53-166(c). Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

147.     Neither Big Picture nor Red Rock were licensed to make loans in North Carolina.

**K.    Maryland**

148.    Maryland law, Md. Code, Com. Law § 12-306, prohibits lenders from making consumer loans to Maryland residents in excess of 24% or 33% depending on the size of the loan.

149.    Moreover, no person may make a loan under Maryland's Consumer Loan Law without being licensed by the Maryland Commissioner of Financial Regulation. Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204. Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection."  Neither Big Picture nor Red Rock were licensed to make loans in Maryland.

150.    Because the loans were made in violation of Maryland's licensing and interest rate requirements, it was unlawful for any person to collect or receive any interest, fees, or charges on the loans. Md. Code, Com. Law § 12-314.

151.    For willful violations, like those committed here, Maryland law allows consumers to recover principal, interest, or other compensation paid with respect to all loans. Md. Code, Com. Law § 12-313.

**L.    Georgia**

152.    Short term loans of $3,000 or less fall within the scope of the Georgia Industrial Loan Act. Ga. Code § 7-3-1, *et seq*.

153.    The purpose of the Industrial Loan Act is to "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (2012) (citation omitted).

154.    Unless expressly exempted by the terms of the Industrial Loan Act, a lender must obtain a license by the Industrial Loan Commissioner to make loans of $3,000 or less at an interest rate exceeding eight percent (8%). Ga. Code §§ 7-3-5, 7-3-6, 7-3-8.

155.    Pursuant to Ga. Code § 7-3-29(a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Industrial Loan Act] by such person shall be null and void."

156.    Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less at an interest rate that exceeds eight percent (8%). Ga. Code § 16-17-1, *et seq*.

157.    A lender who violates of the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both." Ga. Code § 16-17-2(d).

158.    Ga. Code § 16-17-3 bars a lender from collecting any indebtedness created by the illegal loan and declares the loan "void ab initio."

### M.    Michigan

159.    Under Michigan law, the legal rate of interest is 5%. MCL 438.31. In cases where the parties stipulate in writing for the payment of interest, the legal rate of interest shall not exceed 7%. *Id.*

160.    Pursuant to MCL 438.32, lenders that charge interest at a rate that exceeds 7% are barred from recovering any "interest, any official fees, delinquency or collection charge, attorney fees or court costs" and the borrower is entitled to recover attorney fees and court costs from the lender.

161.    In Michigan, criminal usury results when a person, not being authorized or permitted by law to do so, knowingly charges interest at a rate that exceeds 25%. MCL 438.41.

162.    The penalty for any person guilty of criminal usury is imprisonment for a term not to exceed 5 years or a fine of not more than $10,000, or both. MCL 438.41.

163.     The possession of usurious loan records is also prohibited by Michigan law. MCL 438.42. A person commits the offense of possession of usurious loan records "when, with knowledge of the contents thereof, he possesses any writing, paper, instrument or article used to record criminally usurious transactions" that are prohibited by law. *Id.* The penalty is imprisonment up to one year or a fine of not more than $1,000, or both. *Id.*

164.     In Michigan, the Deferred Presentment Service Transactions Act (DPSTA) regulates lenders that provide short-term loans to consumers up to $600. MCL 487.2121 *et seq*.

165.     Entities that are engaged in such lending must apply and receive a license to issue short-term loans. MCL 487.2131.

166.     Any person who violates the DPSTA is subject to "a civil fine of not less than $1,000.00 or more than $10,000.00 for each violation." MCL 487.2168. A person who knew or reasonably should have known of the violation is subject to "a civil fine of not less than $5,000.00 or more than $50,000.00 for each violation." *Id.*

### N.     Massachusetts

167.     Under Massachusetts law, a lender must be licensed to make a loan of $6,000 or less, unless the annual interest rate does not exceed 12 percent. M.G.L. C. 140, § 96. Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. M.G.L. C. 140, § 110.

168.     Massachusetts law also prohibits criminal usury. M.G.L. C. 271, § 49. This law provides that "[w]hoever in exchange for either a loan of money or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum upon the sum

loaned or the equivalent rate for a longer or shorter period, shall be guilty of criminal usury."

M.G.L. C. 271, § 49.

169.    Massachusetts law also prohibits the waiver of consumer rights. M.G.L. C. 140, §§ 96, 110, C. 271 § 49, and C. 93A.

170.    The Massachusetts Consumer Protection Act prohibits unfair or deceptive acts or practices. M.G.L. C. 93A, §§ 2, *et seq.* Massachusetts law grants persons injured by unfair or deceptive acts or practices a private cause of action to pursue "damages and such equitable relief, including an injunction, as the court deems to be necessary and proper." M.G.L. 93A, § 9.

 **O.    Mississippi**

171.    "[T]he legislative branch of government has a duty under its police power as a matter of public policy to protect poor people from the evils of usury." *Consumers Credit Corp. of Miss. v. Stanford*, 194 So.2d 868, 871 (Miss. 1967) (internal citations omitted).

172.    For loans less than $2,000, the maximum annual interest rate in Mississippi is 10%. Miss. Code. § 75-17-1 (2).

173.    If the annual interest rate on the loan exceeds 10%, the consumer may recover any interest paid on the loan. Miss. Code. § 75-17-25.

174.    If the interest rate on the loan exceeds 20%—more than double the legal rate—the lender forfeits the principal and all finance charges, and any amount paid toward interest or the principal is recoverable by the consumer. Miss. Code § 75-17-25.

175.    Only lenders licensed under the Small Loan Privilege Law may charge interest rates in excess of 10% on small loans of $4,000 or less. Miss. Code § 75-67-105(1). Licensees must have a physical office located in the State of Mississippi. Miss. Code § 75-67-105(2).

176.    Even if a lender is properly licensed and located in Mississippi, the interest rate on a small loan in Mississippi may not exceed 59% APR. Miss. Code § 75-67-181.

177.    If the interest rate on a small loan exceeds 59% APR, the consumer may recover any interest paid on the loan. Miss. Code § 75-67-119.

178.    If the interest rate on a small loan exceeds 118% APR— more than double the legal rate—the lender forfeits the principal and all finance charges, and any amounts paid are recoverable by the consumer. Miss. Code § 75-67-119.

**P.    Oregon**

179.    Under Oregon law, a lender must be licensed to make a loan of $50,000 or less, unless the annual interest rate does not exceed the greater of 12 percent or five percent in excess of the discount rate on 90-day commercial paper ("the legal rate of interest"). ORS 82.010 and 725.045; *see also* ORS 725A.020(2) (license requirement for payday loan).

180.    Any loan made without the requisite license is void, and the lender has no right to collect, receive or retain any principal or interest. ORS 725.045(1)(b).

**Q.    Wisconsin**

181.    Under Wisconsin law, weekly or monthly installment loans are subject to interest rate limitations of 6%, and other loans are subject to interest rate limitations of 12%. Wis. Stat. § 138.05(1).

182.    Consumers may recover from lenders charging in excess of these limitations all interest and charges, and up to $2,000 in principal. Wis. Stat. § 138.06

## THE INITIAL STRUCTURE OF THE SCHEME

183.    Martorello and others established and operated a rent-a-tribe scheme that charges more than 400% annual interest on short term loans.

184.    Beginning in 2011, the enterprise made high-interest loans to consumers in the name of Red Rock—an entity formed under the laws of the LVD for the dual purpose of avoiding state and federal laws and concealing the role of Martorello's companies.

185.    Consistent with the rent-a-tribe model, Red Rock received 2% of the net revenue from the loans in return for the use of its name. Ex. 1 at § 2.25.[4]

186.    By contrast, SourcePoint received the "revenue remaining" and reimbursement for all advances and expenses. Ex. 1 at § 3.5.1; § 2.2.2.

187.    Further, under the servicing agreement, SourcePoint was contractually entitled to exercise almost exclusive control over Red Rock's operations.

188.    For example, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. Ex. 1 at § 3.1.

189.    The servicing agreement further outlined the extensive duties SourcePoint performed and Red Rock's nominal role, including: (1) selecting and negotiating with service providers and lenders; (2) "[d]evelopment and promotion of sound and positive business relationships," including "the enforcement and termination of agreements with such service providers and lenders;" (3) preparation of regulatory, compliance, training, education, and accounting standards, as well as standards for "screening and review of" "website contents, marketing and consumer relations practices;" (4) providing "pre-qualified leads" and the "credit-

---

[4] In reality, Red Rock actually received 1% of the net revenue of the loans because it paid 50% "broker fee" to Tribal Loan Management, LLC—a company owned by Robert Rosette, *i.e.*, the managing partner of the Rosette law firm.

modeling data and risk assessment strategies;" (5) oversight of Red Rock's call center in the Philippines; and (6) sales to third-party debt collectors. Ex. 1 at § 4.2.1.

190.   SourcePoint also had the authority to "collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock.]" Ex. 1 at § 4.9.

191.   SourcePoint also had the contractual right to "sweep [Red Rock's] bank account into [SourcePoint's] bank account" to receive its share of the proceeds. Ex. 1 at § 3.5.

192.   SourcePoint had "*sole signatory and transfer authority* over such bank accounts." Ex. 1 at § 3.5; § 4.4.

193.   Consistent with the terms of the Servicing Agreement, tribal members provided minimal assistance in the day-to-day operations of Red Rock, and nearly all the activities associated with it occurred off the Lac Vieux Reservation, such as the call centers, payment processing, and servicing of the loans.

194.   Nearly all activities performed on behalf of Red Rock were performed by officers and employees of Martorello's companies located in the Virgin Islands, Puerto Rico, and the Philippines.

195.   For example, Bellicose Capital procured consumer reports from Trans Union in an attempt to identify consumers who may be susceptible to, or in need of, a loan.

196.   If a consumer's report showed that he or she may be susceptible to a high-interest loan, then Bellicose Capital sent direct mailings to the home of the consumer stating that he or she was pre-approved, that the loan was "a smarter way to borrow," and that funds can be deposited "as early as tomorrow."

197.   If a consumer called the number on the letter, he or she would reach a call center in the Philippines, who took direction and instructions from Bellicose Capital and not the Tribe.

## EVENTS LEADING TO THE RESTRUCTURE

198.    In August 2013, the New York Department of Financial Services issued a cease and desist notice to Red Rock warning it to stop offering its illegal credit products to New York consumers. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

199.    The New York Department of Financial Services also issued warnings to third parties, such as banks and payment processors, to cease providing electronic banking services to Red Rock, and these third parties "cut back or cut off entirely their financial dealings with the Tribes." *Id.*

200.    In response, Red Rock filed a lawsuit in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Id.*

201.    The district court denied Red Rock's request for a preliminary injunction on September 30, 2013, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, Red Rock was "subject to the State's non-discriminatory anti-usury laws." *Id.* at 361.

202.    The court reasoned, "There is simply no basis . . . that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id.*

203.    Ten days after the district court's decision, Martorello formed Bellicose Capital, LLC ("Bellicose Capital"), to add an additional layer of protection to his companies involved in the scheme. Ex. 2.

204.    Bellicose Capital became the holding company for Bellicose VI and SourcePoint VI to reduce their risk of liability.

205.    Although Martorello was the architect and primary beneficiary of the scheme, Martorello's brother, Justin Martorello, and Defendants Brian McFadden, James Dowd, and Simon Liang were the other officers and shareholders of Bellicose Capital.

206.    Through multiple shell entities, Matt Martorello owned 85.1% of Bellicose Capital, which wholly owned SourcePoint and Bellicose VI. *See, e.g.*, Ex. 3. Justin Martorello owned 9.9% of Bellicose; and the remaining 5% was owned by Defendants McFadden, Liang, and Dowd. *Id*.

