IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RENEE GALLOWAY, et al.,

    Plaintiffs,

v.                             Civil Action No. 3:19-cv-470

JAMES WILLIAMS, JR., et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT (ECF No. 104) ("Final Approval Motion"). The Plaintiffs request that the Court enter an order: (1) confirming the certification of the proposed Settlement Class; (2) approving the proposed Settlement, including (a) Class Counsel's request for $2,871,000 in fees inclusive of costs, and (b) $5,000 in service awards for each Named Plaintiff; and (3) finding that the notice sent to class members satisfies due process. Final Approval Mem. at 4, ECF No. 105. For the reasons set forth below, the Motion for Final Approval will be granted in part and denied in part.

## BACKGROUND

The facts of the broader case, a related bankruptcy action, and the path to Settlement are set out at length in the Memorandum Opinion (ECF No. 92) ("Intervention Memorandum")

addressing Eventide Credit Acquisition, LLC's motion to intervene following announcement of the settlement. The facts and procedural history of this case are, therefore, presumed known and discussed only to the extent necessary to aid in the analysis of the present motion.

This matter arises out of what Plaintiffs' described as a "rent-a-tribe scheme" in which a "payday lender – which does most of its lending over the internet – affiliates with a Native American tribe to attempt to insulate itself from federal and state" consumer financial protection laws "by purporting to piggy-back on the tribe's sovereign legal status and its general immunity from suit under federal and state laws." First Amended Class Action Compl. ("FAC") ¶ 7, ECF No. 23. In particular, Plaintiffs' alleged that several lending entities,[1] nominally run by the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD"), were, in practice, created and operated by Matt Martorello ("Martorello") — a Chicago entrepreneur with no lineage to the LVD. FAC ¶ 13, ECF No. 23. Plaintiffs' alleged that these LVD-affiliated lending entities were charging usurious interest rates in violation of state and federal laws. FAC at 7-8, 15-29, 45-60, ECF No. 23.

---

[1] These lending entities had a complex corporate structure that evolved over time. See FAC at 29-38, ECF No. 23.

The settlement proposed by the parties would resolve claims asserted in nine cases,[2] in this district and throughout the country, against 25 different defendants.[3]  The 25 defendants are (1) Big Picture Loans, LLC, (2) Ascension Technologies, LLC, (3) James Williams Jr., (4) Michelle Hazen, (5) Henry Smith, (6) Alice Brunk, (7) Andrea Russell, (8) Tina Caron, (9) Mitchell McGeshick, (10) Gertrude McGeshick, (11) Susan McGeshick, (12) Giiwegiizhigookway Martin, (13) Jeffery McGeshick, (14) Roberta Ivey, (15) June Saad, (16) James Dowd, (17) Simon Liang, (18) Brian McFadden, (19) Brian Jedwab, (20) Amlaur Resources, LLC, (21) Columbia Pipe & Supply Co., (22) Timothy Arenberg, (23) Terrance Arenberg, (24) DTA Trinity Wealth Transfer Trust, and (25) Deborah M. Arenberg Living Trust ("Settling Defendants") as well as some other individuals and entities that were not named

---

[2] These cases are (1) <u>Lula Williams, et al. v. Big Picture Loans, LLC, et al.</u>, No. 3:17-cv-00461 (E.D. Va.) ("Williams"); (2) <u>Renee Galloway, et al. v. Big Picture Loans, LLC, et al.</u>, No. 3:18-cv-00406 (E.D. Va.) (<u>Galloway I</u>); (3) <u>Renee Galloway, et al. v. Matt Martorello, et al.</u>, No. 3:19-cv-00314 (E.D. Va.) (<u>Galloway II</u>); (4) <u>Renee Galloway, et al. v. James Williams, Jr., et al.</u>, No. 3:19-cv-00470 (E.D. Va.) (<u>Galloway III</u>); (5) <u>Dana Duggan v. Big Picture Loans, LLC, et al.</u>, No. 1:18-cv-12277 (D. Mass); (6) <u>Richard Lee Smith, Jr. v. Big Picture Loans, LLC, et al.</u>, No. 3:18-cv-01651 (D. Or.); (7) <u>Christine Cumming, et al. v. Big Picture Loans, LLC, et al.</u>, No. 5:18-cv-03476 (N.D. Cal.); (8) <u>Chris Kobin v. Big Picture Loans, LLC, et al.</u>, 2:19-cv-02842 (C.D. Cal.); and (9) <u>Victoria Renee McKoy, et al. v. Big Picture Loans, LLC, et al.</u>, 1:18-cv-03217 (N.D. Ga.).  All nine cases are, at bottom, challenging the same allegedly illegal lending scheme.
[3] <u>But see</u> Final Approval Mem. at 1, ECF No. 105 ("This class settlement resolves claims asserted against twenty-four defendants.").

as defendants ("Released Parties").  "The settlement does not release" the Plaintiffs' "claims against Matt Martorello, Justin Martorello, Rebecca Martorello, Jeremy Davis, Eventide Credit Acquisitions, LLC, Bluetech Irrevocable Trust, Kairos Holdings, LLC, Liont, LLC, or any other entities owned, directly or indirectly, by Matt Martorello, Justin Martorello or Rebecca Martorello ("non-Settling Defendants").

### *Settlement Process*

Settlement was reached after several years of "contentious litigation."  Final Approval Mem. at 2, ECF No. 105.  The parties have put significant time and effort into this case:

> "At the time the parties notified the Court of the settlement in October 2019, there were 636 docket entries in the <u>Williams</u> matter alone and the Court had issued well over one hundred rulings on virtually every issue imaginable, from sovereign immunity to motions to dismiss to privilege waivers to over thirty contested discovery motions.  In <u>Williams</u> and <u>Galloway I</u>, over a million pages of documents have been produced; thirty-four witnesses have been deposed; and 145 subpoenas have been issued."

Final Approval Mem. at 2, ECF No. 105.