207.    Despite the additional layer of liability, Martorello and the other investors remained worried. In addition to the loss in *Otoe-Missouria*, a growing number of lawsuits and government enforcement actions against the scheme's competitors brought increased scrutiny to the tribal lending business model, including an affirmative action filed by the New York Attorney General against CashCall in August 2013. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV1507522JFWRAOX, 2018 WL 485963, at *10 (C.D. Cal. Jan. 19, 2018) (findings of fact and conclusions of law detailing CashCall's tribal lending involvement).

208.    Martorello was paying close attention to the litigation involving CashCall, including the case filed by the CFPB in December 2013. *Consumer Fin. Protection Bureau v. CashCall, Inc.,* No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013).

209.    In that case, the CFPB took the same position as the district court in *Otoe-Missouria*, *i.e.*, that state usury laws applied to tribal lenders. Ex. 4, Jan. 2014 e-mail chain at LVD-DEF00018128.

210. On January 3, 2014, Martorello characterized the CFPB's position as "without question a major attack on legit tribal lending operations." *Id*. If an "attack" on the Red Rock operation happened, he warned, "the stakes are very literally everything." Ex. 4 at LVD18129.

211. The threat of an attack grew on October 1, 2014, when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014).

212. In doing so, the Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Id*.

213. A month after the Second Circuit's decision, Red Rock's attorney, Karrie Wichtman, wrote an e-mail to Martorello, explaining that the best option was to "go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 5 at Rosette1130 (emphasis added).

## OVERVIEW OF THE RESTRUCTURE

214. Long before the restructure, Martorello had created the concept for Big Picture to be used as another rent-a-tribe enterprise associated with a tribe on the Fort Belknap Indian Reservation.

215. Martorello worked with a marketing company to develop a logo, website, and other marketing materials, which are identical to those used by Big Picture today.

216. In September 2013, Bellicose VI was getting ready to launch Big Picture Loans for the tribe on the Fort Belknap Indian Reservation, but the "launch date" was delayed because of the lack of an ACH provider to process the payments. *Id*.

217. Because of the loss in *Otoe-Missouria*, Matt and Justin Martorello never officially launched Big Picture Loans with the tribe located on the Fort Belknap Indian Reservation.

218.    Instead, as evidenced by an e-mail from Justin Martorello dated October 22, 2013, undertakings associated with this venture were placed on "FULL STOP" and because of "the massive attacks on the industry we do not plan use these sites."

219.    Because of these massive attacks, the ongoing enterprise with Red Rock was also at risk. As Matt Martorello further explained: "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." Ex. 6 at Martorello_009775.

220.    One of those was an action filed by the Pennsylvania Attorney General, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for sure." *Id*.

221.    Martorello further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id*.

222.    In addition to state attorney general threats, Martorello further explained that the NYDFS has "issues too" with tribal lending "and they could go after SPVI as well." *Id*.

223.    In "order to build an even stronger case for future litigation," Ex. 5, and protect the illegal amounts obtained from consumers, Martorello wrapped up the lending operation in newly-created tribal entities through a "sale" of Bellicose Capital and its wholly owned subsidiaries.

224.    Through a series of interrelated agreements, Red Rock was rebranded as Big Picture (using the materials and website previously created for the other tribe), and Bellicose became Ascension, a newly created LVD entity.

225.    On paper, the LVD now appeared to have created and to own the lending business, ostensibly: (1) shielding Bellicose (and the substantial revenue paid to it) from any pre-merger claims; and (2) enhancing the appearance of tribal ownership and control over operations.

226.    To facilitate the restructure, the LVD's entities agreed to a $300,000,000.00 promissory note to Eventide—a new company with the same ownership structure as Bellicose, *i.e.*, 85.1% being held by Matt Martorello; 9.9% being held by Justin Martorello; and the remaining 5% was owned by McFadden, Liang, and Dowd.

227.    But other than changing the form of the transaction, the substance remained the same—the Promissory Note requires the tribal entities to pay 1.8% interest *and* the "Net Cash Available" at the end of each month. Ex. 7, Promissory Note.

228.    The "Net Cash Available" is defined as the tribal entities' gross revenues minus: (1) a "monthly distribution to the Tribe equal to two percent (2%) of the Gross Revenues;" (2) a "one-time reinvestment amount equal to $1.3 million dollars ($1,300,000), and a monthly reinvestment amount thereafter of two percent (2%);" and (3) interest, expenses, and reserves. *Id*. at § 1.2(a)-(b)(1)-(6).

229.    In other words, Martorello, McFadden, Liang, Dowd, and a few other investors continue to be the primary beneficiaries of the scheme.

230.    And, other than changing the name and the jurisdiction of formation, Ascension continues to be operated in the same manner and by primarily the same individuals who ran Bellicose—none of whom are members of the LVD or work on the reservation.

231.    The LVD not only lacks involvement in Ascension's day-to-day operations, it contractually relinquished any right to control Ascension through a Delegation of Authority Policy. Ex. 8, Delegation of Authority Policy.

232.    Under this policy, Ascension delegated McFadden with the authority to: (1) handle Ascension's "strategic direction, goals and targets," (2) perform "all matters necessary for the day to day management of Ascension," (3) execute documents on behalf of Ascension, (3)

open and maintain bank accounts, and (5) adopt employee benefit plans and programs. *Id*. at §
1.4(a)-(e).

233.    McFadden also possesses the exclusive authority to handle "verbal
communications with media, regulatory bodies, or other entities" and must approve any written
communications with the media, regulatory bodies, and other entities. *Id*. at § 3.1-3.2.

234.    By contrast, the only matters designated to the tribal co-managers, Defendants
Hazen and Williams, are: (1) approval of contracts in excess of $100,000 in a calendar year, (2)
appointment of the president, and (3) approval of any "new major employee benefit plans." *Id*. at
§ 1.2(a)-(c).

235.    And, while the authority to appoint the president seems to provide some control, a
Loan and Security Agreement takes this control away.

236.    To appoint a new president of Ascension, the tribal entities must receive the
approval of Eventide, *i.e.*, a company owned by Matt Martorello and Brian McFadden.

237.    Because of Martorello/McFadden/Eventide's *de facto* control of Ascension,
Defendants delegated to Ascension the vast majority of responsibilities associated with Big
Picture's operations—no different than the relationship between SourcePoint and Red Rock.

238.    In particular, Ascension and Big Picture entered into an "Intratribal Servicing
Agreement," which is virtually identical to the prior servicing agreement between SourcePoint
and Red Rock. *Compare* Ex. 9; *with* Ex. 1.

239.    This agreement grants Ascension "all the necessary power and authority to act in
order to fulfill its responsibilities," which includes the enumerated responsibilities previously
designated to SourcePoint.

240.     And, just like the Delegation of Authority Policy, the tribal entities cannot amend, modify, or terminate the Intratribal Servicing Agreement until satisfaction of the $300 million-dollar promissory note.

241.     In short, other than the change in titles, things have largely stayed the same because the restructuring agreements "confer on Eventide, and hence Martorello, significant control mechanisms over significant aspects of Ascension's operations." *Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 279 (E.D. Va. 2018).

## MCFADDEN, LIANG, AND DOWD'S ROLE IN THE ENTERPRISE

242.     Although Martorello was the architect and primary beneficiary of the scheme, Defendants McFadden, Dowd, and Liang along with Justin Martorello were the other officers and shareholders of Bellicose Capital.

243.     In their capacity as officers and shareholders of Bellicose, Defendants McFadden, Dowd, and Liang participated in the operation and management of the rent-a-tribe enterprise; and agreed to undertake the conspiracy to collect high-interest loans from consumers in violation of their respective state laws.

244.     For example, McFadden was the Director of Operations who was "[r]esponsible for managing and coordinating operations, including the Tribe's offshore call center." Ex. 10 at Martorello_005441. As part of these responsibilities, McFadden managed "payment processing" for Red Rock's portfolio, as well as "all aspects" of Red Rock's "customer service." *Id*. McFadden also coordinated the "marketing plans" for Red Rock to "maximize" its return on investment and monitored key performance indicators.

245.     Liang was the Controller of Bellicose who "[d]esigned the accounting system for [Red Rock's] online lending portfolio." *Id*. at Martorello_005441-2. He oversaw and assisted in

the preparation of the "monthly financial statements and servicing fee schedules" and prepared "weekly and monthly operating reports for decision-making." *Id*.

246.    Dowd was another executive of Bellicose who managed "vendor relationships for lead purchasing and underwriting data" for Red Rock's products. Dowd helped "develop the management reporting, underwriting strategies and proprietary Direct Mail marketing and risk models for" Red Rock. *Id*. at Martorello_005442.

247.    McFadden, Liang, and Dowd devoted 100% of their professional time to Bellicose. Ex. 3.

248.    Indeed, Matt Martorello himself claims "he delegated increasing responsibility to Justin Martorello, McFadden, data analyst James Dowd, accountant Simon Liang" to run the operations of Bellicose and SourcePoint. *See Williams v. Big Picture Loans*, Case No. 4:17-cv-461-REP/RCY, Dkt. 216 at pg. 11.

249.    Upon information and belief, each of these individuals had knowledge of the litigation involving the *Otoe-Missouria*, oversaw the restructure, and participated in the creation of Eventide to further the scheme.

250.    And following the restructure, each of these individuals remain involved in the day-to-day operations of the business (now under the guise of Ascension) and continue to receive substantial profits from the illegal activities through their ownership interest in Eventide.

## THE INVESTOR DEFENDANTS' ROLE IN THE ENTERPRISE

251.    Defendants Amlaur Resources, Columbia Pipe, Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and Deborah M. Arenberg Living Trust (collectively, the "Investor Defendants") provided substantial capital to fund the loans to

consumers and worked together with the other entities described herein to systemically perpetrate fraud and to scam consumers.

252.    On December 10, 2012, Columbia Pipe provided a $2,000,000.00 loan to fund the illegal loans. Ex. 11 at Martorello_000115. In exchange, Columbia Pipe received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers. These amounts were reinvested in the enterprise, including as part of a $4,000,000.00 loan on November 21, 2013, and a $2,000,000.00 loan on August 16, 2014. *Id*.

253.    On December 10, 2012, Timothy Arenberg provided a $700,000.00 loan to fund the illegal loans. *Id*. In exchange, Timothy Arenberg received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers. These amounts were reinvested in the enterprise, including as part of a $700,000.00 loan on November 21, 2013, and a $400,000.00 loan on December 10, 2014. *Id*.

254.    On December 10, 2012, Terrance Arenberg provided a $900,000.00 loan to fund the illegal loans. *Id*. In exchange, Terrance Arenberg received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers. These amounts were reinvested in the enterprise, including as part of a $750,000.00 loan on November 21, 2013, and a $400,000.00 loan on December 10, 2014. *Id*.

255.    On September 25, 2013, DTA Trinity Wealth Transfer Trust provided a $300,000.00 loan to fund the illegal loans. *Id*. In exchange, DTA Trinity Wealth Transfer Trust received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers. Upon information and belief, these amounts were reinvested in the enterprise, including as part of a $150,000.00 loan on November 21, 2013. *Id*.

256.    On March 31, 2016, Deborah M. Arenberg Living Trust provided a $150,000 loan to fund the illegal loans. *Id*. In exchange, Deborah M. Arenberg Living Trust received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers.

257.    Prior to December 2015, Amlaur Resources provided a $10,500,000.00 loan to fund the illegal loans. In exchange, Amlaur Resources received a fixed return of 30% APR on the invested funds in the enterprise, which was paid *via* the illegal amounts collected from consumers.