The settlement process required (1) three in-person mediations with an independent mediator; (2) an in-person settlement conference with a magistrate judge; and (3) "numerous informal telephone conferences between sessions."  Final Approval Mem. at 2, ECF No. 105.  Moreover, settlement negotiations did not even begin until the tribal entities

obtained a favorable ruling in the Fourth Circuit. Final Approval Mem. at 2, ECF No. 105.

**Settlement**

The proposed settlement class has approximately 491,018 members. Final Approval Mem. at 8, ECF No. 105. The Settlement Class is defined as

> All consumers residing within the United States or its territories who executed loan agreements with Red Rock Tribal Lending, LLC or Big Picture Loans, LLC (including loans assigned to Big Picture Loans, LLC) from June 22, 2013 to December 20, 2019; provided, however, that "Settlement Class" and "Settlement Class Member" shall exclude: (i) all consumers who would otherwise qualify for membership in the "Settlement Class" for which the consumer previously has released all claims as to the Settling Defendants; (ii) the Settling Defendants' officers, directors, and employees; (iii) the Settling Defendants' attorneys; (iv) the Plaintiffs' attorneys; and (v) any judge who has presided over either mediation or disposition of this case and the members of his or her immediate family.

Final Approval Mem. at 8, ECF No. 105.

According to Class Counsel, the Settlement provides three benefits. Final Approval Mem. at 3, ECF No. 105. For class members who have outstanding loans that are current, Big Picture and Ascension will not collect payments that amount to more than 2.5 times the original loan principal. Final Approval Mem. at 3, ECF No. 105. For class members who have outstanding loans but who are more than 210 days in default, Big Picture and Ascension will cancel the loans, cease collecting on them, and

will not sell, transfer, or assign the loans.  Final Approval
Mem. at 3, ECF No. 105.  For class members who paid off their
loans and who paid more than 2.5 times the original loan
principal, the Settling Defendants will establish an $8.7
million Settlement Fund from which class members can make a
claim.  Final Approval Mem. at 3, ECF No. 105.  All claimants
will receive a pro rata share of the fund after the fund has
been used to pay (1) settlement administration expenses, (2)
court-awarded attorneys' fees, (3) litigation costs, and (4)
class representative service awards.  Final Approval Mem. at 3,
ECF No. 105.

Approximately 361,731 Settlement Class Members have
outstanding loans.  Final Approval Mem. at 9, ECF No. 105.
Thus, roughly 129,287 class members would be in a position to
make claims on the $8.7 million Settlement Fund.  Final Approval
Mem. at 9, ECF No. 105.  Because of the pro rata structure,
class Members who paid more interest on their loans will receive
a larger cash damage award.  Final Approval Mem. at 9, ECF No.
105.

As of October 23, 2020, 4,245 eligible Settlement Cass
Members submitted claims for a pro rata share of the Settlement
Fund.  Final Approval Mem. at 9, ECF No. 105.  "If no more
claims are submitted and the Court approves the requested fees,
service awards, and administration expenses, approximately 122

6

claimants will receive between $5,000 and $12,000, approximately 1,600 claimants will receive between $1,000 and $5,000, 922 claims will receive between $500 and $1,000, 1,400 claimants will receive between $50 and $500, and the remaining claimants will receive up to $50." Final Approval Mem. at 9-10, ECF No. 105.

Notably, the Settlement does not require a general class member release. Final Approval Mem. at 3, ECF No. 105. Class members only have to release their individual damage claims against the Settling Defendants if they affirmatively elect to obtain a cash claim payment from the Settlement Fund. Final Approval Mem. at 3, ECF No. 105.

On December 20, 2019, the Court granted preliminary approval of the Settlement and preliminarily certified the class pursuant to Fed. R. Civ. P. 23(b)(2). PRELIM. APPROVAL ORDER, ECF No. 65.

*Notice*

In accordance with the notice plan approved by the Court as part of the preliminary settlement approval, the Settlement Administrator, American Legal Claim Services, LLC ("ALCS"), began sending notice to the class on September 10, 2020. Final Approval Mem. at 4, ECF No. 105. The Settling Defendants provided ALCS with a class list that "included Settlement Class Member contact information and loan information." Final

7

Approval Mem. at 10, ECF No. 105.   After confirming that email
addresses that ACLS received were likely correctly spelled and
still in use, ALCS sent initial notices to most Settlement Class
Members by email.   ACLS DECL. at 1-2, ECF NO. 105-4.   For class
members who could not be reached by email, ACLS mailed notice
via US Mail.   ACLS DECL. at 2, ECF NO. 105-4.   Only 1,600
notices (i.e., 0.33% of Settlement Class Members) could not be
delivered.   See Final Approval Mem. at 11, ECF No. 105.

ALCS also created a website and telephone hotline to
provide more information about the Settlement.   Final Approval
Mem. at 11, ECF No. 105.   As of November 30, 2020, ALCS had
received 2,915 calls to TAP and there were 30,426 unique
visitors to the website.   Suppl. ACLS Decl. at 3, ECF No. 108-1.

Pursuant to the Class Action Fairness Act, the Settling
Defendants notified the appropriate state and federal attorneys
general on December 6, 2019.   Final Approval Mem. at 11-12, ECF
No. 105.   There have been no governmental objectors.   Final
Approval Mem. at 12, ECF No. 105.

Objections to the Settlement were due on November 10, 2020.
ALCS did not receive any objections to the Settlement.   Final
Approval Mem. at 4, ECF No. 105.

## LEGAL FRAMEWORK

### I.   Notice

Fed. R. Civ. P. 23(e) requires that notice of a proposed class action settlement (and consequent dismissal) be distributed in a reasonable manner to all class members who would be bound by the settlement.[4]   Settlement notice must also satisfy the Constitution's Due Process requirements (i.e., notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").   Rubenstein, 5 Newberg on Class Actions § 8.15 (5th ed.) (internal quotation marks omitted).

### II.   Final Settlement Approval

Per Federal Rule of Civil Procedure 23(e), a class action may only be settled with the court's approval.   Fed. R. Civ. P. 23(e). If the settlement proposal would bind all class members, a court may only approve the settlement proposal after it holds a hearing and subsequently finds that the settlement proposal is fair, reasonable, and adequate.   Fed. R. Civ. P. 23(e)(2).