258.    Jedwab is a hedge fund manager and resident of New York. At all times relevant hereto, Jedwab was the president of Amlaur Resources and Jedwab personally participated in its decision to provide the capital to the enterprise. Jedwab had knowledge that the capital would be used to make high-interest loans to consumers, and signed the key documents related to Amlaur Resources's investment in the enterprise.

259.    These loans "were a large part of [Red Rock's] success and the continuous growth of its lending portfolio." Ex. 12, Letter from McFadden to Investors.

260.    Upon information and belief, each of the investors received periodic updates from representatives of SourcePoint and Bellicose, including regarding the litigation with the New York Department of Financial Services.

261.    Each of the Investor Defendants had knowledge of the failed litigation and, as part of the restructure, each of the Investor Defendants had an opportunity to withdraw their money from the enterprise.

262.    Despite their knowledge of the illegality of the lending operations, the Investor Defendants nonetheless agreed to convert their loan with SourcePoint to "a direct Loan and Security Agreement and Promissory Note with Big Picture." *Id*.

263.    "With this new direct relationship," McFadden promised that the investors "can feel confident that your investment is protected." *Id*.

264.    In addition to the enhanced protections of the new structure, the Loan and Security Agreement further protected the Investor Defendants as it provided them with "a security interest" in Big Picture's collateral, including its consumer loans and accounts receivable. *Id*.

265.    Upon information and belief, each of the Investor Defendants continue to maintain their investment in the enterprise, including the millions of dollars identified on Exhibit A to the Agreement and Plan of Merger. *See* Ex. 12 at Martorello_000115. In return, each of the Investor Defendants continue to receive a fixed return of 30% APR on the invested funds in the enterprise.

## THE TRIBAL DEFENDANTS' ROLE IN THE ENTERPRISE

266.    Defendants Big Picture Loans, LLC, Ascension Technologies, LLC, James Williams, Jr. Michelle Hazen, Henry Smith, Alice Brunk, Andrea Russell, Tina Caron, Mitchell McGeshick, Jeffrey McGeshick, Gertrude McGeshick, Susan McGeshick, Giiwegiizhigookway Martin, Roberta Ivey, June Saad, James Dowd, Simon Liang, and Brian McFadden ("Tribal Defendants") worked together with the other entities described herein to systemically perpetrate fraud and to scam consumers.

267.    The LVD Tribal Council serves as the LVD's governing body and has the power to make laws and ordinances pursuant to the LVD Constitution.

268.     Pursuant to Article IV of the LVD Constitution, the Tribal Council is vested with all powers of its inherent sovereignty and "shall exercise such powers to the fullest extent permitted by Federal law." These powers expressly include the power to "manage the economic affairs, enterprises, property, both real and personal, and other interests of the Band."

269.     Although Plaintiffs maintain that Defendants are not involved in the day-to-day management and operations of Big Picture Loans, the LVD Tribal Council's quiescence in and facilitation of the illegal lending enterprise is a key component. And, Defendants' withdrawal from the conspiracy and direction that Big Picture Loans cease unlawful collections in Plaintiffs' home states would provide Plaintiffs with relief from future harm.

270.     Accordingly, it is within Defendants' power, as members comprising the Tribal Council, to shut down the operations of Big Picture Loans and Ascension, including to stop the unlawful collection of interest by Big Picture in Plaintiffs' home states.

271.     In July 2011, the LVD Tribal Council created Red Rock by tribal ordinance, which purported that Red Rock was a wholly-owned tribal business entity.

272.     Defendant Hazen, who was on the Tribal Council at the time Red Rock was formed, was manager of Red Rock from 2011 through its dissolution in 2016.

273.     Defendant Hazen has *claimed* that she and Defendant Williams were ultimately responsible for all final decisions about operations at Red Rock.

274.     In 2014, the LVD Tribal Council created Big Picture Loans by passing a tribal resolution. The LVD holds out Big Picture Loans as owned and operated by the LVD.

275.     Defendants Hazen and Williams were designated as co-managers of Big Picture. And since, December 2015, Defendant Hazen has been designated as the Chief Executive Officer of Big Picture.

- 43 -

276.    Big Picture's operating agreement grants Defendants Williams and Hazen with broad authority over the business; however, they are ultimately appointed and may be removed by the Tribal Council.

277.    In early 2015, the LVD Tribal Council created Tribal Economic Development Holdings, LLC, which purports to be a wholly-owned and operated economic arm and instrumentality of LVD.

278.    The LVD was the sole member of Tribal Economic Development Holdings, and Defendants Hazen and Williams were designated as its co-managers.

279.    The Tribal Council also created Ascension as a subsidiary of Tribal Economic Development Holdings.

280.    Ascension was created "as a wholly owned and operated instrumentality of the Tribe," with Tribal Economic Development Holdings as its sole member, and Defendants Hazen and Williams were designated as its co-managers.

281.    Defendant Hazen has purported to be responsible for the day to day operations and management of Tribal Economic Development Holdings, Ascension, and Big Picture.

282.    As CEO of Big Picture, Defendant Hazen has purported to have control over the bank account used by Big Picture to fund consumer loans, receive consumer payments, and pay vendors.

283.    Defendant Williams has described Defendant Hazen as "handl[ing] more onsite operational functions, such as overseeing employees, marketing, customer and applicant matters, budgeting, website operation, office materials, etc."

284.    Defendant Williams, who is the LVD Tribal Council Chairman, is a manager of Tribal Economic Development Holdings, Ascension, and Big Picture.

285.    Defendant Williams has purported to be responsible for oversight of Tribal Economic Development Holdings, Ascension, and Big Picture.

286.    Specifically, Defendant Williams has represented that he is "responsible for outreach, recruiting investors, and soliciting vendors, mentoring industry best practices; managing relationships with banks, other tribal officials, and other tribal consumer financial service providers."

287.    Defendant Williams has represented that the LVD has invested over $7,000,000 into the illegal lending enterprise, and he suggested that these were profits from the illegal lending enterprise that the LVD reinvested back into the illegal lending enterprise.

288.    Each month, Big Picture reinvests a portion of the profits from the illegal loans back into the lending enterprise.

289.    Defendant Williams has represented that Tribal Economic Development Holdings has the power to make all important business decisions with respect to Big Picture Loans and has complete discretion to expand the business as it chooses.

### PLAINTIFFS' EXPERIENCES

A.    **Plaintiff Renee Galloway (Virginia)**

290.    On or around April 21, 2017, Plaintiff Galloway obtained a loan for $600 with Big Picture that had an interest rate of 636.75%.

291.    Plaintiff Galloway paid $930 on her loan with Big Picture, almost all of which was credited to interest and fees.

292.    As part of her application, Plaintiff Galloway entered in her Virginia residential address.

**B.**    **Plaintiff Dominique de la Bay (Virginia)**

293.    On or around July 4, 2017, Plaintiff de la Bay obtained a loan for $1,025.00 with Big Picture that had an interest rate of 482.12%.

294.    Plaintiff de la Bay paid more than $500 on her loan with Big Picture, almost all of which was credited to interest and fees.

295.    As part of her application, Plaintiff de la Bay entered in her Virginia residential address, located in Alexandria, Virginia.

**C.**    **Plaintiff Lori Fitzgerald (Virginia)**

296.    On or around July 24, 2017, Plaintiff Fitzgerald obtained a loan for $500.00 with Big Picture that had an interest rate of 643.87%.

297.    Plaintiff Fitzgerald paid approximately $836 on her loan with Big Picture, almost all of which was credited to interest and fees.

298.    As part of her application, Plaintiff Fitzgerald entered in her Virginia residential address.

**D.**    **Plaintiff Andrea Scarborough (Virginia)**

299.    On or around May 10, 2018, Plaintiff Scarborough obtained a loan for $750.00 with Big Picture that had an interest rate of 492.18%.

300.    Plaintiff Scarborough also obtained a loan with Big Picture in early 2017 that had a similar interest rate.

301.    Plaintiff Scarborough paid approximately $200 on her 2017 loan with Big Picture.

302.    Plaintiff Scarborough paid more than $200 on her 2018 loan with Big Picture, almost all of which was credited to interest and fees.

303.    301.    As part of her application, Plaintiff Scarborough entered in her Virginia residential address.

**E.    Plaintiff Dianne Turner (Virginia)**

304.    On October 12, 2015, Plaintiff Turner obtained a $400 loan with Red Rock that had an interest rate of 615%.

305.    Plaintiff Turner paid no less than $560 on her loan with Red Rock, almost all of which was credited to interest and fees.

306.    As part of her application, Plaintiff Turner entered in her Virginia residential address.

**F.    Plaintiff Derek Geter (Virginia)**

307.    Since January 2016, Plaintiff Geter has obtained multiple high-interest loans with Big Picture, including a loan dated October 18, 2018, that had an interest rate of 348.4%.

308.    Plaintiff Geter has paid no less than $7,838 on the loans with Big Picture, much of which was credited to interest and fees.

309.    As part of his application, Plaintiff Geter entered in his Virginia residential address.

**G.    Plaintiff Earl Browne (California)**

310.    On February 2, 2017, Plaintiff Browne obtained a loan with Big Picture that had an interest rate of 697%.

311.    Plaintiff Browne paid no less than $1,124.09 on his loan with Big Picture within the past year, most of which was credited to interest and fees.

312.    As part of his application, Plaintiff Browne entered in his California residential address.

**H.     Plaintiff Rose Marie Buchert (Illinois)**

313.    On October 9, 2015, Plaintiff Buchert applied for a $250 loan from Red Rock. The loan had an interest rate of 755%, requiring monthly payments with a final payment due on August 3, 2016. The finance charge was $1,000.

314.    In October 2016, Plaintiff Buchert took out a second loan that was identical in amount, interest rate, and payment plan to her first loan.

315.    As part of her applications, Plaintiff Buchert entered in her Illinois residential address.

316.    Plaintiff Buchert paid off both loans, including $2,000 in finance charges.

**I.     Plaintiff Anthony Green (Illinois)**

317.    On or around January 9th, 2018, while living in Illinois, Plaintiff Green took out a loan from Big Picture.

318.    The principal amount on the loan was $400.00 and the interest rate was 683.36%. This loan required 13 bi-weekly payments of $116.67.

319.    Plaintiff Green made approximately seven payments and paid at least $800.00 to Big Picture for repayment on the loan.

320.    As part of his application, Plaintiff Green entered in his Illinois residential address.

**J.     Plaintiff Regina Nolte (Indiana)**

321.    Plaintiff Nolte took out a $450 loan from Big Picture that was deposited into her account on December 20, 2016. The interest rate on the loan was at least 200%.

322.    As part of her application, Plaintiff Nolte entered her Indiana residential address.

323.    Plaintiff Nolte paid Big Picture in excess of the principal amount on her loan.

### K.     Plaintiff Kevin Minor (Ohio)

324.     On or about May 5, 2016, Plaintiff Minor received a $900 loan from Big Picture. The loan had an annual interest rate that exceeded 44%.

325.     On or about August 4, 2016, Plaintiff Minor received a $1,000 loan from Big Picture. The loan had an annual interest rate that exceeded 56%.

326.     Plaintiff Minor made multiple payments on his loans, and paid off at least one of his loans with Big Picture in full.

327.     As part of his loan applications, Plaintiff Minor entered his Ohio address.

### L.     Plaintiff Teresa Titus (Washington)

328.     On or about July 14, 2015, Plaintiff Titus applied for a loan at www.castlepayday.com. Plaintiff Titus was approved for a loan for $400.00. The loan had an annual interest rate over 400%.

329.     On July 14, 2015, $400 was deposited into her bank account by "Castle Payday.com."

330.     By June 2016, Plaintiff Titus had paid a total of $2,281.25 on her July 2015 loan. But when she could no longer afford her payments on the loan, she had to take out another loan to cover her payments on the first loan. Over the course of the next year, Plaintiff Titus suffered from this debt treadmill whereby she had to take out new loans in order to pay back old loans.