In determining whether a settlement is fair, reasonable, and adequate, the court must consider whether:

> (A) the class representatives and class counsel have adequately represented the class;

---

[4] Class Counsel argue that they meet the higher standard of "best notice that is practicable."   See Fed. R. Civ. P. 23(c)(2)(B).

> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Nevertheless, "[t]he primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." In re Jiffy Lube Sec. Litig., 927 F.2d 155, 158 (4th Cir. 1991).

In the Fourth Circuit, the Rule 23(e)(2) analysis has been condensed into the two-step Jiffy Lube test which examines the fairness and adequacy of the settlement. In re The Mills Corp. Sec. Litig., 265 F.R.D. 246, 254 (E.D. Va. 2009); see also In re Jiffy Lube Sec. Litig., 927 F.2d 155, 158-59 (4th Cir. 1991).

**A. Fairness**

Under the fairness prong of the Jiffy Lube test, the court must assess the procedural fairness of the settlement negotiations. In re The Mills Corp. Sec. Litig., 265 F.R.D. 246, 254 (E.D. Va. 2009). The relevant factors to evaluate the

fairness of the settlement negotiations are "(1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel." Brown v. Transurban USA, Inc., 318 F.R.D. 560, 571 (E.D. Va. 2016).

## B. Adequacy

Under the adequacy prong of the Jiffy Lube test, the court assesses the substantive adequacy of the settlement agreement. Brown v. Transurban USA, Inc., 318 F.R.D. 560, 571 (E.D. Va. 2016). The relevant factors to evaluate the adequacy of the settlement are "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." Brown v. Transurban USA, Inc., 318 F.R.D. 560, 573 (E.D. Va. 2016) (quoting In re Jiffy Lube Sec. Litig., 927 F.2d 155, 159 (4th Cir. 1991)).

11

### III. Attorneys' Fees, Costs, and Service Awards

### A. Attorneys Fees

There are two basic approaches to calculating reasonable attorneys' fees in a class action case: the "percentage of recovery" or "percentage of the fund" method and the lodestar method. Brown v. Transurban USA, Inc., 318 F.R.D. 560, 575 (E.D. Va. 2016). Under the percentage of the fund method, fees are awarded based on a percentage of the benefit secured for the settlement class. Brown, 318 F.R.D. at 575. Under the lodestar method, fees are awarded based on the value of the attorneys' time spent litigating the claims. Brown, 318 F.R.D. at 575. The Fourth Circuit has not explicitly mandated which method district courts should use. Brown, 318 F.R.D. at 575. A district court, therefore, has discretion to use either method. Grissom v. The Mills Corp., 549 F.3d 313, 320 (4th Cir. 2008).

Nevertheless, over time, certain customs have developed, both in the Fourth Circuit and across the country; for example, the favored method for calculating attorneys' fees in common fund cases is the percentage of the fund method. See Brown, 318 F.R.D. at 575. And in a fee shifting case, the award is typically calculated using the lodestar method. See, e.g., Landwehr v. AOL, Inc., No. 1:11-cv-1014, 2013 WL 1897026, at *1 (E.D. Va. May 1, 2013). In any case, courts will typically employ one method as the primary calculation method and use the

12

other method as a cross check on the reasonableness of the first.   See, e.g., In re Genworth Financial Securities Litigation, 210 F. Supp. 3d 837, 843 (E.D. Va. 2016).

**_Lodestar Method_**

Using the lodestar method, a court must first determine the lodestar figure by multiplying the number of reasonable hours expended by a reasonable rate.   Brown, 318 F.R.D. at 575.   The burden of proof is on the applicant to establish that the hourly rate(s) are reasonable.   Grissom, 549 F.3d at 321.

"Although the determination of a market rate in the legal profession is inherently problematic, as wide variations in skill and reputation render the usual laws of supply and demand largely inapplicable, the [Supreme] Court has nonetheless emphasized that the market rate should guide the fee inquiry."   Grissom, 549 F.3d at 321 (quoting Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 2008)).   "[T]he community in which the court sits is the first place to look to in evaluating the prevailing market rate."   Grissom, 549 F.3d at 321 (citing Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 179 (4th Cir. 1994)).   But an attorney's actual billing rate can also be considered.   See Brown, 318 F.R.D. at 575.

***Reasonableness***

Once a figure has been calculated using the percentage of the fund or lodestar method, a court must determine if that result is reasonable.

Although the touchstone of the inquiry is always reasonableness, it is no longer clear exactly which factors the courts in this circuit should apply when assessing the reasonableness of proposed attorneys' fees in percentage of the fund cases. In particular, there is considerable confusion regarding whether the proper test is the 12-factor <u>Johnson</u> test from the Fifth Circuit or the seven-factor <u>Gunter</u> test from the Third Circuit.[5] To address this ambiguity, some courts in this circuit have begun applying both tests to assess the reasonableness of attorneys' fees calculated using the percentage of the fund method. <u>See, e.g.</u>, <u>In re Genworth Financial Securities Litigation</u>, 210 F. Supp. 3d 837, 843 (E.D. Va. 2016); <u>Clark v. Experian Info. Solutions, Inc.</u>, No. 8:00-1217-22, 2004 U.S. Dist. LEXIS 32063, *61 (D.S.C. Apr. 21, 2004). Absent clear guidance from the Fourth Circuit, this Court will do the same.

---

[5] "The Fourth Circuit utilized the Fifth Circuit's <u>Johnson</u> factors in a statutory fee-shifting case, so some district courts have utilized those factors in setting a percentage in common fund cases, while other district courts have used the Second Circuit's Goldberger factors and/or the Third Circuit's <u>Gunter</u> factors." Rubenstein, 5 <u>Newberg on Class Actions</u> § 15:82 (5th ed.) (citations omitted).