331.     In addition to her original loan, Plaintiff Titus took out loans from Defendants in June 2016 ($500) and July 2017 ($400). These loans both had annual interest rates in excess of 400%. These loans were deposited into Plaintiff Titus's bank account by "VBS Big Picture Loans" and "Big Picture Loans," respectively.

332.     Since August 2015, Plaintiff Titus has paid $4,994.11 to Defendants toward her $1,300 principal in Castle Payday/Big Picture loans. Plaintiff Titus has also paid $175 in

overdraft fees and returned item charges associated with automatic bank account debits for her Castle Payday/Big Picture payments.

333.    As part of her application for these loans, Plaintiff Titus entered in her Washington residential address.

334.    As of the filing of the initial complaint in the matter, Defendants are still attempting to collect additional payments from Plaintiff Titus.

**M.    Plaintiff Burry Pough (Texas)**

335.    On or around November 28, 2017, while living in Texas, Plaintiff Pough took out a loan from Big Picture.

336.    The principal amount on the loan was $800.00 and the interest rate was 598.3569%. The loan required 20 bi-weekly payments of about $179.58. Plaintiff paid at least $2,873.28 to Big Picture for repayment on the loan.

337.    As part of the loan application, Plaintiff Pough provided his Texas address.

338.    Defendants are still attempting to collect on the loan.

**N.    Plaintiff Lisa Martinez (Texas)**

339.    On or around October 19, 2017, while living in Texas, Plaintiff Lisa Martinez took out a loan from Big Picture.

340.    The principal amount on the loan was $800.00 and the interest rate was at least 320%. The loan required 13 bi-weekly payments of about $211.16.

341.    Plaintiff Martinez paid off the loan in full prior to the loan maturity date, and paid at least $2,598.28 to Big Picture for repayment on the loan.

342.    As part of the loan application, Plaintiff Martinez provided her Texas address.

**O.     Plaintiff Anastasia Sherman (Florida)**

343.     On or around April 21, 2016, while living in Florida, Plaintiff Sherman took out her first loan from Big Picture.

344.     The principal amount on the loan was $400.00 and the interest rate was 569.2071%. Plaintiff Sherman paid off well above the principal balance of the loan.

345.     On or around October 20, 2017, still while living in Florida, Plaintiff Sherman took out her second loan from Big Picture.

346.     The principal amount on the loan was $425.00 and the interest rate was 497.6327%. The loan required 13 bi-weekly payments of about $85.45. Plaintiff Sherman paid at least $1,110.66 to Big Picture for repayment on the second loan.

347.     As part of the loan applications, Plaintiff Sherman provided her Florida address.

**P.     Plaintiff Sonji Grandy (New Jersey)**

348.     On or around January 19, 2017, while living in New Jersey, Plaintiff Grandy took out a loan from Big Picture.

349.     The principal amount on the loan was $600.00 and the interest rate was 720.03%. This loan required 28 bi-weekly payments varying from $62.50-$150.00.

350.     Plaintiff Grandy paid at least $3,000 to Big Picture for repayment on the loan.

351.     As part of the loan application, Plaintiff Grandy provided her New Jersey address.

**Q.     Plaintiff Jerry Avent (North Carolina)**

352.     In or around December 2017, while living in North Carolina, Plaintiff Avent took out a loan from Big Picture.

353.     The principal amount on the loan was $200.00 and the interest rate was between 564.392%.

354.    Plaintiff Avent has paid around $700 on the loan, including $653.69 that has been credited to interest.

355.    As part of the loan application, Plaintiff Avent provided his North Carolina address.

**R.    Plaintiff Lucinda Gray (North Carolina)**

356.    On or around December 10, 2017, while living in North Carolina, Plaintiff Gray took out a loan from Big Picture.

357.    The principal amount on the loan was $600.00 and the interest rate was 598.7874%. The loan required 12 monthly payments of about $264.27.

358.    Plaintiff Gray paid at least $2,114.16 to Big Picture for repayment on the loan.

359.    As part of the loan application process, Plaintiff Gray entered in her North Carolina address.

**S.    Linda Madison (Maryland)**

360.    On or around March 6, 2018, Plaintiff Madison obtained an $800 loan with Big Picture that had an interest rate of 665%.

361.    Plaintiff Madison obtained the loan over the internet when she was in Maryland, and her loan application originated in Maryland.

362.    Plaintiff Madison paid no less than $880.92 on her loan with Big Picture—most of which was credited to interest and fees.

**T.    Plaintiff Keisha Hamm (Georgia)**

363.    In or around July 2015, while living in Georgia, Plaintiff Hamm took out a Castle Payday loan for $1,000 with an interest rate of over 500%. She paid back at least $6,931.50 on that loan.

364.    In or around April 2017, while living in Georgia, Plaintiff Hamm took out a Big Picture loan for $1,500 with an interest rate of over 4500%. She paid back at least $6,779.96 on that loan.

365.    As part of her loan applications, Plaintiff Hamm entered in her Georgia address.

**U.    Plaintiff Faith Thomas (Georgia)**

366.    In 2017, Plaintiff Thomas took out loans for $1,300 and $825 from Big Picture with interest more than twice what is allowed under Georgia law. She paid off both the loans, paying back thousands of dollars to Big Picture.

367.    In July 2018, Plaintiff took out another usurious loan with Big Picture for $1,200. She paid back no less $1,358 on that loan.

368.    As part of her loan applications, Plaintiff Hamm entered in her Georgia address.

**V.    Plaintiff Sharon Paavo (Michigan)**

369.    On or around January 29, 2018, Plaintiff Paavo applied for a loan with Big Picture for $350. Plaintiff Paavo made six monthly payments to Big Picture in 2018. Paavo paid back at least $1,056.86 on this loan, with most of the payments going towards an excessive interest rate of over 300%.

370.    As part of her loan application, Plaintiff Paavo entered in her Michigan residential address.

**W.    Plaintiff Latanya Tarleton (Michigan)**

371.    Between February 2016 and March 2018, Plaintiff Tarleton applied for at least 6 loans with Big Picture. The amounts of the loans range between $300 to $1,000. Plaintiff Tarleton has paid far in excess of the principal balance of these loans to Big Picture for repayment on the loans.

372.    On or around March 10, 2018, Plaintiff Tarleton applied for a loan with Big Picture for $600. The loan required 13 monthly payments of about $102.90, with a total repayment of $1,337.59. Plaintiff Tarleton has paid far in excess of $600 to Big Picture for repayment on the loan. Most of the payments were going towards an excessive interest rate of over 398.906%.

373.    As part of her application, Plaintiff Tarleton entered in her Michigan residential address.

## X.    Plaintiff Lula Williams (Virginia)

374.    Plaintiff Williams has taken out at least three loans with Big Picture. Plaintiff Williams applied for the first loan on August 3, 2016. The amount of that loan was $800. Big Picture financed two additional loans on September 30, 2016 and November 2, 2016 both for $800. Big Picture auto-debited funds from Plaintiff Williams' bank account in the amount of $1,330, including when there weren't sufficient funds charging her $60. In total, Plaintiff Williams paid $1,930 on these loans with most of the payments going towards an interest rate of 649.8%.

375.    As part of her application, Plaintiff Williams entered in her Virginia residential address.

## Y.    Plaintiff Gloria Turnage (Virginia)

376.    On March 3, 2017, Big Picture issued Plaintiff Turnage a loan for $225, with an annual interest rate of 696.97%. Plaintiff Turnage paid back at least $319.80 on this loan, with most of the payments going towards the excessive interest rate. Plaintiff Turnage took out a second loan for $300 on April 7, 2017 with an annual percentage rate of 693%.

377.    Plaintiff Turnage contacted Big Picture to schedule a payment to pay off the loan on April 18, 2017 for $334.47. Plaintiff Turnage called and emailed Big Picture numerous times

to arrange that payment. They did not deduct the money on April 18, 2017 because it was not a scheduled payment. They started calling her to schedule a payment on May 1, 2017, but she no longer had the funds to pay off the loan. Big Picture sent a notice stating they would deduct $146.86 on May 31, 2017. She had to pay $30 to Richmond Postal Credit Union on May 24, 2017 to stop the payment. In total, Plaintiff Turnage paid $319.80 on the two loans. As part of her loan application, Plaintiff Turnage entered her Virginia address.

**Z.     Plaintiff George Hengle (Virginia)**

378.    Plaintiff Hengle took out at least ten loans with Red Rock and Big Picture. On December 16, 2013 he took out a loan with Red Rock for $800 and paid if off on December 27, 2013. His payments for this loan total to $1,080. He took out a second loan on January 2, 2014 for $600. He paid off his loan on February 7, 2014. His payments for this loan total to $843.75. He took out a third loan on February 10, 2014 for $300. He paid this loan off on April 18, 2014. His payments for this loan total to $600. He took out a fourth loan on August 22, 2014 for $1,000. He paid this loan off on November 28, 2014. His payments for this loan totaled $1,812.50. He took out a fifth loan on December 6, 2014 he took out a loan for $1,000 and paid it off on March 20, 2015. His payments for this loan totaled $2,500. He took out a sixth loan for $1,000 on March 22, 2015. He paid off this loan on April 17, 2015. He took out a seventh loan on April 19, 2015 again for $1,000. This loan was paid off on May 15, 2015. The eighth loan was funded on May 26, 2015 for $1,000 and was paid off on August 7, 2015. Plaintiff Hengle took out a ninth loan on September 1, 2015 in the amount of $700. The loan was paid off on September 23, 2016. He took out a loan with Big Picture on October 31, 2019 for $850. The loan is not paid off and Plaintiff Hengle has not been able to access any account information on line. In total, Plaintiff Hengle paid $12,698.75. Most of the payments went towards an excessive interest rate of over 600%.

379.    As part of her application, Plaintiff Williams entered in her Virginia residential address.

### AA.    Plaintiff Dowin Coffy (Virginia)

380.    On or around December 11, 2015, Plaintiff Coffy applied for a loan with Red Rock for $1,000. Plaintiff Coffy paid back at least $2,050 on this loan. Plaintiff Coffy took out a loan with Big Picture on or around February 16, 2016 with Big Picture for $800. Plaintiff Coffy paid back at least $1,150 with most of the payments going towards an excessive interest rate of 607.5%. The loan is not paid off and Plaintiff Coffy has not been able to access any account information on line.

381.    As part of his application, Plaintiff Coffy entered in his Virginia residential address.

### BB.    Plaintiff Marcella Singh as executor of the estate of Felix Gillison, Jr. (Virginia)

382.    On or around March 12, 2013, Felix Gillison applied for a loan with Red Rock. This loan was approved for $600 and Mr. Gillison paid $1,412.50 on this loan. Mr. Gillison took out a second loan with Red Rock around June 13, 2013 for $400. Mr. Gillison paid $750 on his loan. Mr. Gillison's next loan was issued on August 7, 2013 for $800. In total, Mr. Gillison paid $4,575 on these two loans, with most of the payments going towards an interest rate that grossly exceeded 12%.

383.    As part of his application, Mr. Gillison entered in his Virginia residential address.

### CC.    Plaintiff Christina Cumming (California)

384.    Plaintiff Cumming took out a loan with Big Picture for $600. Plaintiff Cumming paid back at least $1,026.76.

385.    At least $717.22 of the amount Cumming paid was credited toward excessive interest that exceeded 600%.

**DD.   Plaintiff Lamesha Kondo (Ohio)**

386.    Plaintiff Kondo took out a $400 loan with Big Picture. Defendants charged Kondo an APR of 661.4771%

387.    Plaintiff Kondo paid back at least $1,089.63, with most of the payments going towards an excessive interest rate of 627.2%.