**The *Johnson* Factors**

In 1978, the Fourth Circuit adopted the 12-factor <u>Johnson</u> test from the Fifth Circuit.  <u>See</u> <u>Barber v. Kimbrell's, Inc.</u>, 577 F.2d 216, 226 n.28 (4th Cir. 1978).  The twelve <u>Johnson</u> factors are

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for legal work; (6) the attorney's expectations at the outset of litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation[,] and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

<u>Brown</u>, 328 F.R.D. at 577 (quoting <u>Barber v. Kimbrell's, Inc.</u>, 577 F.2d 216, 226 n.28 (4th Cir. 1978)).  While a district court has discretion to determine the amount of the fee award, the court must provide detailed findings of fact to support the factors it considers.  <u>Barber</u>, 577 F.2d at 226; <u>Grissom</u>, 549 F.3d at 320.

However, the Court need not address all twelve <u>Johnson</u> factors independently because many of these considerations are subsumed in the calculation of the hours reasonably expended and the reasonableness of the hourly rate.  <u>Brown</u>, 328 F.R.D. at

15

577. Moreover, the result obtained for the class is often treated as the most important factor. In re Genworth Financial Securities Litigation, 210 F. Supp. 3d 837, 843 (E.D. Va. 2016).

### The *Gunter* Factors

Under this test, the reasonableness factors are: (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys' involved; (3) the complexity and duration of the case; (4) the risk of nonpayment; (5) awards in similar case; (6) objections; and (7) the amount of time devoted to the case by plaintiffs' counsel. Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000). As with the Johnson factors, not all factors are equally weighted in every case. See In re Cendant Corp. PRIDES Litigation, 243 F.3d 722, 735 (3d Cir. 2001).

### B. Costs

Under Rule 23(h), a court may award reasonable non-taxable costs to Class Counsel. Fed. R. Civ. P. 23(h). Reasonable costs can include, among other things, costs related to computer legal research, court reporting, court filing fees, deposition transcripts, stenographer fees, travel, document duplication, expert witness fees, photocopying, postal fees, and mediation fees. In re Microstrategy, Inc. Securities Litigation, 172 F. Supp. 2d 778, 791 (E.D. Va. 2001); Berry v. Wells Fargo & Co.,

No. 3:17-cv-304, 2020 U.S. Dist. LEXIS 143893, at *42 (D.S.C. July 29, 2020).

## C. Service Awards

Trial courts often authorize service awards to class representatives for the time and effort they expended for the benefit of the class. Jones v. Dominion Resources Services, Inc., 601 F. Supp. 2d 756, 767 (S.D.W. Va. 2009). Service awards are "'intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general.'" Berry v. Schulman, 807 F.3d 600, 613 (4th Cir. 2015) (quoting Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958-59 (9th Cir. 2009)).

DISCUSSION

## I.   Notice

Here, the Court finds that the notice provided to class members satisfies due process and that it was both reasonable, and the best notice practicable under the circumstances. Class members could be easily identified because the Settling Defendants maintained loan records that included the borrowers' names, addresses, and frequently, email addresses. Final Approval Mem. at 13, ECF No. 105. The Settlement Administrator, ACLS, "took reasonable measures to update the provided contact

17

information and conserved costs by initially sending notice by email and only mailing the notice if an email bounced back as undeliverable or no email existed for a particular Settlement Class Member." Final Approval Mem. at 13, ECF No. 105. Using this process, ACLS estimates that there was a successful delivery rate of 99.67%. Final Approval Mem. at 13, ECF No. 105. ACLS also established a telephone hotline and settlement website to facilitate notice to the class and has received 2,915 calls and 30,426 unique visitors to the website. SUPPL. ACLS DECL. at 3, ECF No. 108-1.

## II. Settlement Approval

### A. Fairness

Here, all four fairness factors point to a conclusion that the settlement negotiations in this case were procedurally fair.

First, the procedural posture of the case points towards the fairness of the negotiations. Considering the procedural posture is one way for a court to assess whether there was any improper collusion among the parties. <u>Brown v. Transurban USA, Inc.</u>, 318 F.R.D. 560, 571 (E.D. Va. 2016). Here, the case was at an advanced stage when the parties entered settlement negotiations:

> At the time the parties notified the Court of the settlement in October 2019, there were 636 docket entries in the <u>Williams</u> matter alone and the Court had issued well over one hundred rulings on virtually every issue imaginable, from sovereign

> immunity to motions to dismiss to privilege waivers
> to over thirty contested discovery motions.

Final Approval Mem. at 2, ECF No. 105. And

> At the time the parties negotiated this settlement,
> Williams had been on file for two years; the parties
> had conducted jurisdictional discovery; the Fourth
> Circuit had issued its sovereign immunity decision;
> and the parties in Galloway I were preparing for an
> evidentiary hearing on whether the Williams
> sovereign immunity decisions should be revisited due
> to material information received after sovereign
> immunity was briefed in the district court.

Final Approval Mem. at 15, ECF No. 105. Moreover, "[t]he
information Plaintiffs had received through discovery in
Williams and Galloway I also prompted Plaintiffs to file
Galloway II and Galloway III against other co-conspirators
involved in this nationwide scheme." Final Approval Mem. at 15,
ECF No. 105. "And McKoy, Cumming, Smith, and Duggan had been on
file for nearly a year." Final Approval Mem. at 16, ECF No.
105.

Second, the extent of the discovery taken also points
towards the fairness of the negotiations. Considering the
extent of discovery allows a court to "ensure that the case is
well-enough developed for Class Counsel and Lead Plaintiffs
alike to appreciate the full landscape of their case when
agreeing to enter into this Settlement." In re The Mills Corp.
Sec. Litig., 265 F.R.D. 246, 254 (E.D. Va. 2009). Here,

significant discovery had been completed before the parties

entered settlement negotiations:

> The parties aggressively pursued discovery before
> the case settled. Defendants had produced over a
> million pages of documents in the Virginia actions
> alone and Class Counsel spent hundreds of hours
> reviewing them. The parties pursued data and
> documents from third parties, issuing dozens of
> subpoenas to state attorney generals [sic],
> attorneys involved in advising the co-conspirators
> about the enterprise's legality, companies that
> maintain loan level data, and individuals involved
> in the day-to-day operation of the online lending
> business.