**EE.   Plaintiff Tammy Wangeline (Wisconsin)**

388.    Plaintiff Wangeline took out several loans with Big Picture, including (1) a loan funded on January 31, 2013 in the amount of $700 that had an APR of 912.5%, (2) a loan of $600 funded in May 2013 with an APR of 549.5121%, (3) a loan issued in September 2013 for $300 with an APR of 559.8631%, and (4) a loan issued in April 2014 for $1,000 with an APR of 661.2601%.

389.    Plaintiff Wangeline made payments on these loans, with most of the payments going towards the excessive interest.

**FF.   Plaintiff Andrea Mendez (Texas)**

390.    Plaintiff Mendez took out a $300.00 loan with Big Picture. According to her loan documentation, Mendez was charged an interest rate of 673.1618%.

391.    Plaintiff Mendez paid back at least $620.95, with most of the payments going toward the excessive interest.

**GG.   Plaintiff Kimberly Pool (Illinois)**

392.    Plaintiff Pool took out a loan with Big Picture with a principal amount of $600.00. Defendants charged Pool an APR of 765.8972%.

393.    Plaintiff Pool was charged at least $4,002.55, the majority of which was the excessive interest.

### HH. Plaintiff Tasha Pettiford (Michigan)

394.    Plaintiff Pettiford took out a $400 loan with Big Picture.

395.    Over the course of only three months, Plaintiff Pettiford paid at least $783.68, with most of the payments going towards interest well in excess of 25%.

### II. Richard L. Smith (Oregon)

396.    On or around December 12, 2017, Plaintiff Richard L. Smith obtained a $1,500 loan from Big Picture with bi-weekly payments of $337.91. The interest rate on the loan exceeded 527%.

397.    In April 2018, Plaintiff Richard Smith made a final payment of $1,650.41 for repayment of the loan. Thus, over a period of approximately four months, Mr. Smith paid a total of $4,353.69 for repayment of a $1,500 loan.

### JJ. Victoria Renee McKoy (Georgia)

398.    Plaintiff McKoy obtained an $800 loan from Big Picture Loans with bi-weekly payments of $189.08.

399.    The interest rate on the loan exceeded 420%.

### KK. Desiree Wright Lovins (Georgia)

400.    Plaintiff Lovins received a loan of $300 with payments of $145.12 deducted from her account every month.

401.    The interest rate on the loan exceeded 420%.

### LL. Sandra Monsalve (Georgia)

402.    Plaintiff Monsalve has had several loans with Big Picture. Plaintiff Monsalve's loans with Big Picture include, but are not limited to, loans dated October 4, 2017 (492.7% interest rate), November 2, 2017 (492.7% interest rate), November 30, 2017 (673.1% interest rate), and June 19, 2018 (497.6% interest rate).

403.     For each of her loans prior to the June 19, 2018 loan, Plaintiff Monsalve repaid the principal amount as well as the usurious interest. For the June 19, 2018 loan, Plaintiff Monsalve made two payments of $290.15. Plaintiff Monsalve wrote to Big Picture on or around August 7, 2018 and revoked its right to make further electronic withdrawals from her account.

**MM.  Carrie Samantha Smith (Georgia)**

404.     Plaintiff Carrie Smith received a $525 loan from Big Picture Loans with bi-weekly payments of $99.56.

405.     The interest rate on the loan exceeded 420%.

**NN.   Chris Kobin (California)**

406.     In April 2018, Plaintiff Kobin received a short-term installment loan from Big Picture in the amount of $500 with monthly payments of $280.24. He was not told that the interest rate for his loan was 590%.

407.     Over approximately six months, Plaintiff Kobin paid a total of $1,665.03 as principal and interest on the $500 loan.

**OO.   Dana Duggan (Massachusetts)**

408.     In October 2017, Plaintiff Duggan took out a $425 loan from Big Picture Loans with monthly payments of $191.52. The interest rate for this loan exceeded 596%. Over six months, Plaintiff Duggan paid a total of $1,083.22 in principal and interest.

409.     In April 2017, Plaintiff Duggan received a second short-term installment loan from Big Picture with a principal amount of $775. Plaintiff Duggan's monthly payments were $366.40. The interest rate for the load exceeded 535%. Plaintiff Duggan paid a total of $875 on her $775 loan, but Big Picture asserts that she still owes at least $719.06.

PP.    **John Actis (Mississippi)**

410.    On October 27, 2017, Plaintiff John Actis II applied for a $1,200 loan from Big Picture. The loan had an annual interest rate of 558%.

411.    To completely pay off the $1,200 loan, Mr. Actis would have had to pay $6,319.01 over 24 installments between November 10, 2017 and October 26, 2018.

412.    As part of his loan application, Mr. Actis entered his Mississippi residential address.

413.    Mr. Actis has made at least one payment on his loan.

414.    Defendants are still trying to collect further payments from Mr. Actis.

## CLASS ACTION ALLEGATIONS

415.    Plaintiffs also assert claims on behalf of the proposed Class defined as follows:

> *All consumers residing within the United States or its territories who executed loan agreements with Red Rock Tribal Lending, LLC or Big Picture Loans, LLC (including loans assigned to Big Picture Loans, LLC) from June 22, 2013 to the date of the Preliminary Approval Order.*

### Numerosity

416.    There are tens of thousands of members of the Class. Thus, the Class is so numerous that joinder of all members is impracticable.

### Commonality

417.    There are numerous common questions of law and fact common to Plaintiffs and members of the Class. These questions include but are not limited to the following:

      a.    Whether Matt Martorello, Big Picture, Ascension, the Investor Defendants, Bellicose Capital, SourcePoint, the Tribal officials, McFadden, Dowd, and Liang, and others unknown to Plaintiffs, constitute an "enterprise" under RICO;

     b.     Whether Defendants conducted the affairs or participated in the enterprise's affairs;

     c.     Whether Defendants violated RICO by collecting on the loans;

     d.     Whether the loans were unlawful debts as defined by RICO; and

     e.     Whether injunctive and declaratory relief is appropriate.

**Typicality**

418.    Plaintiffs' claims are typical of the claims of the Class they seek to represent. Each Plaintiff, like members of the Class, took out a usurious Big Picture or Red Rock loans. Thus, Plaintiffs' claims, like the claims of the Class, arise out of the same common practices of conduct by Defendants and are based on the same legal and remedial theories.

**Adequacy**

419.    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience in litigating rent-a-tribe cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that conflict with the Class.

**Predominance and Superiority**

420.    The Class meets the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Class even though certain members

of the Class are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

    a.    Absent a class action, class members as a practical matter will be unable to obtain redress; Defendants' violations will continue without remedy; and additional consumers will be harmed.

    b.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.

    c.    A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

    d.    The lawsuit presents no difficulties that would impede its management by the Court as a class action.

    e.    Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. §§ 1962(c)
### (Against All Defendants)

421.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

422.    Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

423.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Big Picture and Ascension, together with Bellicose Capital, Source Point, Matt Martorello, Justin and Rebecca Martorello, entities that Mr. Martorello

formed to protect his assets, and other unnamed investors are an "enterprise," as that term is

defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the

collection on unlawful debt by offering and collecting on loans to consumers throughout the

United States.

424.    The Enterprise has an ongoing organization with an ascertainable structure, and

functions as a continuing unit with separate roles and responsibilities.

425.    Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in

the conduct of the Enterprise's affairs in the collection of unlawful debt.

426.    RICO defines "unlawful debt" as a debt which was incurred in connection with

"the business of lending money or a thing of value at a rate usurious under State or Federal law,

where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

427.    All of the loans made to Class members and collected by Defendants included

interest rates far in excess of twice the enforceable rate in their states.

428.    Plaintiffs and Class members were injured as a direct result of Defendants'

violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious

rates of interest on loans made by the Enterprise.

429.    This conduct began sometime in 2011, continues to date, and will be repeated

again and again in the future to the detriment of consumers in the United States or its territories.

430.    Accordingly, Defendants are jointly and severally liable to Plaintiffs and the Class

for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. §

1964(c).

## SECOND CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. §§ 1962(d)
### (Class Claims against All Defendants)

431.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

432.    Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

433.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Big Picture and Ascension, together with Bellicose Capital, Source Point, Matt Martorello, Justin and Rebecca Martorello, entities that Mr. Martorello formed to protect his assets, and other unnamed investors are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States.

434.    Enterprise has an ongoing organization with an ascertainable structure, and functions as a continuing unit with separate roles and responsibilities.

435.    Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

436.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

437.     Plaintiffs and Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

438.     This conduct began sometime in 2011, continues to date, and will be repeated again and again in the future to the detriment of consumers the United States and its territories. Accordingly, Defendants are jointly and severally liable to Plaintiffs and the Class for their actual damages treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. §§ 1962(a)**
**(Class Claims against Amlaur Resources, Columbia Pipe, Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and Deborah M. Arenberg Living Trust)**

439.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

440.     As alleged above, Amlaur Resources, Columbia Pipe, Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and Deborah M. Arenberg Living Trust violated § 1962(a) of RICO through the receipt of income derived, directly and indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

441.     These defendants participated in the collection of the unlawful debt as principals by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

442.     Plaintiffs and the Class members were injured as a result of the violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for their investment and participation in the enterprise.

443. Plaintiffs and Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(a) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

## FOURTH CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. §§ 1962(b)
### (Class Claims against Amlaur Resources, Columbia Pipe, Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and Deborah M. Arenberg Living Trust)

444. As alleged above, Amlaur Resources, Columbia Pipe, Jeremy Davis, Timothy Arenberg, Terrance Arenberg, DTA Trinity Wealth Transfer Trust, and Deborah M. Arenberg Living Trust violated § 1962(b) of RICO by acquiring and maintaining interests in and control of the Enterprise involved in the unlawful collection of debt.

445. These defendants participated in the collection of the unlawful debt as principals by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

446. Plaintiffs and Class members were injured as a result of the violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

447. Plaintiffs and Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(b) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

## FIFTH CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (Class Claims against all Defendants)

448. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

449.    Virginia and many other states require all who engage in the business of making personal loans to be licensed.

450.    Neither Big Picture nor Red Rock were licensed to make loans in Virginia or any other state in the United States.

451.    Because the loans were made without the required license and charged excessive interest rates, the loans are null and void in Virginia, as well as many other states.

452.    In addition to licensing violations, Defendants' loan violated the general usury laws of many states including Virginia's. *See* Va. Code § 6.2-305(A). Thus, the loans violated the general usury statutes of many states and are void pursuant to state usury laws.

453.    As alleged herein, Defendants' loan agreements were violative of fundamental state public policy in Virginia and other states with similar usury, licensing, and criminal laws.

454.    Further, the lending agreements used for Plaintiffs contained unconscionable choice of law and forum-selection provisions that are void and unenforceable for public policy concerns.

455.    Plaintiffs still have outstanding amounts owed for their Red Rock and Big Picture accounts.

456.    Because of the triple digit interest rates charged on the loans, the debts are increasing in value substantially.

457.    Accordingly, Plaintiffs seek a determination as to their obligation to pay their outstanding Red Rock and Big Picture debts.

458.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law and forum-selection provisions.

459.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

460.    Accordingly, Plaintiffs seek a declaratory judgment that they are not obligated to pay any principal or interest outstanding on the illegal loans.

**SIXTH CAUSE OF ACTION**
**INJUNCTIVE RELIEF**
**(Class Claims against the Tribal Defendants)**

461.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

462.    As alleged herein, Plaintiffs have taken out Red Rock and Big Picture loans, which they maintain were void ab initio because they violated their state's licensing and usury requirements in addition to violating the public policy of their states and using unconscionable terms.