Final Approval Mem. at 16, ECF No. 105.   In particular, 34

witnesses have been deposed, and 145 subpoenas were issued.

Final Approval Mem. at 2, ECF No. 105.   The Court is confident

that the parties had completed enough discovery to have a firm

grasp on the strengths and weaknesses of their positions.

Third, the circumstances surrounding the negotiation point

towards the procedural fairness of the negotiations.   The

purpose of this factor is to ensure that the settlement was

reached through arm's-length negotiations.   Brown v. Transurban

USA, Inc., 318 F.R.D. 560, 572 (E.D. Va. 2016).   "Courts look to

the number of meetings between the parties to discuss

settlement, the quality of those negotiations, and the duration

of time over which negotiations took place."   In re Genworth

Fin. Sec. Litig., 210 F. Supp. 3d 837, 840 (E.D. Va. 2016).

Here, the parties had three formal mediation sessions over

approximately two months and an additional settlement
conference.   Final Approval Mem. at 17, ECF No. 105.   The
mediation sessions were overseen by professional mediator Nancy
A. Lesser, and the settlement conference was overseen by then-
Magistrate Judge David Novak.   Final Approval Mem. at 17, ECF
No. 105.   In between formal sessions, the parties also engaged
in informal discussions "including countless telephone calls
with Ms. Lesser and between counsel."   Final Approval Mem. at
17, ECF No. 105.

Finally, Class Counsel and their firms have extensive
backgrounds in complex and class action litigation and consumer
protection litigation, see DECL. KRISTI C. KELLY ¶ 6, ECF No.
105-1; DECL. BETH E. TERRELL ¶ 3, ECF No. 105-2; DECL. LEONARD
A. BENNETT ¶¶ 13-14, ECF No. 105-3; DECL. MICHAEL A. CADDELL ¶¶
11-13, ECF No. 105-5; DECL. E. MICHELLE DRAKE ¶¶ 10, 12, ECF No.
105-6; DECL. MATTHEW W.H. WESSLER ¶ 2, ECF No. 105-7; DECL. ANNA
C. HAAC ¶ 5-7, ECF No. 105-8.   And, in particular, members of
Class Counsel have significant experience in litigating class
action lawsuits against tribal lenders.   See, e.g., Hayes, et
al. v. Delbert Servs. Corp., 3:14-cv-00258-JAG, Dkt. No. 193 ¶
4, 14 (Jan. 20, 2017) (approving class action settlement against
tribal lender here Leonard A. Bennet, Kristi C. Kelly, Andrew J.
Guzzo, Casey Shannon Nash, and Craig Carley Marchiando were part
of the Class Counsel team).   The Court is satisfied that Class

Counsel had sufficient experience to competently and fairly represent the interests of the class. This factor, therefore, points to the fairness of the settlement.

Based on these four fairness factors, the Court finds that the Settlement Agreement was the product of an adversarial, arm's-length negotiation process conducted once discovery had reached a stage where both parties had a clear sense of the strengths and weaknesses of their arguments. Accordingly, the Settlement Agreement was sufficiently "fair" under Federal Rule of Civil Procedure 23(e)(2).

### B. Adequacy

Here, all relevant adequacy factors suggest that the result achieved for the class and the other terms of the settlement agreement are adequate.

The first two adequacy factors, the strength of the plaintiffs' case and the risks of going to trial, together suggest that the settlement is substantively adequate. The three years of contentious litigation in this case, see Final Approval Mem. at 19, ECF No. 105, are a testament to Class Counsel's belief in the strength of their case given that the Class Counsel team is composed of experienced consumer protection attorneys who are well-versed in these issues. See, e.g., DECL. KRISTI C. KELLY ¶¶ 6-7, ECF No. 105-1; DECL. BETH E. TERRELL ¶ 3, ECF No. 105-2; DECL. LEONARD A. BENNETT ¶¶ 5-14,

22

ECF No. 105-3; DECL. E. MICHELLE DRAKE ¶ 8, ECF No. 105-6; DECL. ANNA C. HAAC ¶ 5-7, ECF No. 105-8.   Nevertheless, proceeding to trial would have presented real risks because each of the Settling Defendants asserts that they are entitled to sovereign immunity, and while "Plaintiffs strongly believe that the Fourth Circuit would have decided the issue differently had it had the benefit of a complete record," a Fourth Circuit decision in this case supports the Settling Defendants' arguments.   Final Approval Mem. at 19, ECF No. 105; see also Williams v. Big Picture Loans, LLC, 929 F.3d 170, 185 (4th Cir. 2019) (holding that two of the Settling Defendants, Big Picture and Ascension, are entitled to sovereign immunity as arms of the LVD). "Plaintiffs faced the risk that the Court would dismiss the individual tribal defendants, tribal council members, and the scheme's lenders either for lack of jurisdiction or for lack of sufficient facts supporting liability under RICO."   Final Approval Mem. at 19, ECF No. 105.

The third factor, the anticipated duration and expense of additional litigation, similarly supports the conclusion that the settlement is adequate.   Because of the risks Plaintiffs would face if the case continued to trial, and the costs of litigation generally, the case would likely have continued at significant expense for both parties.   Final Approval Mem. at 19, ECF No. 105.   But the risk of prolonging the litigation

carried a special risk for class members with outstanding loans on which the interest would continue to accrue. Final Approval Mem. at 20, ECF No. 105. As Class Counsel notes, "mitigating these risks at this juncture allows Plaintiffs to obtain immediately substantial debt reduction and debt cancellation relief for the entire class." Final Approval Mem. at 19, ECF No. 105. The Court shares that view.

Class Counsel has not provided any argument on the fourth adequacy factor, the solvency of the defendants and the likelihood of recovery on a litigated judgment, but the Court has no reason to believe there is any such risk. Accordingly, this factor has no bearing on the Court's adequacy analysis.