463.    Plaintiffs have outstanding balances on their Red Rock and Big Picture loans.

464.    Because of the triple digit interest rates used by Red Rock and Big Picture loans, each Plaintiff is subject to significant liability as the interest accrues on their unpaid debts.

465.    Such debt has the potential to financially ruin and bankrupt each of Plaintiffs if relief is not obtained.

466.    Big Picture is owned by the LVD, which claims that Big Picture is an arm of the tribe and subject to its sovereign immunity. Even if not true, the LVD is entitled to sovereign immunity, and Plaintiffs are unable to recover against the LVD.

467.    Accordingly, Plaintiffs face irreparable harm if the Court does not grant injunctive relief.

468.     Further, Plaintiffs face ongoing harm absent relief because collection efforts are ongoing and will continue in the absence of relief.

469.     Accordingly, Plaintiffs seek injunctive relief prohibiting the Tribal Defendants from continuing to collect on the unlawful loans in Plaintiffs' home state, requiring the Tribal Defendants to forgive the loans and/or prevent Big Picture Loans from selling the unlawful loans to third-party debt collectors, and prohibiting the Tribal Defendants from continuing to engage in unlicensed and unlawful lending in Plaintiffs' home states.

## SEVENTH CAUSE OF ACTION
### Violation of Virginia Usury Laws
### (Class Claims Against All Defendants)

470.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

471.     Under Virginia law, the maximum allowable interest rate on a consumer loan is 12% per annum. Va. Code § 6.2-303.

472.     All of the loans made to Virginia consumers in the name of Big Picture and Red Rock used an annual interest rate well in excess of 12%.

473.     As a result, Plaintiffs Williams, Turnage, Coffy, Galloway, Turner, Singh as executor of the Estate of Gillison, de la Bay, Fitzgerald, Scarborough, Geter, Hengle, and Class members are entitled to recover all amounts paid on these void loans, as well as twice the amount of usurious interest repaid. Va. Code § 6.2-1541(B); Va. Code § 6.2-305.

## EIGHTH CAUSE OF ACTION
### Violation of California Usury Laws
### (Class Claims Against All Defendants)

474.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

475.    Under the California Constitution, the maximum allowable interest rate on a consumer loan is 10% per annum. Cal. Const. Art. XV § 1.

476.    All of the loans made to California consumers in the name of Big Picture and Red Rock used an annual interest rate well in excess of 10%.

477.    Accordingly, Plaintiff Browne and Class members are entitled to recover all interest paid on the loans in excess of 10%, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3.

## NINTH CAUSE OF ACTION
### Violations of Cal. Bus. & Prof. Code § 17200
### (Class Claims Against All Defendants)

478.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

479.    As alleged above, Defendants engaged in unlawful, unfair, and deceptive business practices through the sham relationship with the Tribes in order to make high-interest loans to consumers throughout the country, including California.

480.    Defendants' conduct violated California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

481.    Accordingly, Plaintiffs Cumming, Kobin, Browne, and Class members are entitled to recover all interest paid on the loans in excess of 10%, as well as an injunction prohibiting any future collection of the loans. Cal. Bus. & Prof. Code § 17203.

**TENTH CAUSE OF ACTION**
**Violation of Illinois Consumer Installment Loan Act - 205 Ill. Comp. Stat. 670/1, et. seq.**
**(Class Claims Against All Defendants)**

482.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

483.     Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less.  205 ILCS 670/15.

484.     Small consumer loan lenders are required to be licensed to make loans. 205 ILCS 670/1.

485.     If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."  205 ILCS 670/20(d).

486.     Defendants violated Illinois law by charging interest rates making small consumer loans without a license and charging interest rates far in excess of those permitted to licensed

487.     As a result of these unlawful loans, Plaintiffs Pool, Buchert, Green, and Class members are entitled to recover damages, attorneys' fees, and costs pursuant to 205 ILCS 670/20(b); 205 ILCS 670/20.7.

**ELEVENTH CAUSE OF ACTION**
**Violation of Illinois Consumer Fraud Act – 815 ILCS 505/2**
**(Class Claims Against All Defendants)**

488.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

489.     Defendants, in the course of trade or commerce, engaged in unfair acts and practices, in violation of 815 ILCS 505/2, by contracting for and collecting finance charges, interest, and fees, from Illinois residents, in excess of the amounts permitted by Illinois law.

490.     These unlawful charges caused actual damages to Plaintiffs Pool, Buchert, Green, and Class members.

491.     Pursuant to 815 ILCS 505/10a, Plaintiffs Pool, Buchert, Green, and Class members seek damages for all amount paid to the Defendants, injunctive relief, and attorneys' fees and costs.

## TWELFTH CAUSE OF ACTION
### Violation of Indiana Usury Law - Ind. Code § 24-4.5-5-202
### (Class Claims Against All Defendants)

492.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

493.     In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans in Indiana. Indiana Code § 24-4.5-3-502. A separate license is required for making small loans of less than $550. *Id.* If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

494.     Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150. Ind. Code § 24-4.5-7-201. For all other loans, even licensed lenders may not charge interest that exceeds the equivalent of the greater of:

(a) the total of:

(i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is two thousand dollars ($2,000) or less;

(ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

(iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal. Ind. Code § 24-4.5-3-508.

495. "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt." Ind. Code § 24-4.5-5-202.

496. Defendants made loans in Indiana without a license.

497. Defendants further made loans to Indiana residents at interest rates well in excess of the rates permitted by Indiana law.

498. As a result, Plaintiff Nolte and Class members are entitled to recover all amounts paid on these void loans, as well as interest on amounts paid.

499. Further, debtors on unlawful small loans of $550 or less are entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees," where the conduct did not result from a bona fide computation error. Ind. Code § 24-4.5-7-409.

## THIRTEENTH CAUSE OF ACTION
### Violation of Mississippi Usury Law
### (Class Claims Against All Defendants)

500.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

501.    For loans less than $2,000, the applicable maximum interest rate in Mississippi is 10% APR. Miss. Code. § 75-17-1 (2).

502.    If the interest rate on the loan exceeds 10% APR, the consumer may recover any interest repaid on the loan. Miss. Code. § 75-17-3.

503.    As a result, Plaintiff Actis and Class members are entitled to recover all amounts paid on all interest repaid on the loans. Miss. Code. § 75-17-3.

## FOURTEENTH CAUSE OF ACTION
### Violation of Ohio Law
### (Class Claims Against All Defendants)

504.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

505.    Under Ohio's small loan law and newly enacted Consumer Installment Loan Act, a person or business operating without a license from the Ohio Division of Financial Institutions may not charge interest in excess of the general maximum amount of interest available under state law. Ohio Code § 1321.02; § 1321.63(a). The generalized maximum rate of interest under Ohio law is 8%. Ohio Code § 1343.01(A).

506.    On information and belief, Defendants do not possess the requisite lending licenses, in violation of Ohio Code §§ 1321.02 and 1321.63(a). Thus, the loans to Plaintiff Kondo and Class members are void, and Defendants have "no right to collect, receive, or retain any principal, interest, or charges." Ohio Code §§ 1321.02, 1321.63.

507.     Even *licensed* lenders making small loans of $5,000 or less in Ohio are subject to strict interest rate ceilings. Licensed lenders may contract for interest rates of up to 28% on the portion of principal not exceeding $1,000, and up to 22% on the portion of principal exceeding $1,000. Ohio Code § 1321.13. And the newly enacted Ohio Consumer Installment Loan Act provides an interest rate ceiling of 25%. Ohio Code § 1321.68.

508.     Ohio's small loan law and Consumer Installment Loan Act both render void any loans made in violation of the laws, and a lender violating the law "has no right to collect, receive, or retain any principal, interest, or charges." Ohio Code §§ 1321.02, 1321.63.

509.     Willful violators of Ohio's small loan law are liable to borrows for twice the amount of interest contracted for. Ohio Code §§ 1321.14(D).

510.     Defendants entered into usurious contracts with Plaintiff Kondo and Class members by charging interest rates well in excess of any applicable APR, whether 8%, 22%, 25%, or 28%. Thus, Defendants are liable to Plaintiff Kondo and Class members for twice the amount of interest collected. Ohio Code §§ 1321.14(D).

## FIFTEENTH CAUSE OF ACTION
### Violation of Washington Usury Law - RCW 19.52.030
### (Class Claims Against All Defendants)

511.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

512.     Under RCW 19.52.020, the maximum allowable interest rate in Washington has been twelve percent per annum since at least 2004. See also RCW 19.52.025; State Maximum Interest Rate, available at  http://leg.wa.gov/CodeReviser/Documents/rates.htm.

513.     A contract is usurious if it provides for a rate of interest higher than the statutory maximum of twelve percent. RCW 19.52.030(1).

514.     If a contract is usurious, "the creditor shall only be entitled to the principal, less the amount of interest accruing thereon at the rate contracted for; and if interest shall have been paid, the creditor shall only be entitled to the principal less twice the amount of the interest paid, and less the amount of all accrued and unpaid interest; and the debtor shall be entitled to costs and reasonable attorneys' fees plus the amount by which the amount the debtor has paid under the contract exceeds the amount to which the creditor is entitled." RCW 19.52.030(1).

515.     Defendants entered into usurious contracts with Plaintiff Titus and Washington Class members by charging interest rates well in excess of twelve percent.

516.     Therefore, Plaintiff Titus and Class members are entitled to a declaration that Defendants' loan contracts are usurious. Plaintiff Titus and Class members are entitled to recover any amounts paid in excess of the amount Defendants are entitled to collect on the loans, pursuant to RCW 19.52.030.

**<u>SIXTEENTH CAUSE OF ACTION</u>**
***Per se* Violation of the Washington Consumer Protection Act – RCW 19.86.020 and RCW 19.52.036**
**(Class Claims Against All Defendants)**

517.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

518.     Plaintiff Titus and Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

519.     Pursuant to RCW 19.52.036, "[e]ntering into or transacting a usurious contract" is per se "an unfair act or practice in the conduct of commerce for purposes of application of the consumer protection act."

520.    As alleged above, Defendants entered into usurious contracts with Plaintiff Titus and Class members by contracting for interest rates exceeding the statutory maximum of twelve percent. Thus, Defendants engaged in unfair acts or practices in the conduct of commerce.

521.    Defendants' unfair and deceptive acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law.

522.    Defendants' unfair acts and practices therefore affect the public interest.

523.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff Titus and Class members have been injured. Defendants' conduct has injured the property of Plaintiff Titus and other Class members by charging and collecting interest that they were not legally entitled to charge or collect.

524.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Class members, particularly since Defendants continue to make loans to Washington residents at usurious interest rates and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiff Titus and Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

525.    Plaintiff Titus and Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiff Titus and Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

## SEVENTEENTH CAUSE OF ACTION
### Violation of the Washington Consumer Protection Act – RCW 19.86 – Deceptive Business Practices
### (Class Claims Against All Defendants)

526.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

527.    Plaintiff Titus and Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

528.    Defendants engaged in deceptive acts that occurred in trade or commerce by conduct set forth above. These deceptive acts include the following:

a.      Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

b.      Representing or implying that state law does not apply to Plaintiff Titus's and Washington Class members' loans;

c.      Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

529.    Defendants' deceptive acts and practices have occurred in trade or commerce.

530.    Defendants' deceptive acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law. Defendants deceived Plaintiff Titus and members of the Class by representing or implying that they could legally charge interest rates of 400% or more because Defendants claim Big Picture and Ascension are tribal entities not subject to state law.

531.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Titus and Class members have been injured. Defendants' conduct has injured the

property of Plaintiff Titus and the other Class members by charging and collecting interest that they were not legally entitled to charge or collect.