The fifth and final factor also points to the substantive adequacy of the Settlement. Of the approximately 491,018 class members, none objected. ALCS Suppl. Decl. ¶¶ 3, 10. The absence of objections is notable because the Settlement Administrator reports a notice delivery rate of 99.69%. ALCS Suppl. Decl. ¶ 7. Additionally, the Settlement Administrator reports that, as of November 30, 2020, 2,915 calls were received at the telephone assistance hotline created for this case, and there have been 30,436 unique visitors to the settlement website. ALCS Suppl. Decl. ¶¶ 11,12. A lack of objections suggests that the Settlement is indeed adequate. See In re The Mills Corp. Sec. Litig., 265 F.R.D. 246, 257-58 (E.D. Va. 2009).

Based on the relevant adequacy factors, the Court finds that the relief provided by the settlement is reasonable and adequate under Federal Rule of Civil Procedure 23(e)(2) in light of the costs and risks of further litigation.

## III. Attorneys' Fees

### A.   Reasonableness of Attorneys' Fees and Costs

To determine whether the attorneys' fees requested by Class Counsel are reasonable, the Court has considered the 12 <u>Johnson</u> Factors and the seven <u>Gunter</u> factors.

The Court finds that the following <u>Johnson</u> factors weigh in favor of the reasonableness of the requested fee award: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for legal work; (6) the attorney's expectations at the outset of litigation;; (7) the amount in controversy and the results obtained; (8) the experience, reputation[,] and ability of the attorney; and (9) attorneys' fees awards in similar cases.[6]

---

[6] The Court does not consider: (1) the time limitations imposed by the client or circumstances; (2) the undesirability of the case within the legal community in which the suit arose; or (3) the nature and length of the professional relationship between attorney and client. Class Counsel has offered no evidence that these three factors are relevant to this case nor does the Court have any independent reason to think that these factors would affect its analysis.

Similarly, the Court finds that the following <u>Gunter</u> factors weigh in favor of the reasonableness of the requested fee award: (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys' involved; (3) the complexity and duration of the case; (4) the risk of nonpayment; (5) awards in similar case; (6) objections; and (7) the amount of time devoted to the case by plaintiffs' counsel.

Balancing these factors — and emphasizing the duration and complexity of this case as well as the risk of non-payment — the Court finds that a fee award of $2,871,000 (i.e., 33% of the settlement fund), inclusive of costs, is reasonable.

### i. The results obtained for the class. <u>Gunter</u> factor. Amount involved and result obtained. <u>Johnson</u> factor.

Class Counsel believe that they have secured three "substantial benefits" to the class. First, for class members with outstanding loans, who are not 210 days or more in default, Big Picture and Ascension will not collect more than 2.5 times the principal loan amount on any loan issued during the class period. Final Approval Mem. at 3, ECF No. 105. Second, for class members with outstanding loans, who are 210 days or more in default, Big Picture and Ascension will cancel the loans and cease any collection attempts; they also agree not to sell, transfer, or assign "any interest in these charged-off loans or future loan proceeds from the charged-off loans." Final

26

Approval Mem. at 3, ECF No. 105.  Finally, for class members who have already paid off their loans at interest rates higher than 2.5 times the principal loan amount, the Settling Defendants will establish an $8.7 million Settlement Fund from which those class members can make claims.  Final Approval Mem. at 3, ECF No. 105.  Claimants will receive a pro rata share of the Settlement Fund once deductions have been made for (1) settlement administration expenses, (2) court-awarded attorneys' fees and costs, and (3) class representative service awards. Final Approval Mem. at 3, ECF No. 105.  Notably, the settlement has no effect on class members claims against the non-Settling Defendants.  Final Approval Mem. at 3, ECF No. 105.  And, only class members "who affirmatively elect to obtain a cash claim payment release their individual claim" (i.e., there is no general class member release for individual damages).  Final Approval Mem. at 3, ECF No. 105.

The Court has previously noted that the Settlement confers on over 400,000 class members "significant financial benefits . . . by significantly limiting, or eliminating, their obligations under quite burdensome loan agreements."  Final Approval Mem. at 22, ECF No. 105.  The Court reaffirms that belief here.  In perspective of the relief sought and the challenges of continuing with litigation in this case, the benefits the Settlement provides to class members are significant and

27

valuable.   This factor weighs in favor of the reasonableness of the requested fees.

> ii. **The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel.** _Gunter_ **factor.**

Here, even with a 99.96% notice delivery rate, SUPPL. ALCS DECL. ¶ 7, ECF No. 108-1, none of the 491,018 class members objected to the settlement or the fees requested by counsel. SUPPL. ALCS DECL. ¶ 7.   This factor weighs in favor of the reasonableness of the required fees.

> iii. **The quality, skill, and efficiency of the attorneys involved.** _Gunter_ **factor. The requisite skill required and the experience, reputation and ability of the attorneys.** _Johnson_ **factor.**

Class Counsel submitted a list of all of their accomplishments representing plaintiffs in complex and class action lawsuits and particularly in the areas of consumer financial protection law and tribal lending suits.   _See_ DECL. KRISTI C. KELLY ¶¶ 5-6, 10, ECF No. 105-1; DECL. BETH E. TERRELL ¶¶ 3-4, ECF No. 105-2; DECL. LEONARD A. BENNETT ¶¶ 13-14, 16-18, ECF No. 105-3; DECL. MICHAEL A. CADDELL ¶¶ 3, 11-13, 15, ECF No. 105-5; DECL. E. MICHELLE DRAKE ¶¶ 10, 12, ECF No. 105-6; DECL. MATTHEW W.H. WESSLER ¶ 2, ECF No. 105-7; DECL. ANNA C. HAAC ¶ 5-7, ECF No. 105-8.   The Court has no doubt that Class Counsel are competent, experienced, and skilled attorneys.   The Court finds

that this factor points towards the reasonableness of the
requested attorneys' fees.