532.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Class members, particularly since Defendants continue to represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiff Titus and Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

533.    Plaintiff Titus and Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiff Titus and Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

**EIGHTEENTH CAUSE OF ACTION**
**Violation of the Washington Consumer Protection Act – RCW 19.86 – Unfair Business Practices**
**(Class Claims Against All Defendants)**

534.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

535.    Plaintiff Titus and Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

536.    Defendants engaged in unfair acts that occurred in trade or commerce by conduct set forth above. These deceptive acts include the following:

        a.    Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

      b.      Representing or implying that state law does not apply to Plaintiff Titus's and Washington Class members' loans;

      c.      Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

537.    Defendants' acts and practices are unfair because they: (1) cause substantial financial injury to Plaintiff Titus and members of the Washington Class; (2) are not outweighed by any countervailing benefits to consumers or competitors; and (3) are not reasonably avoidable by consumers. Defendants' acts and practices are also unfair because they are immoral, unethical, oppressive and unscrupulous.

538.    Defendants' unfair acts and practices have occurred in trade or commerce.

539.    Defendants' unfair acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law. Defendants acted unfairly by representing or implying that they could legally charge interest rates of 400% or more because Defendants claim Big Picture and Ascension are tribal entities not subject to state law.

540.    As a direct and proximate result of Defendants' unfair acts and practices, Plaintiff Titus and Class members have been injured. Defendants' conduct has injured the property of Plaintiff Titus and the other class members by charging and collecting interest that they were not legally entitled to charge or collect.

541.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Class members, particularly since Defendants continue to represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect unlawful interest

on usurious loans already made to Washington residents. Thus, Plaintiff Titus and Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

542.     Plaintiff Titus and Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiff Titus and Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

**NINETEENTH CAUSE OF ACTION**
**Violation of Georgia Lending Laws**
**(Class Claims Against All Defendants)**

543.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

544.     Defendants charged and collected interest at a rate greater than the maximum legal rate of interest under Georgia law.

545.     Defendants made loans to Georgia consumers even though they are not licensed to make loans in the State of Georgia.

546.     In their loans to Georgia residents, including Plaintiffs McKoy, Lovins, Monsalve, Carrie Samantha Smith, Hamm, Thomas and Class members, Defendants violated the Payday Lending Act, Ga. Code Ann. §§ 16-17-1, *et seq.*

547.     In their loans to Georgia residents, including Plaintiffs McKoy, Lovins, Monsalve, Carrie Samantha Smith, Hamm, Thomas and Class members, Defendants violated the Georgia Industrial Loan Act. Ga. Code Ann. §§ 7-3-1, *et seq.*

548.     Plaintiffs McKoy, Lovins, Monsalve, Carrie Samantha Smith, Hamm, Thomas and Class members seek a declaratory judgment that the loans are void and unenforceable as a matter of law. Ga. Code Ann. § 16-17-2. The dispute is a justiciable matter that is not

speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

549.    Because the loans at issue are void and unenforceable, Plaintiffs McKoy, Lovins, Monsalve, Carrie Samantha Smith, Hamm, Thomas and Class members request that the Court enter judgment against the Defendants jointly and severally, for the recovery of all principal and interest paid to the Defendants under the terms of the illegal loans and award damages equal to three times the amount of any interest paid by the borrowers arising out Defendants' loan transactions. Ga. Code Ann. §§ 16-17-2, 16-17-3. Plaintiffs further seek the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under Georgia law.

## TWENTIETH CAUSE OF ACTION
### Violation of Texas Lending Laws
### (Class Claims Against All Defendants)

550.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

551.    Under Texas law, "[a] greater rate of interest than 10 percent a year is usurious unless otherwise provided by law." Tex. Fin. Code § 302.001(b).

552.    A person who makes consumer loans and charges interest at a rate higher than 10% is required to hold a license. Tex. Fin. Code §§ 342.005, 342.051.

553.    All of the loans made to Plaintiffs Mendez, Pough, Martinez, and Class members were well in excess of the 10% maximum rate allowed under Texas law.

554.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of Texas.

555.    Defendants' conduct was not the result of an accidental and bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent Texas law and to collect interest at rates well in excess of that allowed under the law.

556.    Accordingly, Plaintiffs Mendez, Pough, Martinez, and Class members are entitled to the greater of (1) three times the interest charged in excess of 10% or (2) the lesser of $2,000 or 20% of the principal. Tex. Fin. Code § 305.001.

557.    Additionally, because Defendants charged Plaintiffs Mendez, Pough, Martinez, and Class members interest at a rate twice the amount authorized by Texas law, Plaintiffs Mendez, Pough, Martinez, and Class members are also entitled to recover the principal amount of the loan, interest, and any other charges or fees.  Tex. Fin. Code § 305.002.

558.    Alternatively, even if Defendants could take advantage of the higher interest rates permitted under Tex. Fin. Code § 342, *et seq*., Defendants charged Plaintiffs Mendez, Pough, Martinez, and Class members interest in excess of the amount authorized by that law.

559.    Accordingly, Plaintiffs Mendez, Pough, Martinez, and Class members are entitled to twice the amount of interest Defendants charged or received, and reasonable attorneys' fees. Tex. Fin. Code § 349.001(a). Additionally, because Defendants charged Plaintiffs Mendez, Pough, Martinez, and Class members interest at a rate twice the amount authorized by Texas law, Plaintiffs Mendez, Pough, Martinez, and Class members are entitled to the principal balance in addition to interest. Tex. Fin. Code. § 349.002.

**TWENTY FIRST CAUSE OF ACTION**
**Violations of Florida Usury Law**
**(Class Claims Against All Defendants)**

560.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

561.    All of the loans made by Defendants to Florida consumers used an interest rate greater than eighteen percent (18%).

562.    Fla. Stat. § 516.02(c) provides that "[a] loan for which a greater rate of interest or charge than is allowed by this chapter has been contracted for or received, wherever made, is not enforceable in this state." Defendants' loan agreements violated Fla. Stat. § 516.02 because they contained interest rates greater than eighteen percent (18%).

563.    Defendants' loan agreements violated the criminal usury provisions of Fla. Stat. § 687.071 because they contained interest rates greater than twenty five percent (25%). Such loans are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

564.    Plaintiff Sherman and Class members are entitled to disgorgement of twice the amount of such usurious interest that was paid. Fla. Stat. § 687.04.

**TWENTY SECOND CAUSE OF ACTION**
**Violations of Maryland Consumer Loan Law**
**(Class Claims Against All Defendants)**

565.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

566.    Maryland's Consumer Loan Law limits the annual interest rate on Defendants' loans as follows:

(i) For any loan with an original principal balance of $2,000 or less, 2.75 percent interest per month on that part of the unpaid principal balance not more than $1,000

- 84 -

and 2 percent interest per month on that part of the unpaid principal balance that is more than $1,000;

(ii) For any loan with an original principal balance of more than $2,000, the maximum rate of interest is 2 percent per month on the unpaid principal balance of the loan.

Md. Code, Com. Law § 12-306(a)(6).[5]

567.    Moreover, if an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of Maryland's interest rate limitations, such loans are void and unenforceable, and the lender or any third-party may not collect, obtain, or receive any principal, interest, or charges whatsoever on said loans. Md. Code, Com. Law § 12-314.

568.    As set forth more fully above, in the course of making and collecting on loans to Plaintiff Madison and Class members, Defendants repeatedly and knowingly charged, demanded, and accepted interest far in excess of Maryland's interest-rate caps.

569.    Accordingly, it was unlawful for Defendants to collect or receive any principal, interest, or charges on the loans, including all amounts paid by Plaintiff Madison and Class members.

570.    Because Defendants' violations were willful, Plaintiff Madison and Class members are entitled to recover from Defendants any principal, interest, or other charges with respect to the loans. Md. Code, Com. Law § 12-313(b)(1).  Alternatively, Plaintiff Madison and Class members may recover three times any excess amount paid.  Md. Code, Com. Law § 12-313(b)(2).

### TWENTY THIRD CAUSE OF ACTION
**Violations of North Carolina Usury Law**
**(Class Claims Against All Defendants)**

---

[5] Additionally, "[i]f any principal balance remains unpaid 6 months after the loan matures as originally scheduled or deferred, the lender may not contract for, charge, or receive interest at a rate exceeding 6 percent simple interest per annum on the actual unpaid principal balances from time to time." Md. Code, Com. Law § 12-306.

571.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

572.     The maximum legal interest rate chargeable to consumers under North Carolina law is 8%.  N.C. Gen. Stat. § 24-1.

573.     Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

574.     All of the loans made to Plaintiffs Avent and Gray, and Class members were well in excess of the maximum rates allowed under North Carolina law.

575.     Defendants' conduct in doing so was knowing, deliberate, intentional, and willful. Defendants' purpose was to take more than the legal rate of interest for the money loaned to Plaintiffs Avent and Gray, and Class members.

576.     Because Defendants' violations were willful, Plaintiffs Avent and Gray, and Class members are entitled to forfeiture of the entire amount of interest owed and may recover twice the amount of the interest rate paid.  N.C. Gen. Stat. § 24-2.

**TWENTY FOURTH CAUSE OF ACTION**
**Violation of North Carolina Consumer Finance Act**
**(Class Claims Against All Defendants)**

577.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

578.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than permitted by North

Carolina's general usury laws without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. § 53-166(a).

579.    A person who fails to comply with the CFA's requirements "shall be guilty of a Class 1 misdemeanor."  N.C. Gen. Stat. § 53-166(c).  Moreover, "[a]ny contract of loan, the making or collecting of which violates any provision of [the CFA] . . . except as a result of accidental or bona fide error of computation is void, and the licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan."  *Id.* § 53-166(d).

580.    All of the loans made to Plaintiffs Avent, Gray, and Class members were $15,000 or less and in excess of the maximum rates allowed under North Carolina law.

581.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of North Carolina. As a result, the conduct at issue herein is both unlawful and criminal.

582.    Defendants' conduct was not the result of an accidental or bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent North Carolina law and to collect interest at rates well in excess of that allowed under the law. Plaintiffs Avent, Gray, and Class members are entitled to a declaration that such loans are void.

583.    Defendants have no right to any principal, interest, or charges on the loans, and Plaintiffs Avent, Gray, and Class members are entitled to restitution of all amounts paid to Defendants.

### TWENTY FIFTH CAUSE OF ACTION
**Violation of Wisconsin Usury Laws**
**(Class Claims Against All Defendants)**

584.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

585.     All of the loans made to Wisconsin consumers in the name of Big Picture used an interest rate greater than either 6% or 12%.

586.     Accordingly, Plaintiff Wangeline and Class members are entitled to recover all interest and charges, and up to $2,000 in principal. Wis. Stat. § 138.06.

### TWENTY SIXTH CAUSE OF ACTION
**Violation of Michigan Usury Laws**
**(Class Claims Against All Defendants)**

587.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

588.     The Michigan Regulatory Loan Act requires a license to make consumer loans such as those made by Defendants. Mich. Comp. Laws § 493.2(1).

589.     A licensed lender may not exceed an interest rate of 25%. Mich. Comp. Laws § 493.13(1); Mich. Comp. Laws § 445.1854.

590.     The Michigan Regulatory Loan Act provides that the penalties for violating it include penalties available under the Michigan Credit Reform Act. Mich. Comp. Laws § 493.13(10). Thus, consumers are entitled to actual damages and statutory damages of $1,500 per violation. Mich. Comp. Laws § 445.1861.

591.     Plaintiffs Pettiford, Paavo, Tarelton, and Class members were charged interest rates well in excess of 25%. Therefore, Plaintiffs Avent, Gray, and Class members are entitled to

a return of the excess interest paid, in addition to statutory damages of $1,500. Mich. Comp.

Laws § 445.1861.