> **iv. The complexity and duration of the litigation and the amount of time devoted to the case by Class Counsel. <u>Gunter</u> factors. The time and labor expended, the novelty and difficulty of the questions, and the requisite skill required. <u>Johnson</u> factors (last factor also listed in (iv) above).**

The Court has already noted that this matter is complex and
has involved numerous, diverse issues with several moving parts,
including the thorny question of sovereign immunity. <u>See</u> Dec.
20, 2019 Hearing Tr. at 37-38, 56, ECF No. 66. This factor
strongly points towards the reasonableness of the requested
percentage award.

> **v. The risk of nonpayment. <u>Gunter</u> factor. The attorney's expectations at the outset of litigation. <u>Johnson</u> factors.**

All members of class counsel operated on a contingency
basis in this case. <u>See</u> Final Approval Mem. at 26-27, ECF No.
105. And, as class counsel note, there was a very real risk
that the class would not succeed at trial and thus a very real
risk of nonpayment. <u>See</u> Final Approval Mem. at 19, ECF No. 105.
This factor therefore weights in favor of the reasonableness of
the award.

### vi. Awards in similar cases. <u>Gunter</u> and <u>Johnson</u> factor. Customary fee or rates. <u>Johnson</u> factor

A percentage award of 33% of a common fund is a bit on the high side for this circuit and in general,[7] but it is certainly not outside of the realm of reasonable percentage awards, <u>see, e.g.</u>, <u>In re Celebrex (Celecoxib) Antitrust Litig.</u>, No. 2:14-cv-361, 2018 WL 2382091, at *5 (E.D. Va. Apr. 18, 2018 (awarding 33% fee in an antitrust class action settlement), particularly given that the award will be inclusive of costs. Moreover, as noted in the analysis of other factors, this was a complex case that had been litigated for three years before the parties began settlement negotiations. This factor points in favor of the reasonableness of the award.

### vii. Lodestar Cross-Check

Here, the lodestar calculation is somewhat more complicated than is typical. First, the lodestar is a function of combining the hours, billing rates, and billing judgment of six different

---

[7] The mean award in the Fourth Circuit is reported to be 27.7%. Rubenstein, 5 <u>Newberg on Class Actions</u> § 15.83 (5th ed.). "An earlier edition of the Treatise reported that (then-available) empirical studies showed that fee awards in class actions average around one-third of the recovery, a statement quoted by many courts. More recent empirical data on fee awards demonstrate that percentage awards in class actions are generally between 20-30%, with the average award hovering around 25% . . . . Usually, 50% of the fund is the upper limit on a reasonable fee award from any common fund." <u>Id.</u> (citations omitted).

law firms[8] (i.e., Kelly Guzzo, PLC, Terrell Marshall Law Group, PLLC, Consumer Litigation Associates, P.C., Caddell & Chapman, Berger Montague, PC, and Gupta Wessler PLLC).[9]   Second, Class Counsel, and even the underlying cases, are not all from the same judicial district.   At the Court's request, Class Counsel from outside the Richmond area attempted to adjust their rates to match those benchmarks outlined by Class Counsel members from the Richmond area; nevertheless, there was some subtle variation among rates for people who appear to have comparable levels of experience.   Finally, because this case involved both Settling and non-Settling Defendants, Class Counsel has tried to tease out what time they spent on matters related to the Settling Defendants versus the non-Settling Defendants (with whom litigation is ongoing); however, not everyone used the same approach to that calculation.

Because of the aforementioned challenges, more subjectivity has been introduced into the relatively objective lodestar

---

[8] Lawyers from seven different law firms were appointed as Class Counsel by virtue of the complicated procedural history of this case and the fact that this Settlement resolves claims from nine different cases.   Final Approval Mem. at 1, ECF No. 105.   Class Counsel have represented to the Court that every piece of the class counsel team has had a leadership role in some aspect of the case and that all members actively participated in litigating this case.   Dec. 20, 2019 Tr. at 38-39, ECF No. 66.
[9] Although two attorneys from the law firm of Tycko & Zavareei, LLP were named as Class Counsel, see PRELIM. APPROVAL ORDER, ECF No. 65, they have not submitted any billing rates or hours for the Court's approval.

calculation than is normal.  Nevertheless, the Court appreciates having detailed information on the hours Class Counsel worked, what they worked on, and some sense of Class Counsel's "Richmond rates."  Moreover, the Court is mindful that the lodestar calculation is only a cross-check on the reasonableness of the 33% percentage fee.  "[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.  Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case."  <u>Jones v. Dominion Resources Services, Inc.</u>, 601 F. Supp. 2d 756, 767 (S.D.W. Va. 2009) (quoting <u>Goldberger v. Integrated Res.</u>, 209 F.3d 43, 50 (2d Cir. 2000)).

By Class Counsel's calculation, the lodestar figure is $4,238,589 — excluding out-of-pocket costs which Class Counsel report amount to $202,709.  Final Approval Mem. at 27-28, ECF No. 105.  That lodestar figure is based on 8,989.74 hours of work.  <u>See</u> DECL. KRISTI C. KELLY at 13,15, ECF No. 105-1; DECL. BETH E. TERRELL at 7-8, ECF No. 105-2; DECL. LEONARD A. BENNETT at 10, ECF No. 105-3; DECL. MICHAEL A. CADDELL at 19, ECF No. 105-5; DECL. E. MICHELLE DRAKE at 12, ECF No. 105-6; DECL. MATTHEW W.H. WESSLER at 5, ECF No. 105-7.  Because the requested fee award is $2,871,000, the lodestar multiplier is 0.65.  Final Approval Mem. at 28, ECF No. 105.  A multiplier of 0.65 is, unsurprisingly below average both nationally and in this

Circuit. Rubenstein, 5 Newberg on Class Actions § 15.87 (5th ed.).  But, negative below-average multipliers have been found reasonable before.  In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., 2020 U.S. Dist. LEXIS 181103, 2020 WL 5757504, *76, *84 (E.D. Va. 2020 Sept. 4, 2020). Under the circumstances of this case, the Court is satisfied that the lodestar cross-check demonstrates that the requested fee award (i.e., 33% of the Settlement Fund) is commensurate with the time and effort expended by Class Counsel and is not an unwarranted windfall payment.[10]