## TWENTY SEVENTH CAUSE OF ACTION
### Violation of New Jersey Usury Laws
### (Class Claims Against All Defendants)

592.    Plaintiffs reallege and incorporate by reference each and every allegation set forth

in the preceding paragraphs.

593.    The maximum interest rate chargeable to consumers under New Jersey law is

16%.  N.J. Stat. § 31:1-1(a).

594.    All of the loans made to Plaintiff Grandy and Class members were in excess of

the maximum rates allowed under New Jersey law.

595.    Defendants' conduct in doing so was knowing, deliberate, intentional, and willful.

Defendants' purpose was to take more than the legal rate of interest for the money loaned to

Plaintiff Grandy and Class members.

596.    Under N.J. Stat. § 31:1-4, Plaintiff Grandy and Class members are entitled to a

declaration that their loans are unlawful and usurious, and restitution of all amounts paid to

Defendants in excess of the principal amount, plus the costs of bringing this action.

## TWENTY EIGHTH CAUSE OF ACTION
### Violation of New Jersey Consumer Finance Leasing Act
### (Class Claims Against All Defendants)

597.    Plaintiffs reallege and incorporate by reference each and every allegation set forth

in the preceding paragraphs.

598.    Defendants are or were "consumer lenders" as that term is defined by the

Consumer Finance Leasing Act ("CFLA").  N.J. Stat. § 17:11C-2.

599.    Defendants are or were engaged in the "consumer loan business" as that term is defined by the CFLA.  N.J. Stat. § 17:11C-2.

600.    All of the loans made to Plaintiff Grandy and Class members were in excess of the maximum rates allowed under New Jersey law.

601.    Defendants' loans to Plaintiff Grandy and Class members were "consumer loans" as that term is defined by the CFLA.  N.J. Stat. § 17:11C-2.

602.    The CFLA requires that consumer lenders must be licensed in the State of New Jersey.  N.J. Stat. § 17:11C-3. The CFLA also provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree." N.J. Stat. § 17:11C-33(b). The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error…."  *Id.* In addition, the CFLA provides that "a consumer lender who knowingly and willfully violates any provision of this act shall also forfeit to the borrower three times any amount of the interest, costs or other charges collected in excess of that authorized by law." *Id.*

603.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of New Jersey. As a result, the conduct at issue herein is not merely unlawful; it is criminal.

604.    Defendants' conduct was not the result of a good faith error but instead was a deliberate, willful, and intentional scheme to circumvent New Jersey law and to collect interest at rates well in excess of that allowed under the law. Plaintiff Grandy and Class members are entitled to a declaration that such loans are void.

605.     In addition, Defendants have no right to any principal, interest, or charges on the loans, and Plaintiff Grandy and Class members are entitled to restitution of all amounts paid to Defendants, plus forfeiture of three times of the amounts of interest, costs, or other charges collected by Defendants in excess of that authorized by law.

**TWENTY NINTH CAUSE OF ACTION**
**Violations of New Jersey Consumer Fraud Act**
**(Class Claims Against All Defendants)**

606.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

607.     The New Jersey Consumer Fraud Act ("CFA") prohibits, among other things, the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact … in connection with the sale or advertisement of any merchandise."  N.J. Stat. § 56:8-2. The requirements of the CFA extend to the offering, sale, or provision of consumer credit.

608.     Defendants' unlawful, criminal consumer lending practices constitute "unconscionable commercial practices" within the meaning of the CFA.

609.     Defendants' conduct caused an ascertainable loss to Plaintiff Grandy and Class members by, among other things, forcing Plaintiff Grandy and Class members to pay excessive, unlawful, unconscionable, and usurious rates of interest on consumer loans.

**THIRTIETH CAUSE OF ACTION**
**Violations of Massachusetts Small Loans Act Mass. Gen. Laws ch. 140, §§ 96, 110**
**(Class Claims Against All Defendants)**

610.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

611.    Defendant Big Picture made loans to Massachusetts consumers even though it is not licensed by the Commissioner of Banks to make loans in the State of Massachusetts.

612.    Big Picture's unlicensed lending to Massachusetts consumers was, and remains, a violation of Massachusetts consumer protection laws. Chapter 140, section 96 of the Massachusetts General Laws specifically provides that "[n]o person shall directly or indirectly engage in the business of making loans of six thousand dollars or less" at rates in excess of 12 percent without the requisite license. Mass. Gen. Laws ch. 140, § 96. Each of the Defendants was directly and/or indirectly engaged in the subject Big Picture lending operation at interest rates greatly exceeding 12 percent.

613.    Plaintiff Duggan and Class members seek a declaratory judgment that the loans are void and unenforceable as a matter of law. Mass. Gen. Laws ch. 140, § 110. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

614.    Because the loans at issue are void and unenforceable, Plaintiff Duggan Class members request that the Court enter judgment against the Defendants for the recovery of all principal and interest paid to the Defendants, directly or indirectly, regarding the illegal loans. Plaintiff further seeks the recovery of attorneys' fees and costs as well as all other relief, including injunctive relief, which may be due and owing under Massachusetts law.

## THIRTY FIRST CAUSE OF ACTION
**Violation of Massachusetts Criminal Usury Laws, Mass. Gen. Laws ch. 271, § 49
(Class Claims Against All Defendants)**

615.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

616.     Defendants charged and collected interest at a rate greater than the maximum legal rate of interest under Massachusetts law. Chapter 271, section 49 of the Massachusetts General Laws specifically provides that "[w]hoever in exchange for either a loan of money or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum upon the sum loaned or the equivalent rate for a longer or shorter period, shall be guilty of criminal usury." Mass. Gen. Laws ch. 271, § 49. Each of the Defendants directly and/or indirectly contracted for, charged, took, or received interest and expenses from the unlawful lending operation at annual rates greatly exceeding 20 percent.

617.     Defendants did not notify the Massachusetts Attorney General of their lending practices at interest rates that exceed 20% APR.

618.     Plaintiff Duggan and Class members seek a declaratory judgment that the loans are void and unenforceable as a matter of law. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

619.     Because the loans at issue are void and unenforceable, Plaintiff Duggan and Class members request that the Court enter judgment against Defendants jointly and severally for the

recovery of all principal and interest paid to the Big Picture Loans under the terms of the illegal loans. Plaintiff further seeks the recovery of attorneys' fees and costs as well as all other relief which may be due and owing under Massachusetts law.

## THIRTY SECOND CAUSE OF ACTION
### Violation of Mass. Gen. Laws ch. 93, § 101
### (Class Claims Against All Defendants)

620.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

621.    Defendants are engaged in the commerce of providing marketing and consumer lending services.

622.    Defendants' choice-of-law, forum selection, tribal dispute resolution, and class action waiver provisions in Big Picture Loans' loan agreement are void and unenforceable because they purport to waive rights granted to Plaintiff Duggan and Class members by Mass. Gen. Laws ch. 140, §§ 96, 110, ch. 271, § 49, and ch. 93A.

## THIRTY THIRD CAUSE OF ACTION
### Unfair or Deceptive Acts or Practices, Mass. Gen. Laws ch. 93A
### (Class Claims Against All Defendants)

623.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

624.    Defendants are engaged in the commerce of providing marketing and consumer lending services.

625.    None of the Defendants maintain a place of business within Massachusetts, so no demand letter is required of Plaintiffs under Chapter 93A.

626.    As detailed in the preceding paragraphs, Defendants established the subject corporate entities to circumvent and systematically violate state lending laws and regulations,

including but not limited to the Massachusetts Small Loans Act and the Massachusetts criminal usury statute.

627.    Based on the facts previously stated, Defendants' marketing and lending to Massachusetts residents constituted unfair or deceptive acts or practices because they (a) make loans to Massachusetts residents without the requisite license; (b) commit criminal usury by extending credit to Massachusetts residents at interest rates that exceed the maximum permissible rate of interest under Massachusetts law; and/or (c) require Massachusetts borrowers to agree to illegal and unconscionable contract terms pertaining to choice of law, jurisdiction, forum selection, and class actions.

628.    Plaintiff Duggan and Class members request that the Court enter judgment against the Defendants jointly and severally for the recovery of all principal and interest paid to the Defendants under the terms of the illegal loans. Plaintiff Duggan and Class members further seek the recovery of statutory damages, attorneys' fees, and costs as well as all other relief which may be due and owing under Massachusetts law.

### THIRTY FOURTH CAUSE OF ACTION
**Violation of Oregon Lending Laws**
**(Class Claims Against All Defendants)**

629.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

630.    Defendants made loans to Oregon consumers even though they are not licensed to make loans in the State of Oregon.

631.    Defendants' unlicensed lending to Oregon consumers was, and remains, a violation of Oregon consumer protection laws.

632.    In their loans to Oregon consumers, Defendants charged and collected interest at a rate greater than the maximum legal rate of interest under Oregon law.

633.    Plaintiff Richard Smith and Class members seek a declaratory judgment that the loans are void and unenforceable as a matter of law. The dispute is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan agreement. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the Loan Agreement.

634.    Because the loans at issue are void and unenforceable, Plaintiff Richard Smith and Class members request that the Court enter judgment against the Defendants jointly and severally for the recovery of all principal and interest paid to the Defendants under the terms of the illegal loans. Plaintiff Richard Smith and Class members further seeks the recovery of attorneys' fees and costs as well as all other relief, including injunctive relief, which may be due and owing under Oregon law.

**THIRTY FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Class Claims Against All Defendants)**

635.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

636.    Plaintiffs and Class members conferred a benefit on Defendants when they made payments on loans that were void or made payments of interest beyond the amounts legally collectible under state law.

637.    To the detriment of Plaintiffs and Class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from residents of the United States and its territories.

638.    As between the parties, it would be unjust for Defendants to retain the benefits attained by their actions. Accordingly, Plaintiff seeks a full accounting and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.    An Order certifying the proposed Class under Fed. R. Civ. P. 23(b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.    An Order declaring that Defendants committed the violations of law alleged herein;

C.    An Order providing for any and all injunctive relief the Court deems appropriate;

D.    An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

E.    An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

F.    An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

G.      An Order awarding Plaintiffs their reasonable costs and expenses of suit,

including attorneys' fees; and

H.      Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

RESPECTFULLY SUBMITTED AND DATED this 3rd day of December, 2019.

CONSUMER LITIGATION ASSOCIATES, P.C.


By: /s/ Leonard A. Bennett, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    Elizabeth W. Hanes, VSB #75574
    Email: elizabeth@clalegal.com
    Craig C. Marchiando, VSB #89736
    Email: craig@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

    Kristi C. Kelly, VSB #72791
    Email: kkelly@kellyguzzo.com
    Andrew J. Guzzo, VSB #82170
    Email: aguzzo@kellyguzzo.com
    Casey S. Nash, VSB #84261
    Email: casey@kellyguzzo.com
    KELLY GUZZO, PLC
    3925 Chain Bridge Road, Suite 202
    Fairfax, Virginia 22030
    Telephone: (703) 424-7572
    Facsimile: (703) 591-0167

E. Michelle Drake, *Admitted Pro Hac Vice*
Email: emdrake@bm.net
John G. Albanese, *Admitted Pro Hac Vice*
Email: jalbanese@bm.net
BERGER & MONTAGUE, P.C.
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470

Beth E. Terrell
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray
Email:  jmurray@terrellmarshall.com
Elizabeth A. Adams
Email: eadams@terrellmarshall.com
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Matthew Wessler
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

*Attorneys for Plaintiffs and Proposed Class*

CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record.

DATED this 3rd day of December, 2019.

CONSUMER LITIGATION ASSOCIATES, P.C.


By: /s/ Leonard A. Bennett, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

*Attorneys for Plaintiffs and Proposed Class*