**B.    Service Awards**

Here, Named Plaintiffs request $5,000 each which will be paid from the overall Settlement Fund.  Final Approval Mem. at 10, ECF No. 105.  These awards are meant to compensate the Named Plaintiffs for "their efforts in prosecuting this case, including retaining counsel, assisting in discovery (including depositions) and keeping abreast of the litigation."  Final Approval Mem. at 10, ECF No. 105.  Moreover, say Class Counsel, "Plaintiffs put their reputations on the line to assist with a nationwide lawsuit to combat predatory lending across the

---

[10] However, for the purposes of future award calculations in other cases in this district, the Court does not take a position on the reasonableness of the individual rates submitted by each and every member of Class Counsel or to the approaches the various firms took to determining the time spent on work for one defendant versus another.

country." Final Approval Mem. at 10, ECF No. 105. And, "[s]ome Plaintiffs were previously offered $5,000 to settle the claims individually." Final Approval Mem. at 10, ECF No. 105.

A service award of $5,000 is not inherently unreasonable, see Rubenstein, 5 Newberg on Class Actions § 17.8 (5th ed.), but here, the award requested is concerning on several fronts: (1) the amount of the requested service awards relative to the benefits for which most class members under the Settlement are eligible, (2) the total amount of the service awards requested (i.e., $210,000) is quite high, and (3) it is not clear that all 42 Named Plaintiffs were equally involved or faced equal risk in representing the class.

First, under the terms of the Settlement, the vast majority of class members are not eligible to receive a cash award as high as $5,000. Out of approximately 491,000 class members only 129,287 are even eligible for a cash damage award. Final Approval Mem. at 9, ECF No. 105. And based on claims submitted as of November 30, 2020, only 72 class members (1.7% of 4,245) could receive a cash damage award of more than $5,000 and only 1,434 class members (33.8% of 4,245) could receive an award between $1,000 and $5,000. SUPPLEMENTAL DECLARATION OF AMERICAN LEGAL CLAIM SERVICES, LLC REGARDING NOTICE DISSEMINATION ("ALCS Supplemental Declaration") at 2-3, ECF No. 108-1. If 15% of the class members eligible for cash damages submitted claims for a

34

cash award, <u>none</u> of the class members would receive an award as high as $5,000. ALCS Suppl. Decl at 3, ECF No. 108-1 (showing that the maximum cash award would be $3,019). This is not to say that the Settlement's non-cash benefits are not valuable, only that there would be an appearance of impropriety if all 42 Named Plaintiffs received a service award so far out of reach for the vast majority of the class.[11]

Second, because there are 42 Named Plaintiffs, an award of $5,000 each becomes $210,000 total, and, in the Court's experience, a total service award of $210,000 is unusual, though certainly not unprecedented, <u>see, e.g.</u>, <u>Ingram v. The Coca-Cola Co.</u>, 200 F.R.D. 685, 688, 694 (N.D. Ga. 2001) (awarding, in an employment discrimination suit, $300,000 each to four class representatives, for a total of $1.2 million in incentive awards, where class members were guaranteed payments averaging approximately $38,000).

Finally, in the Court's view, all 42 Named Plaintiffs have not been equally involved in the litigation of this case. Class Counsel submitted documentation showing that the majority

---

[11] "[A] a primary risk of incentive awards is that they skew the class representative's interests so as to conflict with those of the class she purports to serve. . . . Courts have therefore long attempted to ensure that the size of potential incentive awards are not excessive, lest the class representative's interests so significantly diverge from those of the class that she ceases to be an adequate representative of the class under Rule 23(a)(4)." Rubenstein, 5 <u>Newberg on Class Actions</u> § 17.18 (5th ed.) (Citations omitted).

of the Named Plaintiffs were not deposed and did not respond to written discovery.   See SUPPLEMENT TO PLAINTIFF'S MOTION FOR APPROVAL FO CLASS ACTION SETTLEMENT, ECF NO. 111.   Class Counsel argue that "[w]hile different class members spent different time assisting in these cases, every representative made the same commitment in agreeing to serve, regardless of burden.   Every representative had to absorb the reputational impact of having their name used and made available nationally as a debtor and consumer victim."   SUPPL. DECL. OF LEONARD A. BENNETT, ECF NO. 111-1.   The Court is not persuaded.   Every Named Plaintiff may have faced comparable reputational risks; every Named Plaintiff did not do the same work.

In view of the aforementioned concerns, an award of $5,000 will be given to any Named Plaintiff who was deposed and who was required to answer written discovery; an award of $4,000 will be given to any Named Plaintiff who was required to answer written discovery or who served on the Creditor's Committee in the Eventide bankruptcy proceedings;[12] and an award of $3,000 will be

---

[12] See In Re Eventide, LLC, No. 20-40349 (Bankr. N.D Tex.). Class Counsel have represented to the Court that Named Plaintiffs were brought into the related Eventide bankruptcy proceedings by virtue of their service as Named Plaintiffs in this case. Certain Named Plaintiffs served on a Creditors Committee where they advocated for the dismissal of the bankruptcy and for this Court to continue to handle the Big Picture Loans litigation and settlement. Ex. 2 at 4, ECF No. 111-2. Committee members had to attend weekly meetings. Ex. 2 at 4, ECF No. 111-2.

given to any other Named Plaintiff. With this award scheme, the total service award payment would be $146,000.

## CONCLUSION

Having measured the relief obtained in perspective of the claims being pursued, the Settlement Agreement is fair, reasonable, and adequate in that it accords significant benefits to the class members. And, the Settlement Agreement is fair and adequate within the meaning of the test set by the Fourth Circuit in Jiffy Lube. For all the foregoing reasons, the Motion for Final Approval (ECF No. 105) should be granted.

It is so ORDERED.

/s/ REP
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 17, 2020

37